IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| WARFIELD HISTORIC | ) | Case Nos. 24-12500; 24-12506; |
| PROPERTIES, LLC, *et al.* | ) | 24-12504; 24-12508; 24-12511 |
| | ) | |
|     Debtors. | ) | (Jointly Administered Under |
| _____ | ) | Chapter 11 Case No. 24-12500) |
| | ) | |
| WARFIELD HISTORIC | ) | |
| PROPERTIES, LLC, *et al.* | ) | Adversary No. 25-00042-LSS |
| | ) | |
|     Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| TOWN OF SYKESVILLE | ) | |
| | ) | |
|     Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS, AND HEARING REQUEST</u>**

Timothy F. Maloney (Bar No. 03381)
Alyse L. Prawde (Bar No. 14676)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 207702
(301) 220-2200 (telephone)
tmaloney@jgllaw.com
aprawde@jgllaw.com
*Attorneys for Plaintiffs*

i

## **TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………………………………...1

II.   FACTUAL BACKGROUND………………………………………………..3

    A. The State conveyed the Warfield Complex to the Town for the purpose of redeveloping the property and preserving the historic buildings……………....3

    B. The Town's sale of the Warfield Project…………………………………….4

    C. The COVID-19 pandemic dramatically changed the market………….…..…5

    D. The Town failed to develop or implement a meaningful affordable housing strategy……………………………………………………………………….6

    E. Plaintiffs' response to the collapse of the office and retail market……………..7

    F. The Town has consistently refused to meaningfully consider or even discuss any of Plaintiffs' reasonable proposals for Warfield……………………………..9

    G. The Town's actions as to the Zoning Text Amendment…………………………11

    H. The Town's interference with State grants………………………………….....16

    I. Litigation in circuit court…………………………………………………....17

III.  STANDARD OF REVIEW………………………………………………...18

IV.   ARGUMENT……………………………………………...……………………19

    A. The Town is not entitled to judgment on the pleadings as to Plaintiffs' claim for breach of the implied duty of good faith and fair dealing……………………19

    B. The Town and the Plaintiffs were not engaged in contract zoning…………....22

    C. Plaintiffs substantially complied with the LGTCA notice, and the Town was not prejudiced…………………………………………………...………………26

    D. The Town does not have governmental immunity as to Counts II and III………31

V.    CONCLUSION………………………………………………………………..34

Plaintiffs Warfield Historic Properties, LLC, Warfield Historic Quad, LLC, Warfield Restorations, LLC, Warfield Center, LLC, and Warfield Properties, LLC, by and through counsel, file this Opposition to Defendant Town of Sykesville's Motion for Judgment on the Pleadings and for cause state as follows:

## I.   INTRODUCTION.

There is no lawful basis for the Town of Sykesville's motion for judgment on the pleadings. The parties were first engaged in litigation in the Circuit Court for Carroll County for nearly a year, in which extensive discovery was conducted, including the exchange of thousands of pages of documents and the conducting of depositions. The parties have continued to engage in substantial written discovery in this Court. There are extensive factual questions at issue in this case—which involves the Town's sale of the Warfield Complex to Plaintiffs after the Town's ownership of the property for more than 15 years—that cannot be resolved on a motion for judgment on the pleadings.

Plaintiffs have sufficiently pled that the Town has breached an implied duty of good faith and fair dealing pursuant to the Disposition and Development Agreement ("DDA"), which is recorded against the deed for the Warfield Project, and the various agreements entered into by the Town and Plaintiffs, including the Purchase and Sale Agreement, Preservation Agreement, Reversion Agreement, and Escrow Agreement. These agreements obligated the Town to cooperate with Plaintiffs and not interfere with, frustrate, or obstruct Plaintiffs' ability to perform under the Agreements. Yet, the Town breached the duties of good faith and fair dealing required by the Agreements in its refusal to meaningfully consider Plaintiffs' proposals, its denial of Plaintiffs' due process and refusal to provide a fair hearing, its interference with the Planning Commission's consideration of the Zoning Text Amendment, and its violation of the State's

1

Open Meetings laws, among other acts.

While the Town argues that any contractual obligation related to approval of the Zoning Text Amendment would be illegal contract zoning, this argument fails because (1) the basis for Plaintiffs' breach of contract based on the implied duty of good faith and fair dealing is not that the Town did not approve the Zoning Text Amendment but rather that the Town improperly interfered with the Planning Commission's consideration of the Zoning Text Amendment and failed to provide Plaintiffs with a fair hearing and due process; and (2) there was no "express and legally binding contract" between Plaintiffs and the Town's zoning authority that would amount to "contract zoning." *Bollech v. Charles Cnty.*, 166 F. Supp. 2d 443, 453 (D. Md. 2001).

The Town's request to dismiss Count II (false light) and Count III (tortious interference with contract) on the basis that Plaintiffs did not strictly comply with the LGTCA notice requirement should be rejected. The notice requirement does not apply if the local government had actual or constructive knowledge of the claim or the circumstances giving rise to the claim. *See* Md. Code Ann., CJP § 5-304(e). The Town undoubtedly had actual and/or constructive knowledge regarding Plaintiffs' claims and/or the circumstances of those damages, as they were inflicted by the Mayor and were raised in the prior litigation in the Circuit Court for Carroll County. Further, the Town has not alleged that it was prejudiced in any way in how notice was provided.

The Town also does not have governmental immunity as to Counts II and III because its conduct was proprietary in nature, not governmental. As repeatedly pled in the Complaint, the Town's conduct towards Plaintiffs has been motivated by a desire to "take back" the Warfield property without compensation to Plaintiffs, *i.e.*, for the Town to take ownership of this property—which it previously owned for over 15 years—in order for the Town to benefit

financially from the property.

For the reasons set forth herein, the Town's motion for judgment on the pleadings should be denied in its entirety.

## II.    FACTUAL BACKGROUND.

### A.    The State conveyed the Warfield Complex to the Town for the purpose of redeveloping the property and preserving the historic buildings.

On December 17, 1999, the Town and the State of Maryland signed a Letter of Intent for the State to transfer the Warfield Complex, which is now known as Warfield at Historic Sykesville (the "Warfield Project"), to the Town. (Compl. ¶ 14). The Warfield Project includes historic buildings that were previously part of a State-run psychiatric hospital center but had been largely vacant and in disrepair by the late-1990s. (*Id.* ¶¶ 12-13). The Town acquired the Warfield Project pursuant to a Disposition and Development Agreement ("DDA"), which was executed in November 2002. (*Id.* ¶ 14). The DDA was recorded against the deed to the Warfield Project, and its many obligations imposed by the State remain in effect to this day. (*Id.*).

Although the DDA acknowledged the Town's original desire to develop the Property "principally as an employment center/office park," it stated a contingency that:

> in the event that the Carroll County Public Water Supply becomes sufficient to sustain high-density residential development, the Town shall investigate the feasibility of incorporating residential development into its plans for [the Warfield Project… [and] [i]f residential development is determined feasible, the Town shall employ reasonable efforts to incorporate residential options into the Project…

(*Id.* ¶ 15). The water supply condition was satisfied in 2015. (*Id.*). The DDA further requires that "the Town shall use reasonable efforts to design and develop [the Warfield Project] in accordance with Smart Neighborhood Protocols." (*Id.* ¶ 16).

For nearly two decades, the Town did little to nothing to comply with its obligations to

develop the Warfield Project in accordance with the DDA and committed limited financial resources to protect or stabilize the historic buildings. (*Id.* ¶¶ 18-19). The Town did not undertake reasonable or successful efforts to market the Warfield Project or otherwise identify users for the historic buildings. (*Id.* ¶ 20). The Town refused to look at expanding residential options for the Warfield Project, even though doing so was required by DDA. (*Id.*).

