IN THE CIRCUIT COURT FOR CARROLL COUNTY, MARYLAND

**TOWN OF SYKESVILLE**
    Plaintiff/Counter- Defendant

vs.    Case No. C-06-CV-23-000249

**WARFIELD HISTORIC PROPERTIES, LLC, et al.**

    Defendants/Counter-Plaintiffs

---

### COUNTERCLAIM

Come now the Defendants/Counter-Plaintiffs Warfield Historic Properties LLC, and Warfield Historic Quad LLC ["the Warfield Companies"], by and through the undersigned counsel, and files this Counterclaim and sues the Plaintiff/Counter-Defendant, Town of Sykesville ("the Town") for cause, claims damages, seeks injunctive relief, and in support thereof, states as follows:

**A.   Introduction and Background.**

1.   Springfield Hospital Center ("SHC"), originally set on 1,300 acres, began admitting psychiatric patients in Maryland in July 1896.  In the 1940s and 50s, its patient population exceeded 3,000, and the hospital became one of the subjects of a landmark Baltimore Sun series, "Maryland's Shame." Because of deinstitutionalization and other factors, the State of Maryland ("the State") began to shutter portions of SHC in the 1990's including three clusters of historic buildings known as the Martin Gross campus, Clark Circle, and the Warfield Complex.

2.   By the late 1990s, the historic buildings in these three clusters largely sat vacant and began to deteriorate and fall into disrepair and the State began to consider divestiture of the buildings.  Although the hospital remained in operation on the balance of the campus, its physical footprint and operational mission was scaled down significantly.  The State sought a

1

more productive use of the shuttered portions of the SHC property, which would contribute economically to the region and preserve historic structures.

  **B. In 2002, the State conveyed the Warfield Complex to the Town of Sykesville for the purpose of redeveloping the property and preserving its historic buildings.**

  3. On December 17, 1999, the Town and the State signed a Letter of Intent to transfer the Warfield Complex, which is now known as Warfield at Historic Sykesville ("Warfield Project"). The Town acquired the property in 2002 pursuant to a Disposition and Development Agreement ("DDA") dated November 2002.[1] The DDA was recorded against the deed to the Warfield Project and its many obligations persist through closing and remain in effect to this day.

  4. Although the DDA acknowledges the Town's original desire to develop the Property "principally as an employment center/office park," it states a contingency that "in the event that the Carroll County Public Water Supply becomes sufficient to sustain high-density residential development, the Town shall investigate the feasibility of incorporating residential development into its plans for [the Warfield Project… [and] if residential development is determined feasible, the Town shall employ reasonable efforts to incorporate residential options into Project. The State will consider the dedication of additional programmatic resources to [the Warfield Project] upon demonstration by the Town of the intent to incorporate and implement Smart Growth Ideals." This water supply condition was satisfied in 2015 when the Warfield Project was allocated 142,000 gallons per day of water and sewer capacity.

---

[1] A portion of the property was conveyed back to the State for purposes of locating and constructing the Maryland Police and Correctional Training Center.

5. The DDA further requires that "the Town… use reasonable efforts to design and develop [the Warfield Project] in accordance with Smart Growth Neighborhood Protocols." Key excerpts from the DDA concerning Smart Growth Protocols are summarized as follows:

6. The DDA stated the agreement's intent: The purpose of the smart neighborhood overlay is to encourage development that provides for a diverse mix and efficient arrangement of land uses and housing types."

7. The DDA described "Permitted Uses": "Residential uses that contribute to housing type diversity, including condominiums, duplexes, multifamily, retirement, and townhouses." The DDA described "General Development Standards," including:  a.) "… Smart neighborhood development shall seek to provide a mix of housing types… and should integrate different income levels into the design of, and distributed throughout the community." b.) "The density should be maximized to reduce the costs of providing service to and encourage the growth of a neighborhood as a community." c.) "The smart neighborhood shall contribute to unmet commercial, housing, civic, and open space needs in nearby neighborhoods." and, d.) "The smart neighborhood development shall include some mix of commercial, office/employment, civic, recreational, and residential uses."

8. For nearly two decades, the Town did little to nothing to comply with its obligations to the State to develop the property. The buildings sat vacant and decaying.