**B. The Town's sale of the Warfield Project.**

On April 27, 2014, a Purchase and Sale Agreement ("PSA") was signed, with the Town agreeing to sell the Warfield Project to the Warfield Collaborative, LLC, a group headed by investor Roger Conley, who was and who remains the principal investor in the Warfield Project. (*Id.* ¶ 25). The Warfield Project includes four vacant parcels (Parcels A, B, C, and H) and a parcel where the historic buildings are located (Parcel D). (*Id.* ¶ 26). The sale did not close until June 2018, when the Warfield Collaborative, LLC's successor entities, Plaintiffs Warfield Historic Properties, LLC and Warfield Historic Quad, LLC, paid approximately $8.2 million for about 63 acres, which comprise the Warfield Project. (*Id.* ¶ 27).

On June 26, 2018, Plaintiffs Warfield Historic Properties, LLC and Warfield Historic Quad, LLC and the Town entered into three inter-related agreements: 1) the Parcel D Preservation Agreement (the "Preservation Agreement"); 2) a Reversion Agreement (the "Reversion Agreement"); and 3) the Parcel D Escrow Agreement (the "Escrow Agreement"). (*Id.* ¶ 28). Under the Escrow Agreement, Plaintiffs agreed to establish and fund three escrow funds, including the Parcel D Escrow Fund I, as defined in the Escrow Agreement. (*Id.* ¶ 29). The purpose of the funds in the Parcel D Escrow Fund I was to distribute funds to Plaintiffs to pay for costs and expenses incurred in connection with performing work to improve Parcel D. (*Id.*). The Escrow Agreement does not allow the Town to use monies in Parcel D Escrow Fund I

4

(or any of the escrow funds) for its own purposes. (*Id.*). The only reason the Deed of Trust note was made in favor of the Town was because the PSA transaction was structured, for better or for worse, to have Parcel D Escrow I carried on the Town's balance sheet. (*Id.*).

The Town benefitted significantly from the sale of the Warfield Project, with sales proceeds going to, among other things, the repayment and resolution of over $7 million in debt owed by the Town to the State and Carroll County, including principal and accrued interest. (*Id.* ¶ 30). Plaintiffs reimbursed the Town for the Town's expenses in connection with the PSA. (*Id.*). Plaintiffs spent nearly $700,000 paying the Town's legal expenses to clear title, resolve claims, and correct easements and other encumbrances. (*Id.*). Plaintiffs also paid an eleventh-hour exaction imposed by the Town in the amount of $250,000 for town park improvements and $500,000 due from the Town to the State of Maryland Community Trust Fund. (*Id.* ¶ 31).

The Warfield Collaborative was diligent in its planning and marketing efforts immediately upon signing the PSA. (*Id.* ¶ 32). The Warfield Collaborative and Plaintiffs made major investments in the Warfield Project and initially marketed the project as a primarily non-residential project. (*Id.* ¶ 33). Their early focus on non-residential was largely driven by pressure being exerted by Carroll County on both the Town and Plaintiffs as they worked their way through obligations under the PSA in the run up to closing in 2018. (*Id.*).

The first major development within the Warfield Project was 145 high-end townhouses known as Parkside at Warfield ("Parkside"), which are substantially complete and sold-out. (*Id.* ¶ 34).  While Parkside has been successful, the State officials who reviewed the development plans have made it clear that a greater range of housing choices and price ranges are necessary to support the housing demands of the surrounding area in accordance with the DDA. (*Id.* ¶ 35).

**C.  The COVID-19 pandemic dramatically changed the market.**

The impact of COVID-19 on the development community, including Plaintiffs, was immediate and catastrophic. (*Id.* ¶ 37). Every aspect of development was impacted including construction, supply chain, lending, the availability of workforce, engineering, planning and design. (*Id.*). The long-term impact of COVID-19 on the Warfield Project is more significant, as large portions of the workforce began working from home and have not returned to the office. (*Id.* ¶ 38). Landlords have reported extraordinarily high office vacancy rates, and many have been on the verge of foreclosure and bankruptcy. (*Id.*). Many major lenders will not finance new office construction. (*Id.*). The market for new office space largely disappeared. (*Id.*).

There has been a similar dynamic for retail uses. (*Id.* ¶ 39). The pandemic exacerbated this trend, and retail vacancies have been at record high levels. (*Id.*). Many shopping centers have closed or converted to other uses. (*Id.*). Major financial institutions mostly stopped lending for new retail projects. (*Id.*). Job growth, a primarily driver of commercial and industrial real estate demand, was anemic in Sykesville and Carroll County, and the effects of Covid-19 dashed any reasonable hope that the Warfield Project would be viable as a mixed-use project primarily focused on commercial, industrial, and retail development. (*Id.* ¶ 40).

**D.  The Town failed to develop or implement a meaningful affordable housing strategy.**

In contrast to the collapse of new office and retail construction, the residential market had a resurgence. (*Id.* ¶ 41). There is a housing shortage for all housing types across all price points and a particularly high demand for workforce housing. (*Id.*). The workforce housing shortage is particularly acute in Sykesville and the region. (*Id.* ¶ 42).

For years, the Town has failed to develop and implement any meaningful affordable housing strategy or approve zoning changes to permit residential development to increase its housing stock to provide housing choice, despite being legally obligated to do so. (*Id.* ¶ 43).

State law requires that comprehensive plans for all Maryland jurisdictions include a housing element and that local jurisdictions appropriately plan for both low-income and workforce housing. (*Id.* ¶ 44). The most recent federal Census confirms the lack of affordable housing in the Town. (*Id.* ¶ 46). The Town's 2010 Master Plan reported that Sykesville had "the lowest number of vacant units in the region." (*Id.*). This lack of accessibility can be directly linked to the Town's resistance to affordable housing. (*Id.*). Although there is indisputably a high market demand for affordable multi-family housing, the Town actively resisted allowing additional housing supply to meet this demand. (*Id.* ¶ 48). An element of a Sustainable Communities Plan is municipal commitment to affordable housing. (*Id.* ¶ 49). Performance against the benchmark set by the approved plan is supposed to guide State funding to local jurisdictions. (*Id.*). By any measure, the Town's affordable housing commitment has fallen short of any benchmark. (*Id.*).

**E. Plaintiffs' response to the collapse of the office and retail market.**

In response to the extraordinary changes in commercial and retail demand, Plaintiffs made Herculean efforts to create a development proposal that would meet market demand, be consistent with the State's vision for the Warfield Project, be financed in this new environment, and would serve the Town and the larger community in a sustainable way, consistent with the culture of the community and the history of the Warfield Project and the DDA. (*Id.* ¶ 54). Plaintiffs conducted feasibility studies, surveyed potential users and partners, met with stakeholders, and, importantly, led efforts to obtain State financing and other support to make the project feasible, even in a market that had profoundly changed. (*Id.* ¶ 55).

Plaintiffs developed a project concept that included a mix of residential and other uses that could be financed and constructed in this unprecedented new market and that addressed the significant cost of restoring empty historic buildings. (*Id.* ¶ 56). To ensure that the project could

7

be financed and sustainable, Plaintiffs undertook unprecedented efforts to obtain State financial support for the project, creating the Catalytic Revitalization Tax Credit ("CRTC"), designed specifically to support the Warfield Project and similar projects. (*Id.* ¶ 57). In 2022, the State Department of Housing and Community Development ("DHCD") announced that the Warfield Project was the first recipient of the $15 million CRTC award. (*Id.* ¶ 58). The DHCD has indicated that there is a strong prospect for substantial additional funding including Federal Low-Income Housing Tax Credits of around $15 million and tax-exempt housing bond financing estimated in excess of $20 million. (*Id.* ¶ 59). In addition, the Warfield Project would be eligible for millions in historic preservation tax credits through the State and federal government. (*Id.*).

All of these incentives combined are necessary to overcome the high cost of preserving the Warfield Project's historic buildings and environmental remediation including extensive asbestos and lead abatement. (*Id.* ¶ 60). The magnitude of state and federal support necessary to make the Warfield Project viable was widely understood by local, county, and state officials long before Plaintiffs' involvement and continue to be discussed ad nauseum with officials. (*Id.* ¶ 61). The State has committed significant support toward Plaintiffs' redevelopment effort. (*Id.* ¶ 62).