9. On April 27, 2014, a Purchase and Sale Agreement ("PSA") was signed, with the Town agreeing to sell the Warfield Project to the Warfield Collaborative, LLC.  The PSA did not close until June of 2018, when successor entities, the Warfield Companies, paid approximately $8.2 million for 63 +/- acres, which comprise the Warfield Project. The Town benefitted significantly from the sale of the property with sales proceeds going to, among other things, the

repayment and resolution of over $5 million in Town debt related to the Town's ownership of the property. The Town also received reimbursement of other expenses and carrying charges plus $250,000 from the developer for improvements at a nearby Town park.

10. Warfield Companies was diligent in its planning and marketing efforts immediately upon signing the PSA. Warfield Companies began making major investments in the Warfield Project and commenced marketing of the project as a primarily non-residential project from the time the PSA was executed up to and beyond closing.   Warfield nearly $700,000 supporting the Town's legal expenses to clear title, resolve claims and correct easements and other encumbrances to clear title.

11. The first major development within the Warfield Project, a 145-unit townhouse project known as Parkside at Warfield ("Parkside"), is substantially complete and completely sold-out. Sales prices at Parkside were in the mid to high-$300,000 range when sales began in 2019 and topped out in the mid-$500,000's upon completion in 2022.

12. While Parkside at Warfield has been successful, the State officials who reviewed the development plans have made it clear that a greater range of housing choices and price ranges are necessary to support the housing demands of the surrounding area.

 **C. Covid dramatically changes the market for new office and retail development.**

13. In March 2020, the World Health Organization (WHO) had declared COVID-19 a global health emergency and named the virus "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV-2."  It was the greatest pandemic in over a century and paralyzed business operations throughout the world. The Federal Public Health Emergency was imposed March 14, 2020 and ended more than 3 years later on May 11, 2023.

14.     The impact on the development community was immediate and catastrophic. Every aspect of development was impacted including construction, supply chain, lending, the availability of workforce, engineering, planning and design. Like all developers, the Warfield Companies were severely impacted by the pandemic.

15.     The long-term impact of Covid on the Warfield Project is more significant. Large portions of the workforce insist on working from home and have not returned to the office. Landlords are reporting extraordinarily high office vacancy rates, and many are on the verge of foreclosure and bankruptcy. Most major lenders will not finance new office construction. The market for new office space has virtually disappeared.

16.     There has been a similar dynamic for retail uses. Even before Covid, new retail construction dramatically decreased, primarily because of the rise of Amazon and other alternative home shopping services. Covid exacerbated this trend, and retail vacancies are at record high levels. Many shopping centers have closed outright or converted to other uses. Major financial institutions have stopped most of their lending for new retail projects.

17.     Job growth, a primarily driver of commercial and industrial real estate demand, was anemic in Sykesville and Carroll County and the retail market was saturated prior to Covid, but the effects of the global pandemic dashed any reasonable hope that the Warfield Project would be viable as a mixed-used project primarily focused on commercial, industrial, and retail development project.

**D.      The market today for projects such as Warfield requires a strong residential component, including affordable housing. However, the Town has consistently and historically resisted new affordable housing at Warfield and generally.**

18. In contrast to the collapse of new office and retail construction, the residential market has experienced a resurgence. There is a housing shortage for all housing types across all price points, and a particular high demand for workforce housing.

19. The workforce housing shortage is particularly acute in Sykesville, and the region. There are only two existing properties of federally supported affordable housing that represent a combined 5% of the 1,600 housing units in Sykesville. Schoolhouse Road is a 43-year old community of 26 Section-8 townhomes (opened 1980) near the "Historic Colored Schoolhouse" Museum, a restored one-room schoolhouse that operated from 1903 to 1938. Village House is a newer affordable senior (age 62 or older) community of 54 apartments near the downtown area (opened 2001). This combined 5% of affordable housing units is compared to the recent Comprehensive Plan estimates of 25% of Town households at low income (0-50% of Area Median Income) and a combined 58% of households including those at workforce income levels (50-120% of AMI).

20. For several years, the Town has failed to develop and implement any meaningful affordable housing strategy or approve zoning changes to permit residential development to increase its housing stock to provide housing choice, despite being legally obligated to do so. State law requires that comprehensive plans for all Maryland jurisdictions include a housing element, and that local jurisdictions appropriately plan for both low-income and workforce housing for households earning 60 percent or less (Maryland's defined threshold for "low-income") and 50-120 percent (Maryland's defined threshold for "workforce") of area median income as established by HUD.