Despite strong State support, the Warfield Project has been jeopardized by the active resistance of the Town's Mayor and Town Council. (*Id.* ¶ 64). Lender surveys and market and feasibility studies make it unequivocally clear that the Warfield Project cannot be redeveloped without a strong housing component and State financing for affordable housing. (*Id.* ¶ 66). The Town has remained adamantly opposed to the very elements necessary to make the Warfield Project successful. (*Id.* ¶ 67). Without access to both state and federal tax credits, including affordable housing tax credits and the tax-exempt bond financing, grants, and other incentives that typically accompany such tax credits, the unrestored historic buildings cannot feasibly be

rehabilitated nor is the overall Warfield Project financially viable. (*Id.*). The Town's failed stewardship of the property for 16 years makes it evident that the private market will not respond without major public support. (*Id.* ¶ 68). State financial support, including tax credits, tax-exempt bond financing, and grants cannot be obtained without a significant housing component. (*Id.*).

Recognizing these economic realities, Plaintiffs developed a mixed-use proposal consistent with the State's vision for the property. (*Id.* ¶ 69). The market-rate housing proposed under Plaintiffs' plan would allow development of a number of different housing types at a range of price points promulgated by the DDA. (*Id.* ¶ 70).

**F. The Town has consistently refused to meaningfully consider or even discuss any of Plaintiffs' reasonable proposals for Warfield.**

Plaintiffs were successful in identifying and/or securing millions of dollars in financial incentives to make the Warfield Project viable and sustainable, but these incentives cannot be fully realized without the Town's good faith cooperation and willingness to comply with the DDA and other State policies and directives. (*Id.* ¶ 71). Plaintiffs attempted to meet with the Town's Mayor, Stacy Link, and Town leaders in order to develop a consensus behind a development proposal for the Warfield Project that would be viable, sustainable, and consistent with the DDA. (*Id.* ¶ 72). To be viable and sustainable, a project must be capable of securing financing, meet market demand, and earn a reasonable return for investors. (*Id.*). Instead, the Town, largely through the actions of Mayor Link, acted in a concerted way to prevent any cooperation and to block and prevent the objective of the Agreements and the DDA. (*Id.* ¶ 73).

Mayor Link and the Town acted in bad faith and dealt unfairly with Plaintiffs with the express and stated purpose of reverting the Warfield Project back to the Town and causing unjust enrichment to the Town, even though Plaintiffs had paid $8.2 million for the Warfield Project and invested millions of dollars towards its future development. (*Id.* ¶ 74). Mayor Link

9

consistently refused to meet with Plaintiffs to discuss what type of development might reasonably meet these objectives and to gain an understanding of the complexities of developing such a large, multi-faceted project. (*Id.* ¶ 75). She made many public and private statements against the Plaintiffs, their principals, and their efforts with respect to the Warfield Project, but consistently refused to communicate with the Plaintiffs concerning the Warfield Project. (*Id.*). Mayor Link has undertaken extraordinary efforts, both public and private, to disparage Plaintiffs and the Warfield Project. (*Id.* ¶ 76). Her refusal to consider the project in a fair and open-minded manner was not surprising. (*Id.* ¶ 77). As a candidate for mayor in 2021, she campaigned on the theme of "taking the project back," *i.e.,* wresting control of the Warfield Project away from Plaintiffs and having the Town reassume ownership through any means possible. (*Id.*).

It is also clear that the Town's resistance is motivated to a great degree by opposition to residential development, affordable housing in particular, and an animus toward residents of affordable housing projects. (*Id.* ¶ 80). Town officials and individuals close to Mayor Link and other Town officials have made many comments in opposition to affordable housing options. (*Id.*).

Somewhat surprising was Mayor Link's departure from the course of dealing established between Plaintiffs and the Town's mayor. (*Id.* ¶ 78). Going back to the negotiation of the PSA in 2013 and 2014, meetings between the Town mayor and Plaintiffs (which occurred sometimes with, but just as often without, the Town manager and/or Town attorney) were commonplace to discuss, negotiate, and collaborate on important issues and details concerning the Warfield Project prior to introduction in a public forum. (*Id.*). Such meetings between counterparties in contractual and/or business relationships and elected officials (particularly those with significant delegated authority and/or in smaller jurisdictions) are commonplace. (*Id.* ¶ 79).

10

In addition to refusing to discuss the Warfield Project, the Town provided minimal staff analysis of the impact of the project or potential alternatives, the significant financing and marketing issues associated with the project, obligations under the DDA, or the Town's contractual obligations. (*Id.* ¶ 81). Mayor Link continuously made active efforts to impede the Warfield Project, foment opposition, and impugn Plaintiffs and their principals and consultants, and prevent a vigorous and balanced public conversation about an economic development project of great significance to the Town, County, and State. (*Id.*). Mayor Link has gone to extraordinary lengths to prevent the DDA from being implemented and seeking to retake Plaintiffs' property, including changing the municipal code over the Christmas holiday, without public input, in order to place on the Planning Commission a non-resident because of his avowed opposition to the Warfield Project; conducting private meetings with businesses and citizens to foment opposition to the Warfield Project; providing false, unvetted, self-generated and exaggerated school impact estimates concerning the project; and defaming Plaintiffs and their principals. (*Id.* ¶ 82).

Mayor Link has interfered with contractors and others who had potential business relationships with Plaintiffs. (*Id.* ¶ 84). She called at least two of Plaintiffs' key contractors, improperly asking them to provide her with proprietary and confidential information, including reports, contracts, and status of work. (*Id.*). During those calls, Mayor Link disparaged Plaintiffs, told the contractors that the Town would soon own the property, and that the contractors might not be paid by Plaintiffs. (*Id.* ¶ 85). Mayor Link's interference and defamation impeded the Plaintiffs' preservation efforts among other things. (*Id.*).

### G.  The Town's actions as to the Zoning Text Amendment.

Despite the ongoing opposition and lack of cooperation from the Town to Plaintiffs and the Warfield Project, Plaintiffs pressed ahead to amend the Warfield Project's zoning. (*Id.* ¶ 86).

11

Plaintiffs filed a petition for zoning text amendment (the "ZTA") with the Town on December 13, 2021, to, among other things, modify portions of the Planned Employment Center ("PEC") district to allow for a shift in development density from commercial to residential. (*Id.* ¶ 87). The petition was based largely on the provisions of the DDA, which makes clear the State's preference for housing over non-residential uses to the point of establishing that a more housing-focused project is a condition precedent to the dedication of State financial incentives to the Warfield Project. (*Id.* ¶ 88). The ZTA petition was supported by years of experience by the Town and Plaintiffs unsuccessfully marketing the Warfield Project as a commercially-focused project and numerous studies including third-party market, fiscal impact, economic impact, land planning, engineering, and architectural studies. (*Id.* ¶ 89). The ZTA would have allowed Plaintiffs to develop the Warfield Project for residential uses. (*Id.* ¶ 90).

Despite the extensive analysis and effort associated with the ZTA, Mayor Link and the Town refused to discuss it or negotiate in any way. (*Id.* ¶ 91). The Town failed to provide any fair process normally associated with municipal land use applications and required by state law, which is especially concerning given that the Town had a contractual obligation to act in good faith under its agreements with Plaintiffs. (*Id.*). Immediately after Plaintiffs filed the ZTA, Mayor Link began meeting with various business owners and residents to disseminate her opposition to the zoning change. (*Id.* ¶ 92). During the five months between the submission of the ZTA and the public hearing on May 3, 2022, Mayor Link met on numerous occasions with various groups of residents, business owners, and others about the Warfield Project. (*Id.* ¶ 93). Mayor Link was often the only speaker about the Warfield Project and communicated unsubstantiated projections, invective about the motives of Plaintiffs, and incorrect information about the Warfield Project and its progress. (*Id.*). In many cases the information she presented

12

was at odds with formal reports, studies, and testimony in public meetings – instead giving her personal, largely negative interpretation. (*Id.* ¶ 94). For instance, she stated that "[t]hese guys have already made back all of their money," which was not true; she stated, "I don't trust these guys at all. If they told me my mother loves me, I wouldn't believe them," and that "[e]verything is a tax dodge with these guys"; and she stated that Plaintiffs had "done nothing to protect these historic buildings," despite almost $1 million from the escrow funds being spent and much more on additional efforts outside of the escrow funds. (*Id.*).