21. Additionally, the Town is in a State of Maryland Priority Funding Area, which makes it eligible for priority state investment to support future growth. As an extension of this,

the Town applied for Sustainable Community Area designation, which was granted by the State of Maryland in 2012 and renewed in 2017 and 2022. In short, Sustainable Community Areas receive priority funding from the state over non-designated areas of the State and exclusive access to certain funding programs including funding through the State's Community Legacy Program and Strategic Demolition Fund. In return for its investment under these programs, the State expects that local jurisdictions will promote affordable housing, economic development, and historic preservation (among other things).

22. The most recent federal Census confirms the lack of affordable housing and the lack of a diverse population Sykesville. The 2020 Census reports the Sykesville total population as 3,979, a 10.5 percent decline since the 2010 Census. Sykesville's population is 93.4 percent White. Only 2.54 percent of the total population is Black or African-American. Only 4 percent of the population is Hispanic, significantly less than the average in the statistical area. Only 2.3 percent of the total Sykesville population is foreign born, about one-fifth of the rate in the overall census statistical area.

23. Significantly, the 2020 Census reported 1,490 housing units in Sykesville, with an occupancy rate of 97.0 percent. The Town's 2010 Master Plan reported that Sykesville had "the lowest number of vacant units in the region" (at that time, 98 percent). This lack of accessibility can be directly linked to the Town's resistance to affordable housing.

24. The lack of access to multi-family housing is particularly acute. Recent market studies have reported an overall aggregate vacancy rate of 0.7 percent. Among upper tier units (more expensive apartments) the vacancy rate is 1.7 percent. The one rent-subsidized community near New Market, Maryland is almost fully occupied.

25. The 2020 Census reported that 69.0 percent of housing units are owner occupied. The Town's 2010 Master Plan noted that the percentage of renters in Sykesville had "steadily decreased" from 47 percent to 32 percent. The median value of the housing units are 25 percent higher than the average in the statistical area, and more than 20 percent higher than the state average.

26. Although there is indisputably a high market demand for affordable multi-family housing, and the Town has done little to permit the supply to meet this demand. The multi-family housing stock in the Sykesville market has an average age of 45 years. Since the 2010 census, population in the Sykesville market area grew by 12,308 people, or 12.7 percent, but the Town has done little to accommodate this surging demand.

27. One of the elements of a Sustainable Communities Plan is the municipal commitment to affordable housing. Performance against the benchmark set by the approved plan is supposed to guide state funding to local jurisdictions. By any measure, the Town's affordable housing commitment falls far short of any benchmark.

28. One real world example involves the proposed $177 million, 128-bed veterans' home that will be constructed adjacent to the Springfield hospital site. The veterans' home will ultimately employee 150 skilled and semi-skilled workers. But there will be nowhere to in Sykesville these workers to live because of the shortage of workforce housing; they will need to commute longer distances. In addition, according to Indeed.com, there are presently 536 open jobs within a five-mile radius of Sykesville with little new housing development in the pipeline to support the housing of workers who might fill such jobs. Of these 536 open jobs, 379 (71%) are estimated to pay at or below 60% of AMI for a family of three and 472 (88%) are estimated to pay at or below 100% of AMI for a family of three.

**E.    The Warfield Companies' response to Covid and the collapse of the office and retail market.**

29.    In response to the extraordinary changes in commercial and retail demand, the Warfield Companies made Herculean efforts to create a development proposal that would meet market demand, would be consistent with the State's vision for the Warfield Project, could be financed in this new environment, and would serve Sykesville and the larger community in a sustainable way, consistent with the culture of the community and the history of the Warfield Project and the DDA.

30.    The Warfield Companies conducted feasibility studies, surveyed potential users and partners, met with stakeholders, and, importantly, led efforts to obtain State financing and other support to make the project feasible, even in a market that had profoundly changed. As a result, they developed a project concept which included a mix of residential and other uses which could actually be financed and constructed in this unprecedented new market and which addresses the significant cost of restoring empty historic buildings.

**F.    The Warfield Companies obtained extraordinary state financial support for the project.**

31.    To ensure that the project could be financed and sustainable, the Warfield Companies undertook unprecedented efforts to obtain state financial support for the project for the enactment of SB 885, creating the Catalytic Revitalization Tax Credit ("CRTC"), designed specifically to support the Warfield Project and similar projects.