As the May 3, 2022 public hearing date got closer, Mayor Link held more meetings to encourage attendance in opposition to the ZTA, specifically soliciting negative public testimony. (*Id.* ¶ 95). She held meetings in April 2022, including one with about 20 business owners affiliated with the Downtown Sykesville Connection, a local merchant group and various members of the community. (*Id.*). Another meeting was held at the Parkside at Warfield townhouses on April 28, 2022. (*Id.* ¶ 96). The Town printed flyers that were delivered to residents' doorsteps, stating that the Mayor and a councilperson would be holding a "public information meeting" to explain the ZTA and take questions. (*Id.*). About 40 people attended the meeting, and Mayor Link explained that she wanted to "dispel misinformation about the zoning petition" that she referred to as "upzoning." (*Id.* ¶ 97). She did not use any of the analysis, projections, or conclusions from Plaintiffs' third-party studies, some of which the Town had required. (*Id.*). Instead, using apparently self-generated exaggerations of potential impacts, she described an extreme example of housing density that would increase the Town's population by 48% and said that school crowding would result. (*Id.*). Mayor Link stated that Plaintiffs tried to "sneak[]" in certain language in the ZTA but that she "found it." (*Id.*).

Mayor Link disparaged the Warfield Project, Plaintiffs, and the ZTA, and she stated that

she was working to build opposition to it. (*Id.* ¶ 98). Mayor Link's active efforts to build opposition to the ZTA from the outset was unprecedented and is unlawful and demonstrates bad faith. (*Id.* ¶ 99). The Town routinely shifted hearing dates, took the project on and off the agenda at the last minute, and failed to provide any significant hearing to allow Plaintiffs to present the details of a project of this magnitude. (*Id.* ¶ 100).

The Mayor and Town Council took up the ZTA at a meeting on January 24, 2022. (*Id.* ¶ 101). After a presentation by Plaintiffs, the Mayor and Town Council voted to refer the ZTA to the Town of Sykesville Planning Commission (the "Commission") with instructions limiting the scope of the Commission's evaluation and review and tying the Commission's hands in a manner not authorized by the Town Code or State law. (*Id.*). The Mayor and Town Council and the Commission each have a distinct role to play in the process of considering petitions, such as the ZTA. (*Id.* ¶ 102).

When the project was finally referred to the Commission, the Mayor and majority of Councilmembers made an unprecedented appearance at two Commission meetings and had vigorous *ex parte* communications with the commissioners to ensure that the project would be defeated, all of which was captured on the Town video system and in text messages obtained by the Maryland Public Information Act. (*Id.* ¶ 104). This included Mayor Link texting Commission staff liaison asking if a councilmember could move for a five-minute recess so that Mayor Link could talk to that councilmember and to the chairman of the Commission outside of the public meeting and out of view of the cameras streaming the meeting. (*Id.* ¶ 105). The actions of the Mayor and Council were so severe that the Open Meetings Compliance Board found that the conduct violated the State's Open Meetings law, a ruling that the Town unsuccessfully appealed to the Circuit Court for Carroll County. (*Id.* ¶ 106). Mayor Link's conduct on that evening and

14

her conduct towards the Plaintiffs and the Warfield Project generally since her election have made it impossible for Plaintiffs to obtain a fair hearing or due process before the Commission or the Mayor and Town Council. (*Id.* ¶ 107). The Commission voted in opposition to the ZTA on April 4, 2022, and sent the matter back to the Mayor and Town Council with a negative recommendation. (*Id.* ¶ 108).

In response to the Town's continued opposition to the ZTA, the Secretary of the DHCD convened a meeting to address the status of the Warfield Project, explain how successful projects are financed, and attempt to break the deadlock. (*Id.* ¶ 109). DHCD representatives reiterated DHCD's strong support for the Warfield Project; the importance of residential development to the success of the Warfield Project consistent with the DDA; and the Town's contractual commitment to housing at the Warfield Project as a condition of receiving the property from the State under the DDA. (*Id.* ¶ 110). Soon after, the Mayor and Town Council summarily rejected the ZTA without any meaningful discussion or justification. (*Id.* ¶ 111).

This denial, along with Mayor Link's and the Town's other actions, placed in jeopardy the State's $15 million tax credit commitment to the Warfield Project, as well as the prospect of substantial additional State and federal support. (*Id.* ¶ 112). The Town's failure and refusal to reasonably address the proposed ZTA prevented Plaintiffs from: 1) moving ahead with developing the Warfield Project, which required the zoning entitlements to proceed as a matter of law; 2) prevented Plaintiffs from obtaining financing because lenders require the approval of the zoning entitlements prior to making loan commitments; and 3) prevented the Debtors from utilizing the substantial financial commitments of the State. (*Id.* ¶ 113).

The Town intentionally refused to work in good faith with Plaintiffs, despite contractual requirements to do so. (*Id.* ¶ 114). The Town refused to discuss or negotiate in good faith

planning and zoning issues or the economic feasibility of Plaintiffs' proposal or any alternatives. (*Id.*). Despite publicly rejecting Plaintiffs' plans and interfering with the Commission's consideration of the ZTA, Mayor Link and the Town did not take any steps to analyze the feasibility or marketability of the Town's desired uses for the property, including whether residential development within the Warfield Project would be compatible with the Town's 2030 Comprehensive Plan. (*Id.* ¶ 115-17). The Comprehensive Plan recognized that the "vacant historical buildings will continue to deteriorate" and that the Town needs to embrace "financially viable redevelopment strategies." (*Id.* ¶ 119). The Town's insistence on non-residential uses for the Warfield Project contradicts its Comprehensive Plan. (*Id.* ¶ 121).

## H.  The Town's interference with State grants.

Mayor Link and the Town actively obstructed $2.25 million in State grant funds that would have enabled Plaintiffs to fully perform under the Escrow and Preservation Agreements. (*Id.* ¶ 129). These grants, which were already fully committed by the State, would have enabled total investment of up to $4.9 million in the stabilization and environmental remediation of the historic structures after matching required under the Preservation Agreement. (*Id.*). The need for State funding from grants to help offset the high cost of stabilizing, remediating, and renovating the Warfield Project's historic buildings was understood by all parties. (*Id.* ¶ 130). The first grant was never put to work in the Warfield Project because the Town refused to transfer the funds in a tax-efficient manner. (*Id.* ¶ 132).

After issues with the Town over the first DHCD grant, DHCD suggested that Plaintiffs identify a non-profit partner to act as a conduit for future grant awards. (*Id.* ¶ 133).  The State required all grant funds to be distributed to and administered by either a local jurisdiction or a non-profit. (*Id.*). Plaintiffs identified Community Foundation of Carroll County ("CFCC") and

16

submitted two additional grant applications, receiving awards for fiscal years 2022 and 2023 totaling $1.5 million. (*Id.*). Mayor Link disrupted the relationship between Plaintiffs and CFCC, ultimately leading to Plaintiffs losing another $1.5 million in grants committed to the Warfield Project by the State. (*Id.* ¶ 134). Eighteen months after establishing the working relationship, CFCC suddenly withdrew from the arrangement, and, upon information and belief, the Town's vocal opposition to the Warfield Project was a significant reason. (*Id.*).