32.    Last year, the State Department of Housing and Community Development ("DHCD") announced that the Warfield Project as the first recipient of the $15 million CRTC award. The Department has indicated that there is a strong prospect for substantial additional funding including, but not limited to, Federal Low-Income Housing Tax Credits (LIHTC) of around $15 million and related tax-exempt housing bond financing estimated in excess of $20

9

million. In addition, the Warfield Project would be eligible for millions in historic preservation tax credits through the State and federal government. All of these incentives are necessary to overcome the high cost of preserving the Warfield Project's historic buildings and environmental remediation including extensive asbestos and lead abatement. The magnitude of state and federal support necessary to make the Warfield Project viable was widely understood by local, county, and state officials long before the Warfield Companies' involvement, and continued to be discussed ad nauseum with officials up to present day.

33. As previously discussed, the State has committed significant support including, without limitation, the CRTC.  DHCD Secretary Kenneth C. Holt, who served as secretary from 2015 to 2022, strongly supported the redevelopment effort, stating that

> The redevelopment at Warfield presents a once in a lifetime opportunity for the people of Sykesville to preserve a piece of their heritage by transforming the former Springfield Hospital Center into a residential and commercial hub that will enhance the local community, while preserving prime and productive Carroll County farmland and open space. redevelopment and repurposing of a portion of Springfield State Hospital complex into a mix of residential and commercial uses.

34. This strong support has continued under the DHCD under the Wes Moore Administration.

35. Despite strong state support, the project has been jeopardized by the active resistance of the Sykesville Mayor and Town Council to the project, who have refused to consider any reasonable proposal for the development of the Warfield Project.

**G.  The Warfield Companies' proposal, or similar models, is the only way to attract DHCD financing and successfully repurpose the historic structures on the property.**

36. Redevelopment of the Warfield Project is financially impossible without significant State support.  Indeed, the Town's failed stewardship of the property for 16 years makes it evident that the private market will not respond without major public support.   During

that time, the Town was unable to attract any significant commercial, industrial, or retail investment. What little interest the Town was able to garner was from small commercial users that have brought limited economic impact to the town, county, and state, under terms that reduced the potential value of the Warfield Project. DHCD support will not occur, of course, without a strong housing component per the DDA and other State programs and requirements discussed above. State financial support, including tax credits, tax-exempt bond financing, and grants cannot be obtained without a significant housing component.

37. Although the Town leadership criticizes the Defendants/Counter-Plaintiffs, the economic reality is that no developer can redevelop the Warfield Project without a strong housing component, and State financing for affordable housing. Market studies, lender surveys, feasibility studies have all made this unequivocally clear. Yet the Town leadership remains adamantly opposed to the very elements necessary to make the project successful, under Warfield Companies or any other developer. If the Town's position remains consistent, the Warfield Project's historic buildings will continue to decay and deteriorate for another two decades. Without access to both state and federal tax credits, including affordable housing credits, the unrestored historic buildings cannot feasibly be rehabilitated, nor is the overall Warfield Project financially viable.

38. Recognizing these economic realities, the Warfield Companies developed a mixed-use proposal consistent with the State's vision for the property, and was creative, sustainable and could be financed. This included repurposing vacant historic buildings as 177 +/- workforce housing units and adding additional 49,000 +/- SF of non-residential space which would be included primarily to support the Town's desire to increase the commercial component from the existing 28,000 SF in three office buildings.

11

39. Warfield Companies also proposed a new construction component, consisting of 15 acres of currently vacant parcels, for the construction of market-rate housing, including townhouses, two-over-two condominiums, and possibly a senior housing project consisting of independent and assisted living units along with a dementia care component. The market-rate housing proposed under Warfield Companies' plan would allow development of a number of different housing types at a range of price points promulgated by the DDA.

**H.    The Town has consistently refused to meaningfully consider or even discuss any reasonable proposal for the redevelopment of Warfield.**

40. The Warfield Companies have consistently attempted to meet with the Mayor and Town leadership to attempt to develop a consensus behind a development proposal for the Warfield Project that would be sustainable.  To be sustainable, a project must be capable of securing financing, meet market demand, and earn a reasonable return for investors.  No development project can be successful without meeting these benchmarks.

41. The Mayor and Town leadership have consistently refused to meet with the Warfield Companies to discuss what type of development might reasonably meet these objectives.  While the Town's Mayor, Stacy Link, has made many public and private statements against the development and spoken with many others about the project, she has consistently refused to communicate with the Warfield Companies concerning the project.  Link has undertaken extraordinary efforts, both public and private, to disparage both the development and the Warfield Companies.