Despite extraordinary efforts by Plaintiffs to obtain State and federal funding, the Town provided no support for these grant applications. (*Id.* ¶ 137). Instead, the Town's aggressive conduct has motivated partners and stakeholders to divert these grant proceeds to the Town and defer funding commitments for historic preservation. (*Id.*). The Town's active opposition to Plaintiffs' proposals has been a major obstacle in obtaining funding that would significantly address historic preservation, and in particular address the deterioration of the historic buildings which occurred as a result of the neglect by the Town during the 16 years it controlled the property. (*Id.* ¶ 138). The Town also interfered with Plaintiffs' grant from the Carroll County Department of Economic Development. (*Id.* ¶ 139).

## I.  Litigation in circuit court.

On May 25, 2023, the Town filed a Complaint against Plaintiffs Warfield Historic Properties, LLC and Warfield Historic Quad, LLC in the Circuit Court for Carroll County. *Town of Sykesville v. Warfield Historic Properties, LLC, et al.*, Case No. C-06-cv-23-000249. Plaintiffs filed a Counterclaim on August 18, 2023, in which Plaintiffs raised many of the same allegations raised in its Complaint in this case. (Ex. 1, Counterclaim).[1] The parties engaged in extensive

---

[1] "Courts are permitted to consider facts and documents subject to judicial notice at the motion to dismiss stage." *Baumann v. Advanced Tech. Servs.*, 2020 U.S. Dist. LEXIS 22983, *5 (D. Md. Feb. 10, 2020) (internal quotations omitted).

discovery in the circuit court. (Ex. 2, Circuit Court Docket). Plaintiffs filed a Suggestion of

Bankruptcy on March 26, 2024, and the case was stayed as to Plaintiffs. (*Id.*). On February 11,

2025, Plaintiffs filed an adversary proceeding Complaint in this Court. (ECF 1).

## III.    STANDARD OF REVIEW.

In deciding a Rule 12(c) motion for judgment on the pleadings, courts apply the same

legal standard that is applied for a Rule 12(b)(6) motion to dismiss. *Frey Agric. Prods., Inc. v.*

*Liberty Mut. Ins. Co.*, 2025 U.S. Dist. LEXIS 160207, *3-4 (D. Md. Aug. 1, 2025). Courts

therefore "assume that the well-pleaded facts alleged in the complaint are true and must draw all

reasonable factual inferences in favor of the non-moving party." *Id*. "The purpose of Rule

12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts,

the merits of a claim, or the applicability of defenses." *Bel Air Auto Auction, Inc. v. Great*

*Northern Ins. Co.*, 534 F. Supp. 3d 492, 500-01 (D. Md. 2021). "Ultimately, a defendant may not

prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would

permit recovery for the plaintiff." *Harriston v. Target Corp.*, 2025 U.S. Dist. LEXIS 78678, *6

(D. Md. April 25, 2025).

A Rule 12(c) motion is distinguishable from a Rule 12(b)(6) motion though because a

motion for judgment on the pleadings "requires the court to consider and decide the merits of the

case, on the assumption that the pleadings demonstrate that there are no meaningful disputes as

to the facts such that the complaint's claims are ripe to be resolved at this very early stage of the

litigation." *Id.* at *6. Therefore, a Rule 12(c) motion "should not be granted unless it appears to a

certainty that the non-moving party cannot prove any set of facts in support of its claim that

would entitle it to relief." *Id.*

IV.    **ARGUMENT.**

   E.  **The Town is not entitled to judgment on the pleadings as to Plaintiffs' claim for breach of the implied duty of good faith and fair dealing.**

   Plaintiffs have sufficiently pled that the Town breached an implied duty of good faith and fair dealing, and the Town therefore is not entitled to judgment on the pleadings as to Count I. Maryland contracts give rise to an implied duty of good faith and fair dealing. *Blondell v. Littlepage*, 413 Md. 96, 113 (2010). Such a duty "concerns the performance and enforcement of the contract itself," and "does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract]." *Id.* at 113-14 (internal quotations omitted); *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362 (2012). The implied duty of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing its obligations under the contract." *Blondell*, 413 Md. at 114 (quoting *Parker v. Columbia Bank*, 91 Md. App. 346, 366 (1992)). A plaintiff alleging that there was a breach of contract "must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *Polek*, 424 Md. at 362 (quoting *Cont'l Masonry Co. v. Verdel Constr. Co.*, 279 Md. 476, 480 (1977)).

   This is not a matter of Plaintiffs alleging that the Town has "new obligations about which the contract is silent" or that the Town needed to take affirmative steps beyond its contractual obligations. *Blondell*, 413 Md. at 114. Nor are Plaintiffs contending that the Court needs to rewrite the language of any contracts to impose obligations on the Town that are not found in the contracts. Rather, the Town had obligations pursuant to the Purchase and Sale Agreement, Preservation Agreement, Reversion Agreement, and Escrow Agreement (together, the "Warfield Agreements") to cooperate with Plaintiffs and not to interfere with, frustrate, or obstruct

19

Plaintiffs' ability to perform under these contracts. (Compl. ¶ 28). For instance, the Town had obligations under the Purchase and Sale Agreement "[d]uring the pendency of this Agreement and at all times before and after closing," to cooperate with Plaintiffs "in regard to submissions with respect to all proceedings related to any development plan, site plan, subdivision plan or plat approvals, zoning/master planning, and development, utility company contracts and construction permitting for the Property." (Ex. 3, PSA, ¶ 7(A)). The Town also had obligations to consent to "plans, applications, and other requests for governmental approval, and amendments thereto, which may be prepared by or at the direction of Purchaser, incident to Purchaser's proposed development and improvement of the Property." (*Id.*).

Additionally, the Town had obligations pursuant to the Disposition and Development Agreement ("DDA"), which is recorded against the deed to the Warfield Project, and which it has breached. (Compl. ¶¶ 14-18, 81, 88, 110, 154-56). These obligations included, but were not limited to, requiring that the Town "investigate the feasibility of incorporating residential development into its plans for [the Warfield Project]" and using reasonable efforts to incorporate residential options if doing so is feasible. (*Id.* ¶ 15). The DDA also required the Town to "use reasonable efforts to design and develop [the Warfield Project] in accordance with Smart Neighborhood Protocols." (*Id.* ¶ 16).

Plaintiffs have sufficiently pled in the Complaint "*facts* showing a contractual obligation owed by the defendant [Town] to the plaintiff and a breach of that obligation" by the Town and that the Town has impeded Plaintiffs' performance under the contracts. *Polek*, 424 Md. at 362. As pled extensively in the Complaint, the Town has breached the duty of good faith and fair dealing by acting "in such a manner as to prevent the other party [Plaintiffs] from performing [their] obligations under the contract." *Polek*, 424 Md. at 362. Plaintiffs have satisfied the

20

pleading requirements for a breach of contract, *i.e.*, that the Town owed Plaintiffs a contractual obligation and that the Town breached that contractual obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001).

Contrary to the argument in the Town's motion, Plaintiffs are not alleging that the Town breached the implied duty of good faith and fair dealing by not adopting the Zoning Text Amendment. (Def. Mot. at 11). Plaintiffs have instead pled that the Town's interference with and frustration of the ZTA process, its defamatory conduct towards Plaintiffs, actions in denying Plaintiffs due process and fair hearings related to the ZTA process, and refusal to even consider the viable proposals by Plaintiffs for residential development at the Warfield Project has impaired and impeded Plaintiffs' performance under the terms of the Agreements.