42. Link's refusal to consider the project in a fair and open-minded manner was not surprising.  As a candidate for mayor in 2021, she campaigned on the theme of "taking the project back," in other words, having the Warfield property revert to Town ownership.  She now

seeks to achieve that in this litigation with zero compensation for the developer's ten years and millions of dollars invested.

43. It is clear that the Town's resistance is motivated by opposition to affordable housing and animus toward residents of affordable housing projects. Town officials and influencers have made many comments in opposition to affordable housing options including:

"Nobody wants more housing, especially rental housing and particularly low-income housing."

"We only want people who can afford to buy a house."

"There's only one large rental complex [of 250 apartments] and that's where all the crime is; drugs, domestic problems, etc."

"The Town does not want transients [renters] to become more of a force. The interests of renters are not the same as property owners."

44. Despite the Town's consistent opposition to both the developer and the development, the Warfield Companies pressed ahead to obtain the entitlement approvals from the Mayor and Council which are a necessary predicate to construction.

45. Warfield Companies filed a petition for zoning text amendment to the Town in December 2021 to, among other things, modify the PEC district to shift density from commercial to residential. The petition was filed based largely on the provisions of the DDA, which makes clear the State's preference for housing over non-residential uses to the point of establishing that a more housing-focused project is a condition precedent to the dedication of State financial incentives to the Warfield Project.

46. The zoning change was further supported by years of experience by the Town and Warfield Companies unsuccessfully marketing the Warfield Project as a commercially focused project and numerous studies including third-party market, fiscal impact, economic impact, land planning, engineering, and architectural studies.

47. Despite the extensive analysis and effort associated with the development plan and implementing zone change, the Mayor and Town refused to discuss it or negotiate in any way. The Town failed to provide any fair process normally associated with municipal rezoning, especially one in which the Town had a contractual obligation to act in good faith under its agreement with Defendants.

48. In addition to refusing to discuss the project, the Town provided minimal staff analysis of the impact of the project or potential alternatives, the significant financing and marketing issues associated with the project, or the Town's contractual obligations. The Town routinely shifted hearing dates, took the project on and off the agenda at the last minute, and failed to provide any significant hearing to allow developers to present the details of a project of this magnitude.

49. When the project was finally referred to the Planning Commission, the Mayor and a majority of Council members made an unprecedented appearance at the Planning Commission and began having vigorous *ex parte* communications with the commissioners to insure that the project would be defeated, all of which was captured on the Town video system. The actions of the Mayor and Council were so severe that the Maryland Open Meetings Compliance Board found that it violated the state's Open Meetings law, a ruling that the Town unsuccessfully appealed to the Circuit Court for Carroll County. Link's conduct on that evening and since her election as mayor has made it impossible for Defendants to obtain a fair hearing or due process either before the Planning Commission or the Mayor and Council.

50. Finally, on June 9, 2022, the DHCD secretary Ken Holt convened a meeting at the Sykesville Town Hall to address the status of the Warfield Project, explain how successful projects are financed and to attempt to break the deadlock. The participants included the Mayor,

14

the town attorney and town manager, the town council president (remotely), and representatives of the Warfield Companies.

51. At that meeting, DHCD representatives reiterated, among other things, the following: (1) DHCD's strong support for the Warfield Project; (2) DHCD's willingness to make major new investments into the Warfield Project; (3) the importance of residential development to the success of the Warfield Project; (4) DHCD's commitment to additional affordable housing in Sykesville; (5) Sykesville's contractual commitment to housing at the Warfield Project as a condition of receiving the property from the State; (6) DHCD's willingness to consider additional support from the State for Town projects not directly connected with the Warfield Project; and, (7) the importance of reaching agreements on the Warfield Project immediately as to not further delay the project.

52. Twelve days later, on June 21, 2022, the Mayor and Town Council was "briefed" in public session about the June 9th DHCD meeting. The Town Council meeting can be viewed at https://youtu.be/AmTXTSJTjmw. The briefing concerning the DHCD meeting lasted only one minute and 25 seconds. (41:00) with another 20 minutes of Town Council conversation based on the scant report. Shortly thereafter, the Mayor and Town Council summarily rejected the Warfield text amendment without any meaningful discussion or justification, preventing the project from going forward. The Town's actions placed in jeopardy the State's recent $15 million tax credit commitment for the project, as well as the prospect of substantial additional State and federal support as outlined by DHCD Secretary Holt at the June 9, 2022 meeting.