Plaintiffs have specifically pled that the Town had an implied duty of good faith and fair dealing under the Agreements, which required the Town to cooperate with Plaintiffs in order for all parties to obtain the full benefit arising out of the Agreements. (Compl. ¶ 152). The Town breached this duty of good faith and fair dealing in refusing to meaningfully consider Plaintiffs' proposals, failing to provide a fair hearing, denying Plaintiffs due process, interfering with the Commission's consideration of the ZTA, violating the State's Open Meetings laws, refusing to meet with Plaintiffs to have good faith discussions about the advancement of the Warfield Project, interfering with State grants, refusing to consider any proposal for the Warfield Project that would be viable, sustainable, and consistent with the DDA, and other acts. (*Id.* ¶ 155). The Town instead acted in a concerted way to prevent any cooperation with Plaintiffs and prevent the objective of the Agreements and DDA from being carried out. (*Id.* ¶ 156). The Town was clearly motivated to "take back" the Warfield Project for the Town, despite the Agreements it entered into to sell the Warfield Project to Plaintiffs for $8.2 million. (*Id.* ¶ 157). The Court should

therefore deny the Town's motion for judgment on the pleadings as to Count I.

### F.  The Town and the Plaintiffs were not engaged in contract zoning.

The Town's argument that judgment should be entered in its favor as to Count I because Plaintiffs were engaged in illegal contract zoning should be rejected because there are no allegations in the pleadings that Plaintiffs or the Town were actually engaged in illegal contract zoning and the conduct that is pled does not amount to illegal contract zoning.

Illegal contract zoning "occurs when an agreement is entered between the ultimate zoning authority and the zoning applicant/property owner which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone." *MCB Realty, LLC v. Mayor of Baltimore*, 192 Md. App. 218, 241 (2010) (quoting *Mayor & Council of Rockville v. Rylyns Enters.*, 372 Md. 514, 547 (2002)). Without valid legislative authorization, contract zoning "is impermissible because it allows a property owner to obtain a special privilege not available to others, disrupts the comprehensive nature of the zoning plan, and, most importantly, impermissibly derogates the exercise of the municipality's powers." *Rylyns Enters.*, 372 Md. at 547 (internal citations omitted). Maryland courts "have treated 'contract zoning' narrowly as a situation wherein the developer of property **enters into an express and legally binding contract** with the ultimate zoning authority." *Bollech v. Charles Cnty.*, 166 F. Supp. 2d 443, 453 (D. Md. 2001) (quoting *People's Counsel for Baltimore Cnty. v. Beachwood I Limited P'ship*, 107 Md. App. 627, 668-69 (1995)) (emphasis added). A zoning authority may not enter into such a contract because it would be impermissible for the governmental unit to "bargain away its future use of the police power." *Bollech*, 166 F. Supp. 2d at 453 (quoting *Beachwood I Limited P'ship*, 107 Md. App. at 668-69).

In *MCB Realty, LLC*, the court determined that there was no evidence that could support

22

a reasonable finding that Baltimore City had engaged in illegal contract zoning, as there was no evidence in the record that the City Council, the zoning authority, and the applicants, had entered into any sort of agreement about how the property would be zoned or about the property's zoning status that could be considered "contract[ing] away of [the City Council's] zoning power." 192 Md. App. at 242 (quoting *Attman/Glazer P.B. Co. v. Annapolis*, 314 Md. 675, 676 (1989)).

The Town spends significant time discussing *Attman/Glazer P.B. Co.*, but that case is not on point with the current case as the Town argues. (Town Mot. at 13). In *Attman/Glazer P.B. Co.*, private parties attempted to resolve a property dispute by entering into a settlement agreement with Annapolis's zoning authority whereby the zoning authority would give a conditional use to the applicant on specified conditions. 314 Md. at 676. The court held that "the mayor and aldermen of Annapolis could not by agreement lawfully bind themselves to a future zoning or conditional use decision," and that the City could not "contract away the exercise of its zoning powers." *Id.* at 685. There was undisputedly an actual settlement agreement reached between the applicant and the zoning authority in the *Attman/Glazer P.B. Co.* (*Id.* at 680).

Unlike in *Attman/Glazer P.B. Co.*, Plaintiffs and the Town's zoning authority did not enter into "an express and legally binding contract." *Id.*; *Bollech*, 166 F. Supp. 2d at 453. Plaintiffs have not pled that any such binding contract was entered—or that Plaintiffs sought to enter such a binding contract—and the Town does not assert in its motion that any "express and legally binding contract" existed or was going to be entered.  Because Plaintiffs and the Town did not enter into such an agreement to decide contractually how the Warfield Project would be zoned, there was no illegal contract zoning. *MCB Realty, LLC*, 192 Md. App. at 241.

Plaintiffs are not alleging that the Town had a contractual duty to approve Plaintiffs' proposed ZTA or that the Town had a contractual obligation to accept whatever ZTA that

Plaintiffs put forth. Plaintiffs are also not alleging that the Town entered into any agreement as to the ZTA that could be considered contracting away the Town's future zoning authority or that the Town breached a duty of good faith and fair dealing by not adopting the ZTA. To the contrary, Plaintiffs are arguing that the implied duty of good faith and fair dealing was breached by the Town due to its conduct in seeking to prevent the DDA from being implemented, seeking to retake the property, and interfering with the independence of the Commission's consideration of the ZTA. (Compl. ¶¶ 71-73, 77-79, 102, 154-57).

Plaintiffs have pled that they attempted to meet with Town leaders to develop a consensus behind a development proposal for the Warfield Project that would be viable, sustainable, and consistent with the DDA. (Compl. ¶ 72). Prior to Mayor Link's election in 2021, it was common for the Town's mayor and Plaintiffs, and sometimes other Town officials, to meet to discuss, negotiate, and collaborate on important issues and details regarding the Warfield Project before publicly introducing the issues. (*Id.* ¶ 78). Plaintiffs have pled that such meetings between elected officials and counterparties in contractual and business relationships, particularly officials with significant delegated authority or in smaller jurisdictions, are commonplace. (*Id.* ¶ 79).

Plaintiffs have pled that Mayor Link has gone to extensive lengths to prevent the implementation of the DDA, such as changing the municipal code, without public input, to put a non-resident who opposed the Warfield Project on the Commission, and conducting private meetings with businesses and citizens to draw up opposition to the Warfield Project. (*Id.* ¶ 82). Plaintiffs pled that the Town failed to provide any fair process that is normally associated with municipal land use applications and required by state law. (*Id.* ¶ 91). Instead, after the ZTA application was filed, Mayor Link met with business owners and residents to disseminate her

opposition to the zoning change and held public meetings to attempt to gather support against the change, at which she disparaged Plaintiffs and gave incorrect information about the Warfield Project, and solicited negative public testimony for the upcoming public hearing. (*Id.* ¶¶ 92-98). Such efforts to build opposition to the ZTA was unprecedented and was unlawful and done in bad faith. (*Id.* ¶ 99). The Town also shifted hearing dates for the ZTA, took the Warfield Project on and off the agenda at the last minute, and did not provide any significant hearing to allow Plaintiffs to present the project details. (*Id.* ¶ 100).

When the Mayor and Town Council referred the ZTA to the Commission, the Mayor and Town Council improperly limited the scope of the Commissions' evaluation and review and tied the Commission's hands in a way not permitted by the Town's Code or State law. (*Id.* ¶ 101). Importantly, the role of the Mayor and Town Council and the Commission are distinct when considering a ZTA. (*Id.* ¶ 102). The Commission is an independent body established under provisions of the Land Use Article of the Annotated Code and the Town Code. (*Id.*). The Commission's role is to publicly and independently evaluate applications and prepare a report and recommendation to the Mayor and Town Council. (*Id.*). After receipt of the Commission's independent report and recommendation, the Mayor and Town Council is charged with considering the merits of the ZTA, taking into account, among other things, the Commission's independent report and recommendation, and conducting a public hearing. (*Id.* ¶ 103).

Despite their distinct roles, the Mayor and majority of Council members made an unprecedented appearance at two Commission meetings and engaged in *ex parte* communications with commissions to ensure that Plaintiffs' project would be defeated. (*Id.* ¶ 104). This conduct resulted in the Open Meetings Compliance Board finding that the Mayor and Council's conduct violated the State's Open Meetings law. (*Id.* ¶ 106). As a result of the Town's

conduct, Plaintiffs were not able to obtain a fair hearing or due process before the Mayor and Town Council or the Commission. (*Id.* ¶ 107).