53. Despite clear contractual requirements to work in good faith with Defendants, the Town has consistently and intentionally refused to do so. The Town has refused to discuss or negotiate in good faith, planning and zoning issues generally, the economic feasibility of

15

defendant's proposal or any alternatives, or the consistently with the current zoning with the Disposition and Development Agreement.

54. Mayor Link has gone to extraordinary lengths to prevent the development agreement from being implemented and re-taking the property, including changing the municipal code over the Christmas holiday, without public input, in order to place on the Planning Commission a non-resident because of his avowed opposition to the project, conducting private meetings to foment opposition to the project, providing false, unvetted, self-generated and exaggerated school impact estimates concerning the project, and defaming the defendant developers.   Link has also attempted to interfere with contractors and others who had potential business relationships with the Defendants, and successfully disrupted the relationship between the defendant developers and the Community Foundation of Carroll County, ultimately leading to Warfield Companies losing at least $1.5 million in grants committed to the Warfield Project by the State.

**(Count I)**

**BREACH OF CONTRACT**
(Implied Covenant of Good Faith and Fair Dealing)

Comes now the Defendants/Counter-Plaintiffs Warfield Historic Properties LLC,  and Warfield Historic Quad LLC ["the Warfield Companies"], by and through the undersigned counsel, and in this Count I, and files this Counterclaim and sues the Plaintiff/Counter-Defendant, Town of Sykesville, for cause, claims damages, seeks injunctive relief, and states as follows:

55. The allegations in the preceding paragraphs (1-54) are incorporated in this Count I as if set forth more fully herein.

56. At all times mentioned, the Defendants/Counter-Plaintiffs and the Town were subject to a series of contractual agreements which apply to various aspects of the Warfield project, including the Purchase and Sale Agreement, the Preservation Agreement, the Escrow Agreement, and the Reversion Agreement (collectively, "the Warfield Agreements.")

57. Under the Warfield Agreements, the Town had an implied duty of good faith and fair dealing, including a duty to cooperate with the Warfield Companies so that all parties may obtain the full benefit.  The duty of good faith and fair dealing applies with particular force where one party, such as the Town here, exercises discretionary authority under the contract.  In this case the Town's discretionary authority to approve rezoning and text amendment proposals was subject to an implied duty of good faith and fair dealing.

58. The Town violated its duty of good faith and fair dealing by failing to cooperate with Defendants/Counter-Plaintiffs and utterly failing to cooperate in any way to approve the entitlements or otherwise advance the project, failing to meaningfully consider the proposals, failing to provide a fair hearing, failing to meet with the Warfield Companies, and the other acts and omissions described in this Complaint.  Instead, the Town, acting through its mayor, acted in a concerted way to prevent any cooperation and to block and prevent the objective of the Warfield Agreements, which was the successful development of the project.  Mayor Link and the Town acted in bad faith and dealt unfairly with the Warfield with the express and stated purpose of reverting the property back to the Town and causing unjust enrichment to the Town, despite the fact that the Warfield Companies paid $8.2 million for the property, and have since invested significant sums in its future development.

59. As a direct and proximate result of the Town's breach of good faith and fair dealing, Defendants/Counter-Plaintiffs have suffered severe economic loss, the risk of their $8.2

million purchase price and additional investments since 2018, lost economic opportunity, project delays, continued degradation of the historic buildings, lost revenue, and damage to their reputation, all to their detriment.

60. In addition to compensatory damages, Defendants/Counter-Plaintiffs seek injunctive relief to compel the Town to comply with its duty of good faith, and attorneys' fees and costs.

WHEREFORE Defendants/Counter-Plaintiffs sue the Plaintiff/Counter-Defendant Town of Sykesville, claim damages in an amount exceeding $75,000, seek injunctive relief, demand attorneys' fees, and for such other and further relief as the Court deems appropriate.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By: _____
Timothy F. Maloney, Esq. (CPF No. 8606010245)
tmaloney@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Phone: (301) 220-2200
Facsimile: (301) 220-1214
*Defendants/Counter-Plaintiffs*
*Warfield Historic Properties LLC  and Warfield Historic Quad LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 18th day of August, 2023 a copy of the foregoing was served via MDEC E-Filing to all counsel of record.

*/s/ Timothy F. Maloney*
Timothy F. Maloney