Plaintiffs are alleging that the Town failed to appropriately exercise its local government police powers by interfering with the Commission's consideration of the ZTA, failing to provide Plaintiffs with a fair hearing or due process related to the ZTA, and refusing to reasonably address the proposed ZTA. (Compl. ¶¶ 107, 113). Plaintiffs are not pleading that the Town contracted away or abdicated its local police powers nor was Plaintiffs requesting that the Town or the Commission do so. *Bollech*, 166 F. Supp. 2d at 453. If the Commission had fairly considered the proposed ZTA, without interference by the Mayor or other Town officials, this would not have been considered illegal contract zoning.

For these reasons, Plaintiffs' implied duty of good faith and fair dealing claim is not barred by the prohibition against illegal contract zoning.

### G. Plaintiffs substantially complied with the LGTCA notice, and the Town was not prejudiced.

The Town argues that Counts II and III should be dismissed because Plaintiffs did not plead compliance with the notice requirements of the Local Government Tort Claims Act. *See* Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 5-304(b)(1). Dismissal of Counts II and III on that basis, however, is neither warranted nor required.

The LGTCA provides that "an action for unliquidated damages may not be brought against a local government or its employees unless notice of the claim … is given within 1 year after the injury." CJP § 5-304(b)(1). During 2016 legislative session, the General Assembly added subsection (e) to § 5-304, which dispenses of the notice requirement altogether if the local government has actual or constructive notice of the injury or circumstances giving rise to it:

This section does not apply if, within 1 year after the injury, the defendant local government has actual or constructive notice of:
(1) The claimant's injury; or
(2) The defect or circumstances giving rise to the claimant's injury.

Md. Code Ann., CJP § 5-304(e). *See* 2016 Md. Laws, ch. 64. *See Young v. Hous. Auth. of Balt. City,* 2021 U.S. Dist. LEXIS 163230, *22-23 (D. Md. Aug. 27, 2021) (holding that the plaintiff's EEOC charge, which was filed within one-year from the date of injury, sufficed to constitute actual notice of the claim, even if an LGTCA notice was not filed).

The Maryland Supreme Court has recognized that "strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Moore v. Norouzi*, 371 Md. 154, 171 (2002). To achieve substantial compliance, the LGTCA notice must "fulfill the purpose of the [notice] requirement." *Faulk v. Ewing*, 371 Md. 284, 308 (2002). The purpose of the notice requirement of the LGTCA

is to ensure that the local government is made aware of its possible liability at a time when it is able to conduct its own investigation and ascertain, for itself, from evidence and recollection that are fresh and undiminished by time, the character and extent of the injury and its responsibility for it.

*Moore*, 371 Md. at 175. A plaintiff achieves substantial compliance when:

(1) The plaintiff makes 'some effort to provide the requisite notice'; (2) the plaintiff does 'in fact' give some kind of notice; (3) the notice 'provides… requisite and timely notice of facts and circumstances giving rise to the claim'; and (4) the notice fulfills the LGTCA notice requirement's purpose.

*Ellis v. Hous. Auth. of Balt. City*, 436 Md. 331, 342-43 (2013).

In *Conaway v. State*, 90 Md. App. 234, 250 (1992), the court found substantial compliance with the analogous notice provision of the Maryland Tort Claims Act where the plaintiff "provided the State with sufficient written notice of the circumstances of the underlying incident to enable it to 'investigate the claim and respond either by settlement or defense.'" The *Conaway* court based its ruling on the following:

27

No better argument can be found in support of this conclusion than the conduct of the State upon receipt of appellant's claim. For over two years, the State corresponded with appellant's attorney, who was seeking the medical records to verify that his client had a viable claim. At no time during those two years did the State indicate, or its behavior suggest, that it was in any way handicapped in investigating appellant's claim because of some deficiency in the September 1986 letter. Because appellant's notice served the purpose of the statute, we hold that he substantially complied with the requirements of § 12-107(a) of the MTCA.

*Id*.

A defendant must show that its defense has been prejudiced by the untimely notice. *White v. Prince George's Cnty.*, 163 Md. App. 129, 150 (2005). *See* Md. Code Ann., CJP § 5-304(d) ("Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given."). If there is no prejudice shown, "the court may hear the case despite the faulty notice … to avoid an unjust result." *Prince George's Cnty. v. Longtin*, 419 Md. 450, 467 (2011).

Whether good cause is shown is within the discretion of the trial judge and the good cause exception "allows a court, in certain circumstances, to avoid an unjust result." *Heron v. Strader*, 361 Md. 258, 270 (2000). *See Isley v. Prince George's Cnty.*, 2001 U.S. Dist. LEXIS 7026, *6 (D. Md. May 2, 2001) ("[T]he legislature made no attempt to define what constitutes good cause, but clearly committed that determination to the discretion of the court."). The Maryland Supreme Court has held that the purpose of § 5-304(d) is "to allow the court to achieve 'substantial justice under varying circumstances.'" *Moore v. Norouzi*, 371 Md. 154, 183 (2002).

Many courts have recognized public policy exceptions to governmental tort claims act notice periods. In *Hill v. Board of Educ.*, 443 A.2d 225, 227 (N.J. Super. 1982), the court held that, "even if there is no substantial compliance with the notice provisions of the Tort Claims Act, a public entity will be estopped from asserting this defense 'where the interests of justice,

28

morality and common fairness dictate that course.'" *See Anske v. Borough of Palisades Park*, 354 A.2d 87, 90 (N.J. Super. 1976) ("In affirming a trial judge's refusal to dismiss an action against a county because notice of the claim was not filed until 174 days after the accrual of the cause of action….equitable principles should apply to relieve unjust consequences of literal compliance in particular factual contexts."); *Stephens v. McBride*, 435 N.E.2d 162, 164 (Ill. App. 1982) ("[T]he public policy underlying the right of contribution outweighs that underlying the notice provision of the Tort Immunity Act.").

By analogy, public policy concerns have been found to trump statutes of limitation even when there is no waiver provision resting such discretion with the courts. *See e.g., Equal Employment Opportunity Commission v. Nicholson File Co.*, 408 F. Supp. 229, 233 (D. Conn. 1976) ("This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights."). In another analogous situation, the court in *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193, 198 (Pa. 1977) held that the, "public interest would be disserved by a rule that denied an accident victim recovery against the insurance company because it received late notice of the accident, even though it suffered no prejudice as a consequence thereof."

Here, the Town had actual and/or constructive knowledge of Plaintiffs' claim from the moment the harm was committed. The Town knew or had constructive knowledge of Plaintiffs' claims as to false light and tortious interference with prospective advantage when the Town's Mayor, Stacy Link, repeatedly made false and defamatory statements about Plaintiffs and when she called Plaintiffs' key contractors and interfered with Plaintiffs' relationship with the Community Foundation of Carroll County.

Further, Plaintiffs' Counterclaim in the Circuit Court for Carroll County, filed on August 18, 2023, asserts that Mayor Link had disparaged and defamed Plaintiffs and the Warfield Project. (Ex. 1, Cir. Ct. Counterclaim, ¶ 41, 54). It was also pled that Mayor Link attempted to interfere with contractors and others that had business relationships with Plaintiffs and interfered with the relationship between Plaintiffs and the Community Foundation of Carroll County, resulting in Plaintiffs losing at least $1.5 million state grants. (*Id.* ¶ 54). Plaintiffs similarly described the Town's defamatory conduct and tortious interference in responding to interrogatories and document requests in the circuit court case. The Town has therefore been on notice of Plaintiffs' claims related to false light and tortious interference for at least 18 months before Plaintiffs filed their adversary proceeding Complaint in this Court. This was more than sufficient time for the Town to investigate Plaintiffs' claims and unquestionably fulfills the purpose of the notice requirement.

The Town was not prejudiced by the lack of formal LGTCA notice. The Town has not alleged that it was prejudiced in any way and, regardless, would not be able to show prejudice given that the tortious allegations against the Town were part of the circuit court litigation that had been pending since 2023, putting the Town on notice of these allegations. It would be unjust here for the Court to deny Plaintiffs the ability to seek redress for the tortious conduct against them when the Town was on notice and when there are overriding public policy reasons why the courts should consider the merits of this case, including protecting the rights of entities who have entered into a contract with a municipality and who have been placed in a false light by public officials. This is particularly true when strict compliance with the notice provision would make no practical difference in this case and when the defendant is not prejudiced. The Town's motion for judgment on the pleadings as to Counts II and III should therefore be denied.

### H.  The Town does not have governmental immunity as to Counts II and III.

The Town is not entitled to governmental immunity, and its motion for judgment on the pleadings as to Plaintiffs' claims for false light and tortious interference with prospective advantage on this basis should be denied.[2]  Governmental immunity provides a shied to liability only under certain circumstances and courts "have consistently declined to expand or contract governmental immunity," referring to that task as "one to be performed by the legislature." *Mayor of Balt. v. Whalen*, 395 Md. 154, 163 (2006) (quoting *Austin v. Mayor and City Council of Baltimore*, 286 Md. 51, 58 (1979)). Governmental immunity will shield a municipality from liability only when the torts are committed while the municipality was engaging in an activity that was "governmental" rather than "private" or "proprietary." *Abrams v. Rockville*, 88 Md. App. 588, 603 (1991).

The distinction between governmental and proprietary is not very cut-and-dry. *Rios v. Montgomery County*, 386 Md. 104, 128 (2005). "[T]here is no universally accepted or all-inclusive test to determine whether a given act of a municipality is private or governmental in its nature, but the question is usually determined by the public policy recognized in the jurisdiction where it arises." *Id.* (quoting *Mayor and City Council of Baltimore v. Blueford*, 173 Md. 267 (1937)). Maryland courts have often referred to the distinction between a governmental function and a proprietorial function as a distinction that is "illusory in practice…difficult to discern, and more difficult to define." *Abrams*, 88 Md. App. at 603 (quoting *Austin v. Baltimore*, 286 Md. 51, 59 (1979)) (internal quotations omitted).

---

[2] The Town is not seeking dismissal of Plaintiffs' breach of the duty of good faith and fair dealing claim on the basis of governmental immunity nor could it as "Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities." *Montgomery Cnty. v. Revere Nat'l Corp.*, 341 Md. 366, 384 (1996).

In *Blueford*, the Supreme Court of Maryland outlined the test for determining whether a municipality is engaged in a governmental function:

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.

173 Md. at 276.  "Another way of expressing the test…is whether the act performed is for the common good of all or for the special benefit or profit of the corporate entity." *Tadjer v. Montgomery Cnty.*, 300 Md. 539, 547 (1984).

In *Tadjer*, plaintiff sought indemnification or contribution as a result of the county's negligent creation of a dangerous condition by virtue of its operation of a landfill and its failure to protect the public from dangers associated with the property formerly used as a landfill. *Id.* at 543. The court determined that the failure to enact legislation and issues related to permits were governmental functions. *Id.* at 550. But the court found that a factual dispute existed as to whether the County derived "substantial income" from the operation of the landfill and could therefore be considered a proprietary function, and that such a determination would need to be made at trial. *Id.* at 549-50. *See also Horne v. Blowing Rock*, 732 S.E.2d 614 (N.C. App. 2012) (stating that a municipality may have waived governmental immunity when it derives revenue from the operation of a park or from activities at the park).

The Town relies on *Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 658 (D. Md. 2009) but the court in *Moxley* did not make any determination about whether the town's conduct was governmental in nature or proprietary. In *Moxley*, plaintiffs sought to sell the property to a corporation and alleged that the sale was blocked by government officials and private citizens who were motivated by anti-Muslim hostility. *Id.* at 652. The town's board of appeals denied the

corporation's petition for a special exception to build a mosque in the agricultural zoning district. *Id.* at 654.

The Town argues that the alleged interference, disparagement, and wrongful acts alleged in the Complaint related to the denial of the ZTA and therefore deal with the government function of zoning, citing to *White v. City of Annapolis*, 439 F. Supp. 3d 522 (D. Md. 2020). (Def. Mot. at 21). But that case is also readily distinguishable from the present issues. In *White*, the court acknowledged that a proprietary function deals with "the local or special interests of the municipality and is imperative rather than discretionary." *Id.* (internal quotations omitted). The plaintiffs in *White* did not allege that the city's licensing and inspection services for building permits was profit-making for the city. *Id.*

Here, unlike the governmental functions in *Moxley* and *White*, the conduct alleged in the Complaint falls outside the scope of protected governmental activity and instead constitutes proprietary conduct undertaken to advance the Town's own interests. While the Town characterizes Plaintiffs' claims as a mere challenge to zoning-related activity, that framing misconstrues both the nature of the claims and conduct alleged. Plaintiffs do not seek to impose liability based solely on the zoning decisions, especially as to their claims of false light and tortious interference with prospective advantage. Rather, Plaintiffs allege that the Town intentionally— or at minimum with reckless disregard for the truth—disseminated false information to third parties, including contractors, nonprofits, and business partners, in an effort to harm Plaintiffs' and the Warfield Project's reputation and impede Plaintiffs' funding and preservation efforts, and that the motivation behind this was for the Town to take back control and ownership of real property for the Town's own proprietary benefit. *(*Compl. ¶¶ 74, 77, 161-73, 177-85).

The Town's conduct of contacting entities with existing or potential business relationships with Plaintiffs was not: 1) sanctioned by legislative authority, 2) operated solely for the public benefit, with no profit inuring to the Town, or 3) intended to benefit or promote the welfare of the whole public. *See Blueford*, 173 Md. at 276. As in *Tadjer*, where the Court declined to resolve immunity at the pleading stage due to factual disputes concerning the nature and purpose of the County's conduct, judgment here is premature at best. 300 Md. at 549–50. Plaintiffs have plausibly alleged that the Town's conduct in placing Plaintiffs in a false light and tortiously interfering with their relationships with contractors and the Community Foundation of Carroll County was motivated by self-interest in wresting the property back for the Town's own proprietary control and involved actions wholly collateral to any legitimate zoning function.

The Town ignores the crux of Plaintiffs' claims that make it unique and distinguishable from the cases that the Town relies on: the Town is seeking to "take back" the Warfield Property, *i.e.*, to own property that the Town previously possessed so that the Town can make its own development choices as to the property and profit from the property, without compensation to Plaintiffs, leading to unjust enrichment to the Town. (Compl. ¶¶ 74, 77, 157, 173). The Town's tortious conduct towards Plaintiffs was taken for the Town's own proprietary benefit interest, not for the welfare and benefit of the whole public. Accordingly, because Plaintiffs have plausibly alleged that the Town's actions were proprietary in nature and undertaken to serve its own interests rather than a purely governmental purpose, the Town is not entitled to governmental immunity.

## V.    CONCLUSION.

For the reasons set forth herein, Plaintiffs respectfully request that the Court deny the Defendant's Motion for Judgment on the Pleadings in its entirety.

Respectfully submitted,

/s/ _____

Timothy F. Maloney (Bar No. 03381)
Alyse L. Prawde (Bar No. 14676)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 207702
(301) 220-2200 (telephone)
tmaloney@jgllaw.com
aprawde@jgllaw.com
*Attorneys for Plaintiffs*

## HEARING REQUEST

Plaintiffs request a hearing on their Opposition to the Motion for Judgment on the

Pleadings.

_____/s/_____
Alyse L. Prawde

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of December, 2025, a copy of the foregoing

was served on all counsel of record via the Court's ECF system.

_____/s/_____
Alyse L. Prawde

35