E-FILED; Carroll Circuit Court
Docket: 12/13/2023 11:30 AM; Submission: 12/13/2023 11:30 AM
Envelope: 14798465

## AGREEMENT OF SALE AND PURCHASE
(Warfield)

**THIS AGREEMENT OF SALE AND PURCHASE** (this "**Agreement**") is made and entered into this 17 day of April, 2014 by and between **THE TOWN OF SYKESVILLE**, a municipal corporation organized and existing under the laws of the State of Maryland (the "**Town**") and **WARFIELD DEVELOPMENT CORPORATION**, a Maryland non-profit corporation ("**WDC**") (the Town and WDC being hereinafter collectively referred to as "**Seller**") and **WARFIELD COLLABORATIVE, LLC**, a Maryland limited liability company (hereinafter, "**Purchaser**").

### R E C I T A L S:

**WHEREAS**, by Deed dated July 11, 2001 and recorded among the Land Records of Carroll County, Maryland (the "**Land Records**") in Liber 2610, Folio 696 and confirmed by Deed dated June 25, 2003 and recorded among the Land Records in Liber 3562, Folio 465, the Town became the owner in fee simple of a parcel of land located in the Fifth Election District of Carroll County, Maryland (sometimes hereinafter referred to as "**the County**") as more particularly described in said deeds; and

**WHEREAS**, WDC is the Lessee pursuant to the terms of that certain Master Ground Lease by and between the Town and WDC dated January 27, 2005 and recorded among the Land Records in Liber 4299, folio 182 (the "**Master Ground Lease**"), of all of that land in the Town of Sykesville, Carroll County, Maryland, as more particularly described in the Master Ground Lease (as amended from time to time), together with the improvements thereon and the appurtenances thereto (the "**Development Land**"); and

**WHEREAS**, WDC, with the joinder and consent of the Town, has subdivided the Development Land into eleven (11) parcels designated as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel G, Parcel H, Parcel I, and the Warfield Park Parcel (collectively the "**Parcels**"; each individually a "**Parcel**") and certain dedicated roadways, all as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records in Plat Book 51, Pages 187 through and including 202 (the "**Plat**"); and

**WHEREAS**, Purchaser has proposed a conceptual plan for the development of the Property (the "**Preliminary Concept Plan**") as mixed use development, consistent with modern planning and development practices, providing for an employment center (including office, light industrial, research and development and business incubation space), with a complementary blend of retail space and multi-family and townhome residential units, with the further goal of preservation and adaptive re-use of existing historic buildings and enhancement of the Town's employment base; and

**WHEREAS**, Seller desires to sell and Purchaser desires to purchase the Property described in Section 1 of this Agreement, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for and in consideration of the mutual promises of the parties as set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.  **SALE AND PURCHASE.** Seller agrees to sell and convey unto Purchaser, and Purchaser agrees to purchase and accept from Seller, for the price and subject to the terms, covenants, conditions and provisions herein set forth, the following (collectively, the "**Property**"):

**EXHIBIT A**

A.    All right, title and interest in and to Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel G and Parcel H as shown on the Plat, situate in the Town of Sykesville, Carroll County, Maryland, as more particularly described on the attached **Exhibit A**, hereinafter collectively referred to as the **"Land"**), and all structures, improvements, systems and fixtures located thereon (collectively, the **"Improvements"**);

B.    All right, title and interest in and to all easements in or upon the Land and all other rights and appurtenances belonging or in any way pertaining thereto, including any rights of way thereto and any strips and gores adjacent to or within the Land;

C.    All right, title and interest of Seller in and to the streets and roads that exclusively serve the Land, saving and excepting therefrom the beds of Springfield Avenue and Warfield Avenue as shown on the Plat (the said Springfield Avenue and Warfield Avenue being public roads currently within the public road system of the Town and intended to remain so);

D.    All right, title and interest of Seller in and to all transferrable warranties and guaranties with respect to any improvements, repairs and/or renovations to the Land and/or the Improvements (collectively **"Seller's Transferable Warranties"**);

E.    All right, title and interest of Seller in all those real estate management, leasing, maintenance, security, repair, service and supply contracts, and all other agreements in force with respect to the Property (**"Seller's Contracts"**) which Purchaser may agree to assume or take the Property subject to in accordance with the further provisions of this Agreement;

F.    All title, survey, architectural and engineering information and other data relating to the Land and/or the Improvements, which are not proprietary to third parties, which are in the possession and/or control of Seller, including, but not limited to, all: plats, plans, specifications, architectural drawings and renderings, mylars, sepias and schematics, electrical, mechanical and plumbing system plans, studies, aerial photographs, topographical maps or studies, all oil, gas, mineral or water studies and analyses, evaluations or exploration reports, soils reports, environmental studies and reports (including lead paint and asbestos studies and remediation plans); correspondence, governmental approvals, wetlands studies, marketing or other studies, maps, boundary and other surveys and planning studies, flood plain analyses; all abstracts of title, title opinions, title insurance policies and all other title documents pertaining to the Property; and contractors' bids for improvements to the Property, and all other documents or instruments which relate to the condition of or ability to develop all or any portion of the Property (collectively **"Seller's Studies and Data"**);

G.    To the extent transferrable or assignable, all right, title and interest of Seller in and to all rights, permits, licenses, entitlements or agreements relating to the ownership, use, occupation and/or operation of the Land and/or the Improvements, including, but not limited to, certificates of occupancy for the Property, proposed improvements, including Seller's interest in any development rights, and all those related to operation and leasing of certain Improvements and other areas of the Property for commercial and/or office use (collectively **"Seller's Permits"**);

H.    All licenses, leases, rents, royalties, profits, revenues, incomes, security deposits, letters of credit and other security and benefits of and from the Property (subject to the further provisions of this Agreement with respect to the Water Tower(as defined below)), and all of the estate, right, title and interest of every nature whatsoever of Seller in and to the Property;

2

I.       Those leases, subleases, licenses, options to lease or other agreements (oral or written, contingent or non-contingent), and any and all amendments and addenda to the foregoing, by which Seller has demised, leased, or licensed to or permitted the use or occupancy by another person of any part of the Property (as further defined in Section 12.E of this Agreement, collectively, the **"Leases"**); and

J.       At Purchaser's sole option, to be exercised by written notice from Purchaser to Seller no later than ninety (90) days from the Effective Date, all Seller's right, title and interest in and to Parcel I as shown on the Plat (the **"Parcel I Option"**). In the event Purchaser exercises the Parcel I Option, all references to "Land" in this Agreement shall incorporate and include Parcel I and all references to "Improvements" in this Agreement shall incorporate and include all structures, improvements, systems and fixtures located on Parcel I.

## 2.  DEPOSIT; PURCHASE PRICE.

A.       Purchase Price.   The purchase price for the Property (the **"Purchase Price"**) is Seven Million Six Hundred Thousand and No/100 Dollars ($7,600,000.00), plus or minus (as applicable) the adjustments made in accordance with this Agreement.   The Purchase Price shall be paid by Purchaser as follows:

(i)       Posting of Initial Deposit.   Within ten (10) business days after the Effective Date (defined hereinafter), Purchaser shall deliver an initial earnest money deposit in the amount of Twenty Five Thousand and No/100 Dollars ($25,000.00) (together with any and all interest earned thereon, collectively, the **"Initial Deposit"**) to Home Title Company, Inc, whose address is indicated in Section 16 of this Agreement (the **"Escrow Agent"**), which shall be applied or disbursed by Escrow Agent in accordance with the terms of this Agreement. Upon receipt of the Initial Deposit, Escrow Agent shall notify Seller.

(ii)       Second Deposit.   Within ten (10) business days after the expiration of the Inspection Period (as defined in Section 3.A of this Agreement), unless this Agreement has been previously and timely terminated in accordance with the provisions of Section 3.A of this Agreement, Purchaser shall deliver an additional earnest money deposit in the amount of Twenty Five Thousand and No/100 Dollars ($25,000.00) (together with any and all interest earned thereon, collectively, the **"Second Deposit"**) to Escrow Agent, which shall be applied or disbursed by Escrow Agent in accordance with the terms of this Agreement. Upon receipt of the Second Deposit, Escrow Agent shall notify Seller.    The Initial Deposit and the Second Deposit, when paid, are hereinafter collectively referred to as the **"Deposit"**. The Deposit shall be placed and held in escrow by Escrow Agent in an interest-bearing account at a federally insured banking institution using Purchaser's Federal Taxpayer ID Number 46-2279159, and shall be disbursed in accordance with the terms of this Agreement.  The Deposit shall be applied against the Purchase Price at Closing (as defined in Section 6.A of this Agreement).

(iii)       Balance.   On the Closing Date, Purchaser shall deposit the balance of the Purchase Price (i.e., the Purchase Price less the Deposit) less the principal balance of the Note (as defined below), subject to and plus or minus any adjustment, as applicable, pursuant to this Agreement, by wire transfer of immediately available funds into the escrow account of the Escrow Agent, which shall be applied or disbursed by Escrow Agent in accordance with the terms of this Agreement.

If this Agreement remains in full force and effect following the Inspection Period, then from and after the expiration of the Inspection Period the Deposit shall be non-refundable to Purchaser, except upon failure to satisfy Purchaser's Closing Conditions (as defined in Section 5.A of this Agreement) unless

waived by Purchaser, failure to satisfy Seller's Closing Conditions (as defined in Section 5.B of this Agreement) unless waived by Seller, default by Seller under this Agreement or as otherwise expressly set forth in this Agreement.

        B.     Purchase Price Proceeds. The Purchase Price shall be utilized to satisfy the following obligations:

        (i)     Existing Mortgage Debt. The Property is currently encumbered by liens of deeds of trust and/or the Seller has loan obligations from (a) the County Commissioners of Carroll County, Maryland ("**Carroll County**") in the original principal amount of One Million Ninety Seven Thousand and No/100 Dollars ($1,097,000.00) together with accrued interest, (b) Carroll County in the original principal amount of One Hundred Fifty Thousand and No/100ths Dollars ($150,000.00), having a current principal amount of One Hundred Forty Nine Thousand Seventy Seven and 64/100 Dollars ($149,077.64), together with accrued interest, (c) the Mayor and Town Council of the Town of Sykesville in the original principal amount of One Hundred Forty Four Thousand Nine Hundred and No/100ths) Dollars ($144,900,00), having an existing principal balance of Ninety Nine Thousand Seven Hundred Ninety and No/100 Dollars ($99,790.00), together with accrued interest (d) the Mayor and Town Council of the Town of Sykesville in the original principal amount of Ninety Thousand and No/100ths Dollars ($90,000.00), having an existing principal balance of Thirty Five Thousand and No/100 Dollars ($35,000.00), together with accrued interest, and (e) the Industrial Development Authority of Carroll County (the "**IDACC**"), using funds provided by the State of Maryland's Department of Business and Economic Development ("**DBED**"), in the original principal amount of Four Million and No/100 Dollars ($4,000,000.00) together with accrued interest (the loans referenced in (a), (b), (c), (d) and (e) above are collectively hereinafter referred to as the "**Existing Mortgage Debt**").

        (ii)     Debt Payments and Resolution of Monetary Obligations Under Disposition Agreement. At Closing, Purchaser shall pay: (a) Nine Hundred Thousand and No/100 Dollars ($900,000.00) in cash or by wire transfer to Carroll County as payment in full for the applicable Existing Mortgage Debt; (b) Three Million Five Hundred Thousand and No/100 Dollars ($3,500,000.00) in cash or by wire transfer to the IDACC as payment in full for the applicable Existing Mortgage Debt; and (c) One Hundred Thirty Four Thousand Seven Hundred Ninety and No/100ths Dollars ($134,790.00), in cash or by wire transfer to the Town Council of the Town of Sykesville as payment in full for the applicable Existing Mortgage Debt, closing costs and reimbursement for debt, operation and maintenance of the Property (the amounts referenced in (a), (b) and (c) above are collectively hereinafter referred to as the "**Debt Payments**"). The receipt of the Debt Payments shall result in the release of the Property from the liens of the existing Deeds of Trust and the full release and discharge of WDC and the Town (in the event and to the extent of any liability on the part of the Town for such Existing Mortgage Debt) from such indebtedness. In addition the IDACC and DBED have represented to Seller and Purchaser that the payment under (b) above shall also satisfy any and all monetary obligations set forth in and under that certain Disposition Agreement dated November, 2002, and recorded among the Land Records in Liber 3176, Folio 252, et seq., as amended by Amendment to Disposition Agreement dated November 5, 2005 and recorded among the Land Records in Liber 4704, Folio 197 (collectively, the "**Disposition Agreement**"). It shall be a condition of Closing that the Town, WDC and Purchaser (and each of their respective successors and/or assigns) shall have received a release of all monetary obligations under the Disposition Agreement from such parties and in form and content acceptable to the Town, WDC and Purchaser, and an indemnity by and from the IDACC and DBED in form and content acceptable to the Town, WDC and Purchaser for any and all sums due or found due from the Town, WDC and/or the Purchaser under the Disposition Agreement to the Community Trust Fund.

(iii)    Parcel D Escrow Fund. At Closing, Purchaser shall pay One Million Three Hundred Fifty Thousand and No/100 Dollars ($1,350,000.00) in cash or by wire transfer to the Parcel D Escrow Fund (as defined in Section 7.H.(ii) below).

(iv)    Promissory Note and Deed of Trust. At Closing, Purchaser shall execute and deliver (A) a promissory note in the principal amount of One Million and No/100 Dollars ($1,000,000.00), which shall be substantially in the form attached hereto as **Exhibit N** (the "**Note**"), and (B) a purchase money deed of trust, which shall be substantially in the form attached hereto as **Exhibit O** (the "**Deed of Trust**"), in each case, in favor of the Town of Sykesville for the benefit of the Parcel D Escrow Fund. The Note shall have a term of two (2) years with interest on the outstanding principal balance of the Note calculated at the short-term adjusted applicable Federal rates (AFR) for the month in which the Closing occurs (or if such rate is not available on the Closing Date, the AFR for the month immediately prior to the month in which the Closing occurs), as published by the Internal Revenue Service from time to time for purposes of Section 1274(d) of the Internal Revenue Code, compounded annually (the "**Interest Rate**"). The Interest Rate shall adjust on the first anniversary of the Closing Date, and shall be the published AFR for the month in which the Closing occurred (or if such rate is not available on the Closing Date, the AFR for the month immediately prior to the month in which the Closing occurs) for the then-current year. Purchaser shall make monthly payments of interest only on the Note until maturity at which point the entire unpaid principal and accrued interest then outstanding shall be due and payable. The Deed of Trust shall evidence the Note and shall secure a lien on the entire Property. Notwithstanding, Purchaser shall be permitted to repay the Note in part and shall be entitled to the release of portions of the Property from the lien of the Deed of Trust at amounts to be agreed upon by Seller and Purchaser as more fully set forth in the Deed of Trust. Upon Purchaser's partial or full repayment of the Note, Seller shall execute and deliver a partial or full release of the lien of the Deed of Trust (as the case may be), in accordance with the terms and conditions of the Note. All payments of principal and interest under the Note shall be paid directly into the Parcel D Escrow Fund and shall thereafter be subject to disbursement in accordance with the terms of the Parcel D Escrow Agreement (as defined in Section 7.H.(ii) below). The Escrow Agent under the Parcel D Escrow Agreement shall deliver written confirmation of receipt of all such payments together with such other reasonable information and documentation as requested by Seller regarding the same.

(v)    The balance of the Purchase Price, subject to and plus or minus any adjustment, as applicable, pursuant to this Agreement, shall be paid over and released from Escrow Agent to Seller.

3.    **INSPECTION PERIOD; STUDIES AND OTHER MATERIALS.**

A.    Inspection Period. Purchaser is hereby granted a period, which shall commence on the Effective Date and shall terminate on the date that is one hundred eighty (180) days after the Effective Date (together with any and all extensions, the "**Inspection Period**"), at Purchaser's sole cost and expense, to undertake such boring, engineering, environmental, water, sanitary and storm sewer, traffic, utilities, topographic, and/or other tests, investigations, market studies, surveys and/or other tests or studies as Purchaser may determine appropriate (collectively, "**Purchaser's Studies and Reports**"), and to review and approve of Seller's Studies and Data and any and all other materials provided by or made available by Seller. It is acknowledged and agreed that Seller's Studies and Data have been prepared by third parties and Seller makes no warranties or representations as to their accuracy or completeness. In the event Purchaser, in Purchaser's sole and absolute judgment and discretion, determines that the Property is not suitable to Purchaser for Purchaser's purposes for any reason whatsoever, then Purchaser may terminate this Agreement by written notice to Seller no later than the expiration of the Inspection Period, whereupon (i) the Escrow Agent shall promptly return the Initial Deposit to Purchaser and (ii) the parties shall thereupon

be released from any further liability or obligation to each other except for those that are expressly stated to survive termination of this Agreement. Purchaser shall have the option to extend the Inspection Period for six (6) separate extensions of thirty (30) days each. Each such extension shall be exercisable by written notice from Purchaser to Seller on or before the expiration of the Inspection Period (as may have been previously extended) accompanied by a payment directly to Seller of Five Thousand and No/100 Dollars ($5,000.00) (each an "**Extension Payment**") for each thirty (30) day extension. Except as provided in Section 4 of this Agreement, all Extension Payments shall be non-refundable except in the event of a default by Seller under this Agreement and shall be applied to the Purchase Price at time of Closing.

B.    Access to Books and Records, Studies and Other Materials. From and after the Effective Date of this Agreement, Purchaser shall have complete and free access at reasonable times during regular business hours to review and copy all documents, agreements, and other information in the possession of Seller, or any agent or independent contractor of Seller, pertaining to the ownership, use, rental, or operations of the Property, including, but not limited to, financial records (of the Property, but not including those of the entities comprising Seller), tax assessments, bills, insurance policies, Leases, Seller's Studies and Data, and Seller's Permits. All such materials shall remain confidential and shall not be disseminated or distributed to any third parties, excepting only Purchaser's employees, accountants, attorneys, engineers and other consultants engaged by Purchaser to provide services with respect to the Property, and all copies of such materials shall be returned by Purchaser to Seller or destroyed by Purchaser within ten (10) days after any termination of this Agreement. The foregoing notwithstanding, Seller shall not be required to provide or produce copies of any documentation that is exempt or excluded from production by the Town or WDC pursuant to the provisions of the Maryland Public Information Act.

C.    Fiscal Impact Study. Purchaser has commissioned, at Purchaser's sole cost (subject to credit provision below) and expense, a fiscal impact analysis study (the "**Fiscal Impact Study**", or "**Study**") analyzing the demands for Adequate Public Facilities/Services and related fiscal benefits and consequences to the local governments (Town and County) resulting from Purchaser's proposed development of the Property. The consultant has been selected with the advice and consent of the Town and County. It is understood and agreed that the purpose of the Study is to provide guidance to the Public Sector as to the policy, land use and budget issues that may result from the Purchaser's proposed project. It is further agreed that, Purchaser shall be reimbursed by Seller for fifty percent (50%) of the cost and expense of the Fiscal Impact Study and said amount shall be reimbursed as a credit against the Purchase Price at Closing.

D.    Return of Seller's Studies and Data and Delivery of Purchaser's Studies and Reports. The return of Seller's Studies and Data and the delivery of Purchaser's Studies and Reports shall be subject to the provisions of Section 34 of this Agreement. Seller acknowledges and agrees that Purchaser's Studies and Reports will be or have been prepared by third parties and Purchaser makes no warranties or representations as to their accuracy or completeness.

4.    **TITLE.** At Closing, Seller shall grant and convey unto Purchaser, or its designee(s), good and marketable fee simple title to the Property, by special warranty deed(s) in form reasonably acceptable to Purchaser (the "**Deed**"), free of all liens (pending or otherwise) and encumbrances, excepting the lien for real estate taxes or other governmental assessments not yet due or payable, and the Permitted Exceptions (as hereinafter defined), and insurable by a title insurance company selected by Purchaser holding membership in the American Land Title Association at regular rates. The Deed shall contain the covenant set forth in Paragraph 1.C of Disposition Agreement. Prior to the expiration of the Inspection Period, Purchaser shall obtain, at Purchaser's expense, a title insurance commitment acceptable to Purchaser written by a title insurance company selected by Purchaser ("**Purchaser's Title Commitment**") and, in Purchaser's discretion, a survey of the Property. In the event Purchaser's Title Commitment

discloses title defects or any other matter to which Purchaser objects, or in the event any such survey for the Property discloses title defects or any other matter to which Purchaser objects, Purchaser shall notify Seller in writing of all such title objections (**"Purchaser's Title Objection Notice"**) on or before the expiration of the Inspection Period. Within fifteen (15) days after receipt of Purchaser's Title Objection Notice, Seller shall notify Purchaser, in writing that either (i) Seller is unwilling or unable to correct such title objections or (ii) Seller, at its sole cost and expense, shall undertake promptly to eliminate or modify all such title objections to the reasonable satisfaction of Purchaser. Seller shall have a reasonable time, not to exceed thirty (30) days after receipt of Purchaser's Title Objection Notice, in which to remedy, resolve or remove such title objections to Purchaser's satisfaction. If Seller is unable or unwilling to cure or eliminate such title objections to the satisfaction of Purchaser within thirty (30) days of receipt of Purchaser's Title Objection Notice (or otherwise fails to timely respond), Purchaser shall either (i) terminate this Agreement by written notice to Seller within sixty (60) days of Purchaser's Title Objection Notice, whereupon the Deposit and all Extension Payments paid to Seller shall be returned to Purchaser and the parties shall thereupon be released from any further liability or obligation to each other except for those that are expressly stated to survive termination of this Agreement; or (ii) be deemed to have waived such objection or defects and proceed to Closing as otherwise required herein.

As used in this Agreement, the term **"Permitted Exceptions"** shall mean all matters listed in Purchaser's Title Commitment as either exceptions or exclusions to which Purchaser does not raise an objection prior to the expiration of the Inspection Period, or, having objected, Purchaser waives in accordance with the provisions of this Section. Without the necessity of providing any notification to Seller, Seller shall (a) subject to the provisions of the next succeeding paragraph, deliver or cause to be delivered title to the Property at Closing free and clear of any and all liens of deeds of trust and/or mortgages and any other liens (pending or otherwise), judgments and violations against the Property and (b) satisfy all commercially reasonable requirements for the issuance of the Title Policy identified in Purchaser's Title Commitment, other than those that are Purchaser's responsibility to satisfy. Each of the foregoing items in (a) and (b) above shall be expressly excluded from the definition of Permitted Exceptions. Permitted Exceptions shall include any additional matters affecting title arising after the Effective Date to which Purchaser has consented in writing.

Notwithstanding anything contained in this Agreement to the contrary, the Property shall be conveyed subject to the terms, covenants and conditions contained in that certain Deed of Easement dated October 18, 2004, recorded among the Land Records in Liber 4184 Folio 419, by and between the Town of Sykesville (as grantor) and the Maryland Historical Trust (the **"Historic Preservation Easement"**), which shall be deemed a Permitted Exception under this Agreement.

Notwithstanding anything in this Section to the contrary, Closing shall be conditioned upon the parties obtaining the agreement of all holders of the Existing Mortgage Debt to release their respective liens and to fully release and discharge WDC and the Town from the Existing Mortgage Debt at and for the payments as contemplated in Section 2.B.(ii) above.

As further described in Section 7.H.(i), Parcel D shall be conveyed subject to Seller's right of reversion in the event Purchaser fails to meet certain renovation milestones, which shall be further detailed in the Parcel D Preservation Agreement (as defined in Section 7.H.(i) below).

5.   **CONDITIONS TO CLOSING**.

A.    Conditions to Purchaser's Obligations. The obligation of Purchaser to proceed to Closing is subject to completion, to Purchaser's reasonable satisfaction, of the following conditions to Closing (each, individually, a **"Purchaser's Condition to Closing"**; collectively **"Purchaser's Closing Conditions"**):

7

(i)  Compromise and Release of Existing Mortgage Debt. All holders of the Existing Mortgage Debt shall have agreed in writing to release their respective liens and to fully release and discharge WDC and the Town from the Existing Mortgage Debt at and for the payment amounts contemplated in Section 2.B.(ii) above.

(ii)  Zoning.  Adoption and enactment of all necessary amendments to the Town of Sykesville's "Master Plan" and Zoning Ordinance as set forth in the Town Code as necessary to accommodate the Preliminary Concept Plan attached hereto as **Exhibit B** (including and subject to the "Preliminary Concept Plan Conditions" set forth thereon) (the **"Preliminary Concept Plan"**; which shall mean and include any and all revisions thereto which have been approved in writing by Seller after the Effective Date through Closing).

(iii)  Development Plan Approval.  Final, non-appealable approval of the final development plan for the Property, whether pursuant to a text amendment creating an Employment Campus zone in accordance with Section 180-131.A-C (as amended) or any applicable successor provision of the Town Code of the Town of Sykesville or by special exception or both (the **"Final Development Plan"**), consistent in all material respects with the Preliminary Concept Plan.

(iv)  Termination of Master Ground Lease.  At or prior to Closing, the Master Ground Lease shall have been terminated and released of record by document in commercially reasonable form recorded or to be recorded among the Land Records.

(v)  Title.  Title to the Property shall be in the condition required by Section 4 of this Agreement.

(vi)  Seller's Representations.  There shall not be any material error, misstatement or admission in Seller's representations or warranties contained in this Agreement.  The representations and warranties of Seller contained herein shall be true and correct in all material respects as of the Closing Date, with the same force and effect as though made on and as of the Closing Date. Notwithstanding that certain of Seller's representations and warranties may be limited to the extent of Seller's Knowledge (as defined below) of the facts stated therein (or such other similar qualifier), the Purchaser's Closing Conditions shall not be so limited, and the satisfaction of said conditions shall depend upon the actual correctness as of the time of Closing of the facts stated in all such representations and warranties.

(vii)  Seller's Performance.  All covenants and agreements made by Seller, which are to be completed on or before the Closing Date shall have been performed in all material respects, all documents to be delivered by Seller at Closing shall have been delivered and Seller shall not be in default hereunder.

(viii)  Moratorium.  No governmental authority having jurisdiction over the Property shall have imposed any moratorium or similar restriction, anticipated moratorium, or prohibition, remaining in effect on the Closing Date, the probable effect of which is to prevent, delay or restrict any approvals or permits which Purchaser needs to be entitled to use the Property as contemplated herein.

(ix)  Hazardous Materials.  There shall be no change in the environmental condition of the Property from that existing as of the Effective Date.

8

(x)     **No Legal Actions.** No action or proceeding shall have been instituted or threatened by any one not a party to this Agreement on or prior to the Closing Date which calls into question or seeks to set aside any of the approvals or authorizations for the transaction described herein or the performance of Purchaser's or Seller's obligations hereunder.

(xi)     **Historic District Commission Approval.** The Historic District Commission of the Town of Sykesville shall have approved the Preliminary Concept Plan and, to the extent within the purview of their regulatory responsibility, the Final Development Plan.

(xii)     **Parcel D Escrow Agreement.** At Closing, the parties shall execute and deliver the Parcel D Preservation Agreement, the Reversion Agreement and the Parcel D Escrow Agreement, as further referenced in Section 7.H.(ii) below.

(xiii)     **Town and County Tax Abatement.** Town and County shall have agreed to abate all ad valorem taxes, real estate taxes, general and special, and usual County imposed water and sewer annual front-foot benefit charges (if any), and all other fees payable on an annual or periodic basis on the entire Property or any improvements thereon until such date as each building (existing and those to be constructed) has received a permanent certificate of occupancy, which date shall not exceed twelve (12) years from the Closing Date. Such tax abatement shall be evidenced by separate written agreements by the Town and County in form acceptable to the Purchaser in its sole and absolute discretion (it being understood by the parties hereto that the inclusion of this Purchaser's condition in this Agreement shall not separately constitute or evidence agreement or acceptance by the Town of such tax abatement).

(xiv)     Intentionally Deleted.

(xv)     Intentionally Deleted.

(xvi)     **Disposition Agreement Monetary Obligations.** The Town, WDC and Purchaser (and each of their respective successors and/or assigns) shall have received (a) a release of all monetary obligations under the Disposition Agreement from such parties and in form and content acceptable to the Town, WDC and Purchaser, and (b) an indemnity by and from the IDACC and DBED in form and content acceptable to the Town, WDC and Purchaser for any and all sums due or found due from the Town, WDC and/or the Purchaser under the Disposition Agreement to the Community Trust Fund.

(xvii)     **Storm Water Management Easements.** The Town shall have agreed in writing to grant such easements in, over, under, across, through and upon the Warfield Park Parcel as are reasonably necessary for the development of the Property's storm water management system in accordance with all laws, rules, ordinances or regulations of any applicable governmental authority or body.

In the event that any of Purchaser's Closing Conditions are not satisfied on or before the Closing Date, then in such event, Purchaser shall have the right, at its sole discretion, to either (i) waive the time for performance of the unsatisfied Purchaser's Closing Conditions and proceed to Closing within thirty (30) days after the Closing Date in accordance with the terms of this Agreement; (ii) terminate this Agreement by written notice to Seller, whereupon the Deposit shall be immediately returned to Purchaser and the parties shall thereupon be released from any further liability or obligation to each other except for those that are expressly stated to survive termination of this Agreement, or (iii) extend such Closing Date by written notice to Seller (**"Purchaser's Closing Extension Notice"**) until thirty (30) days after Seller's satisfaction of Purchaser's Closing Conditions to provide Seller with additional time to satisfy Purchaser's Closing Conditions; provided however, in the event Purchaser elects to extend the Closing Date pursuant to item (iii) and any Purchaser's Closing Conditions remain unsatisfied on that date which is three (3) months

9

following the date of Purchaser's Closing Extension Notice, then Purchaser may elect either option (i) or (ii) above.

    B. Conditions to Seller's Obligations.  The obligation of Seller to proceed to Closing is subject to completion, to Seller's reasonable satisfaction, of the following conditions to Closing (each, individually, a "**Seller's Condition to Closing**"; collectively "**Seller's Closing Conditions**"):

      (i) Compromise and Release of Existing Mortgage Debt. All holders of the Existing Mortgage Debt shall have agreed in writing to release their respective liens and to fully release and discharge WDC and the Town from the Existing Mortgage Debt at and for the payment amounts contemplated in Section 2.B.(ii) above.

      (ii) Zoning. Adoption and enactment of all necessary amendments to the Town of Sykesville's "Master Plan" and/or Zoning Ordinance as set forth in the Town Code as necessary to accommodate the Preliminary Concept Plan.

      (iii) Development Plan Approval.  Final, non-appealable approval of the Final Development Plan for the Property as an Employment Campus in accordance with Section 180-131.A-C (or any applicable successor provision) of the Town Code of the Town of Sykesville, consistent in all material respects with the Preliminary Concept Plan.

      (iv) Property Owners Association.  Purchaser, subject to Seller's review and written approval, which approval shall not be unreasonably withheld, conditioned or delayed, shall have prepared (at Purchaser's cost) (a) a Declaration of Covenants, Conditions and Restrictions (the "**Declaration of Covenants, Conditions and Restrictions**") imposing architectural, commercial and residential use restrictions on the Property and providing for a property owner's association (the "**POA**") with annual assessments for the purpose of providing funds for the maintenance of the open space and recreational areas, if any, within the Property; and (b) Articles of Incorporation (the "**POA Articles**") and By-Laws (the "**POA By-Laws**") for the POA. Purchaser shall cause the Declaration of Covenants, Conditions and Restrictions to be recorded among the Land Records immediately after the Deed for the Property from Seller. Purchaser shall also cause the POA Articles to be recorded and filed with the Maryland State Department of Assessments and Taxation. The Declaration of Covenants, Conditions and Restrictions, the POA Articles and the POA By-Laws referenced in this Sub-Section shall be in commercially reasonable form and comply with all applicable laws. Purchaser acknowledges the Town's desire to make the Property self-sufficient such that costs of road maintenance, storm water management, trash removal and other services generally provided to the citizens of the Town will be directly borne by the owners of the parcels and lots within the Property rather than through the provision of public services supported and paid for by the general tax revenues of the Town of Sykesville.  Purchaser's final development plans and the Declaration of Covenants, Conditions and Restrictions shall take into consideration such desire in order to minimize the effect upon the Town of such services and maintenance for the Property (to include, by way of example but not as a condition or requirement, making all future roads within the Property private roads and requiring commercial and residential trash collection rather than Town-serviced collection). In addition, the Declaration of Covenants, Conditions and Restrictions shall include those required provisions set forth on the attached **Exhibit C.** Purchaser shall be designated the Declarant under the Declaration of Covenants, Conditions and Restrictions and shall administer the affairs of the POA until this function is assumed by the individual members of the POA who have purchased all or portions of the Property from Purchaser. Notwithstanding the foregoing, Purchaser shall be responsible for funding any deficits of the POA and for the maintenance of the open space and recreational areas until such time as the administration of the POA (and maintenance of such areas) is assumed by the individual members of the POA.

(v)    Purchaser's Representations.    There shall not be any material error, misstatement or admission in Purchaser's representations or warranties contained in this Agreement. The representations and warranties of Purchaser contained herein shall be true and correct in all material respects as of the Closing Date, with the same force and effect as though made on and as of the Closing Date. Notwithstanding that certain of Purchaser's representations and warranties may be limited to the extent of the best of Purchaser's knowledge of the facts stated therein (or such other similar qualifier), the Seller's Closing Conditions shall not be so limited, and the satisfaction of said conditions shall depend upon the actual correctness as of the time of Closing of the facts stated in all such representations and warranties.

(vi)    Purchaser's Performance.    All covenants and agreements made by Purchaser, which are to be completed on or before the Closing Date shall have been performed in all material respects, all documents to be delivered by Purchaser at Closing shall have been delivered and Purchaser shall not be in default hereunder.

(vii)    Tower Agreement.    At Closing, the parties shall execute and deliver for recording an easement or other agreement (such easement or other agreement being hereinafter referred to as the "**Tower Agreement**") in recordable form pursuant to which, for a period of thirty (30) years, Seller and Purchaser agree to divide any net revenues derived from the use of the water tower on Parcel H (the "**Water Tower**") as a cell tower in the following manner: seventy-five percent (75%) of such net revenues to Seller and twenty-five percent (25%) of such net revenues to Purchaser, until such time as the Seller has received Two Hundred Thousand and No/100 Dollars ($200,000.00) in net revenues; and thereafter, Seller and Purchaser shall divide any net revenues equally. For the purpose of the preceding sentence, "net revenues" shall mean all revenues received less all costs of maintenance for the cell tower (not including, however, capital costs). In addition to the division of revenues as provided in the preceding sentence, the Tower Agreement shall provide that: (1) Purchaser shall be responsible for maintaining the Water Tower in good condition and repair and (2) the parties shall in good faith and in a commercially reasonable manner attempt to obtain a lease or leases of the Water Tower for cell tower use. In the event the parties fail to obtain a commercially reasonable lease of the Water Tower for cell tower use within three (3) years of Closing or any such lease has expired or terminated by its terms and a new lease has not been procured within three (3) years of Closing, then Purchaser shall have the right, but not the obligation, to demolish and remove the Water Tower from Parcel H (the "**Water Tower Demolition**") at Purchaser's sole cost and expense. Purchaser shall pay to Seller the Put Option Payment (as defined below) within ninety (90) days of completion of the Water Tower Demolition and thereupon the Tower Agreement shall automatically terminate and the parties shall thereafter be released from any further liability or obligation to each other under the Tower Agreement except for those that are expressly stated to survive termination of the Tower Agreement.

The Tower Agreement shall further provide that between the period beginning on the date which is three (3) years after the Closing Date and expiring on the date which is seven (7) years after the Closing Date, and further provided Seller has not previously received payment under the preceding paragraph as a result of the Water Tower Demolition, Seller shall have the right to exercise a put option to sell its entire interest of the Tower Agreement (the "**Put Option**") to Purchaser for a price equal to the difference between One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) and the total net revenues actually received by Purchaser pursuant to the Tower Agreement (such difference, the "**Put Option Payment**"). Upon Seller's exercise of the Put Option in accordance with this Section, Purchaser shall have ninety (90) days from the date Purchaser receives written notice of the Put Option from Seller to make the Put Option Payment. Upon payment by Purchaser of the Put Option Payment, Seller shall have no further rights to net revenues under the Tower Agreement, and the parties shall thereupon be released

11

from any further liability or obligation to each other except for those that are expressly stated to survive termination of the Tower Agreement.

        (viii)    Intentionally Deleted.

        (ix)    Parcel D Escrow Agreement.  At Closing, the parties shall execute and deliver the Parcel D Preservation Agreement, the Condominium Documents, the Reversion Agreement and the Parcel D Escrow Agreement, as further referenced in Section 7.H below.

        (x)    Intentionally Deleted.

        (xi)    Disposition Agreement Monetary Obligations.  The Town, WDC and Purchaser (and each of their respective successors and/or assigns) shall have received (a) a release of all monetary obligations under the Disposition Agreement from such parties and in form and content acceptable to the Town, WDC and Purchaser, and (b) an indemnity by and from the IDACC and DBED in form and content acceptable to the Town, WDC and Purchaser for any and all sums due or found due from the Town, WDC and/or the Purchaser under the Disposition Agreement to the Community Trust Fund.

In the event that any of Seller's Closing Conditions are not satisfied on or before the Closing Date, then in such event, Seller shall have the right, at its sole discretion, to either (i) waive the time for performance of the unsatisfied Seller's Closing Conditions and proceed to Closing within thirty (30) days after the Closing Date in accordance with the terms of this Agreement; (ii) terminate this Agreement by written notice to Purchaser, whereupon the Deposit shall be immediately returned to Purchaser and the parties shall thereupon be released from any further liability or obligation to each other except for those that are expressly stated to survive termination of this Agreement, or (iii) extend such Closing Date by written notice to Purchaser ("**Seller's Closing Extension Notice**") until thirty (30) days after  Purchaser's satisfaction of Seller's Closing Conditions to provide Purchaser with additional time to satisfy Seller's Closing Conditions; provided however, in the event Seller elects to extend the Closing Date pursuant to item (iii) and any Seller's Closing Conditions remain unsatisfied on that date which is three (3) months following the date of Seller's Closing Extension Notice, then Seller may elect either option (i) or (ii) above.

    6.    **CLOSING; CLOSING DOCUMENTS**.

        A.    Closing.

        (i)    Subject to Seller's right to extend Closing and/or terminate this Agreement pursuant to Section 5.B of this Agreement, Purchaser shall proceed to settlement upon the Property (the **"Closing"**) on or before that date (the **"Closing Date"**) which is ninety (90) days from the later to occur of (a) the end of the Inspection Period or (b) satisfaction (or waiver by the applicable party) of all Purchaser's Closing Conditions and Seller's Closing Conditions, but not later than one (1) year from the date of this Agreement.

        (ii)    The Closing shall take place at the offices of the title company issuing Purchaser's Title Commitment, or at such other location and at a time as may be mutually agreed upon by Seller and Purchaser.  The Closing shall be deemed to occur at 11:59 p.m. on the Closing Date such that Seller shall be entitled to all rent through and including the Closing Date and all costs associated with the Property through and including the Closing Date shall be Seller's obligation.  Notwithstanding anything contained in this Agreement to the contrary, it is expressly agreed that by consummating Closing hereunder, Purchaser shall accept the Property and the physical condition of the Property in its existing

condition as of Closing, "as is, where is" and with all faults and with no representation or warranty of any kind in respect thereof from Seller except those expressly set forth in this Agreement.

   B.  Seller's Closing Documents.  At Closing, Seller shall deliver the following to the Escrow Agent in commercially reasonable form with respect to required documentation (or, if attached hereto as an Exhibit, then in the form so attached), for delivery to Purchaser upon consummation of Closing (collectively, the **"Seller's Closing Documents"**):

    (i)  The Deed (as defined in Section 4 of this Agreement), which shall convey good and marketable fee simple title to the Land and Improvements free and clear of all liens, encumbrances, easements and restrictions of every nature and description, except the Permitted Exceptions;

    (ii)  A certificate of Seller respecting the "non-foreign" status of Seller;

    (iii)  An affidavit in the form attached as **Exhibit D**;

    (iv)  An executed settlement statement;

    (v)  A certificate that the representations and warranties set forth in Section 12 of this Agreement, are true and correct on and as of the Closing;

    (vi)  The originals or true copies of all books and records pertaining to the operation of the Property;

    (vii)  An assignment to Purchaser of all Leases and a transfer of all funds representing tenant security deposits currently held by or on account of Seller, including all accrued interest thereon required by law or other agreement to be paid thereon, in the form attached as **Exhibit E**;

    (viii)  Copies of any and all new Leases and any and all amendments, modifications or renewals of leases subsequent to the Effective Date. At Closing, Seller shall deliver and certify as true and correct a Rent Roll through the day prior to the Closing Date, which shall be prepared by Seller, at Seller's cost;

    (ix)  Seller shall provide to Purchaser a written notice in form and content reasonably acceptable to Purchaser and to be signed by both Seller and Purchaser, to each Tenant, instructing each Tenant to pay rent to (or at the direction of) Purchaser and to recognize Purchaser or its management company as landlord under their respective Leases;

    (x)  Receipt by Purchaser not less than three (3) days prior to the Closing Date of Estoppel Certificates from each of the Tenants (other than month to month tenants) in the form attached as **Exhibit F**. The parties acknowledge and agree that failure or inability to deliver the same as provided herein shall not be an event of default by Seller under this Agreement, and that Purchaser's sole remedy for such failure or inability shall be to terminate this Agreement and have the Deposit refunded to Purchaser;

    (xi)  Seller shall deliver to Purchaser all keys, combinations and alarm codes to all parts of the Improvements;

    (xii)  A General Assignment in the form attached as **Exhibit G** assigning to Purchaser Seller's Transferable Warranties, Seller's Studies and Data, Seller's Permits (to the extent

13

assignable), Seller's Contracts (only those to be assigned and accepted in accordance with Section 6.C(ii) of this Agreement) and all other general intangibles owned by Seller and used in connection with its ownership and operation of the Property;

(xiii)    Possession of the Property shall be given to Purchaser at Closing, free of any and all tenancies, rights or claims of right to its use and occupancy other than the tenancies under the Leases;

(xiv)    The Tower Agreement, Parcel D Preservation Agreement, the Reversion Agreement and the Parcel D Escrow Agreement; and

(xv)    Seller shall do and perform any such other and additional acts and execute and deliver to Purchaser such other documents and instruments as Purchaser or its counsel may reasonably request to effect the transaction contemplated by this Agreement, including consents authorizing the sale.

C.    Purchaser's Closing Documents. At Closing, Purchaser shall deliver the following to the Escrow Agent, in commercially reasonable form with respect to required documentation (or, if attached hereto as an Exhibit, then in the form so attached) for delivery to Seller upon consummation of Closing (collectively, the "**Purchaser Closing Documents**"):

(i)    The cash portion of the Purchase Price, adjusted for the prorations hereinafter provided for in Section 8 of this Agreement and reduced by the Deposit, which shall be delivered to Seller by Escrow Agent at Closing;

(ii)    The Note and Deed of Trust;

(iii)    The Tower Agreement, the Condominium Documents, Parcel D Preservation Agreement, the Reversion Agreement and the Parcel D Escrow Agreement;

(iv)    An assumption by Purchaser of (i) all post-Closing obligations of Seller as landlord under the Leases in the form attached as **Exhibit E**, and (ii) Seller's Transferable Warranties, Seller's Permits (to the extent assignable and assumable) and Seller's Contracts (only those which Purchaser affirmatively elects to assume) in the form attached as **Exhibit G**. Purchaser will indemnify Seller from all liabilities occurring after Closing relating to the assumptions to be delivered herein;

(v)    An executed settlement statement; and

(vi)    Purchaser shall do and perform any such other and additional acts and execute and deliver to Seller such other documents and instruments as Seller or its counsel may reasonably request to effect the transaction contemplated by this Agreement, including consents authorizing the purchase.

7.    **ADDITIONAL UNDERTAKINGS; POST-CLOSING COVENANTS**.

A.    Cooperation. During the pendency of this Agreement and at all times before and after Closing, Seller agrees to cooperate (as owner of the Property), provided there be no cost or expense to Seller in connection therewith, with Purchaser in regard to submissions with respect to all proceedings related to any development plan, site plan, subdivision plan or plat approvals, zoning/master planning, and development, utility company contracts and construction permitting for the Property. Seller further agrees, provided there be no cost or expense to Seller in connection therewith, to consent to, and to promptly execute, when required as owner, such plans, applications, and other requests for governmental approval,

and amendments thereto, which may be prepared by or at the direction of Purchaser, incident to Purchaser's proposed development and improvement of the Property. The foregoing notwithstanding the Town's cooperation pursuant to this Section or as elsewhere provided in this Agreement shall be that as an owner of the Property and, as further provided in Section 37 of this Agreement, shall not constitute a governmental or regulatory approval or any waiver thereof.

B.      Seller's Reservation; Purchaser's Cooperation. Seller may reserve such rights, easements and rights of way in, over, under, across and through the Property for ingress and egress to and for the benefit of any other properties owned by Seller adjoining the Property or owned by third parties whose properties have been included within or annexed into the Employment Campus District applicable to the Property and/or annexed into the POA for access to a publicly dedicated and maintained street, for all utilities, stormwater management outfalls, and on-site and off-site improvements as reasonably necessary for the development of such other properties (collectively, "**Future Development Rights and Easements**"), provided that there shall be no material adverse impact on the Property or the proposed development thereof. All Future Development Rights and Easements so reserved at or prior to Closing hereunder, as evidenced by recorded instrument, shall be deemed Permitted Exceptions. Further, from and after Closing, upon request of Seller, Purchaser agrees, at no cost to Purchaser, to promptly grant and deliver, at no charge, to Seller, or to any utility company or to Carroll County, as applicable, such Future Development Rights and Easements as Seller may reasonably request, provided that there shall be no material adverse impact on the Property or the proposed development thereof in accordance with the terms of this Agreement; the preceding obligation of Purchaser shall survive Closing.

C.      Entrance Feature Monument Signs. Pursuant to a Memorandum of Understanding (the "**Town/SHA MOU**") dated June 23, 2010, by and between the Town and Maryland State Highway Administration Department of Transportation ("SHA"), SHA agreed to permit and license the installation of two brick entrance feature monument signs (the "**Entrance Feature Monument Signs**") for Warfield Commerce and Cultural Center along the east side of Maryland Route 32, one on each side of Springfield Avenue, such Entrance Feature Monument Signs to be constructed on and within SHA's right of way (not within the Warfield Commerce and Cultural Center). Pursuant to the Town/SHA MOU, the Town is responsible for the maintenance, repair and, as applicable under the terms thereof, the removal of the Entrance Feature Monument Signs. Pursuant to a Memorandum of Understanding dated August 3, 2010 (the "Town/WDC MOU"), by and between the Town and Warfield Development Corporation, Warfield Development Corporation agreed to perform and fulfill all responsibilities and obligations of the Town under the Town/SHA MOU. Copies of the Town/SHA MOU and Town/WDC MOU are attached as **Exhibit H-1** and **Exhibit H-2**. From and after Closing, Purchaser shall perform and fulfill all obligations of the Town and WDC under the Town/SHA MOU and Town/WDC MOU, respectively, and shall indemnify and hold harmless the Town and WDC from any and all loss or liability arising out of or in connection with Purchaser's failure to so perform; the foregoing provisions of this sentence shall survive Closing. The obligations of Purchaser under this Section shall be transferred to the POA by incorporation of such obligations (including the foregoing indemnity for the benefit of the Town and WDC) into the Declaration of Covenants, Conditions and Restrictions, in which event Purchaser's obligations under this Section shall cease and terminate upon recordation of the Declaration of Covenants, Conditions and Restrictions.

D.      Storm Water Management Facilities. Parcel G as shown on the Plat is subject to a Declaration of Drainage Facility Easements dated August 11, 2009 and recorded among the aforesaid Land Records in Liber 5958, Folio 184 et seq. and a storm water management pond has been constructed upon and within Parcel G (the "**Storm Water Management Facility**"). Purchaser shall impose and include within the Declaration of Covenants, Conditions and Restrictions, the obligation for the POA, at the POA's sole cost and expense, to maintain, repair and/or replace the Storm Water Management Facility.

E.    Easement for the Benefit of Parcel I.    In the event Purchaser does not exercise the Parcel I Option, Seller shall convey Parcel I to the State of Maryland (the "**State**") for the Use and Benefit of the Department of Health and Mental Hygiene (or for the benefit of such other division or department of the State as may be determined by the State).    In connection with such transfer and conveyance, the State has requested that the Seller grant a utility easement under and across a portion of Parcel D for the existing underground utility lines in the locations shown on the attached **Exhibit I** (the "**Parcel I Utility Easement**").  Seller shall prepare and deliver a copy of the proposed Parcel I Utility Easement to Purchaser for its review and approval, such approval not to be unreasonably withheld, conditioned or delayed.  Upon such approval, Seller may execute, deliver and record the Parcel I Utility Easement, which shall be deemed a Permitted Exception.  In the event, for any reason, the conveyance of Parcel I from the Seller to the State cannot be accomplished prior to Closing under this Agreement and the Parcel I Utility Easement has not been recorded prior to Closing, Purchaser agrees to grant the Parcel I Utility Easement to the State, upon the State's request, in commercially reasonable form, and Seller shall bear all reasonable costs (including reasonable attorney's fees) incurred by Purchaser for the review and/or preparation and recording thereof; the preceding obligations of Purchaser shall survive Closing.

F.    Intentionally Deleted.

G.    Taxes.  During the Inspection Period, Seller shall cooperate with Purchaser to file a tax appeal or other related action with the Maryland State Department of Assessment and Taxation (or such governmental or administrative body that has jurisdiction over property assessments) to seek a reduction in the assessed value of the Property (the "**Tax Appeal**").  Purchaser shall prepare all necessary Tax Appeal documents for Seller's review and approval; upon such approval Seller shall execute and file such Tax Appeal.  Purchaser shall reasonably cooperate with Seller in seeking such Tax Appeal, and Purchaser shall pay for all third party legal or consulting costs, filing fees and expenses related to such Tax Appeal.  In the event the results of the Tax Appeal received during the Inspection Period are not acceptable to Purchaser, then Purchaser shall have thirty (30) days from Purchaser's receipt of such results to terminate this Agreement by written notice to Seller, whereupon the Deposit shall be immediately returned to Purchaser and the parties shall thereupon be released from any further liability or obligation to each other, except for those that are expressly stated to survive termination of this Agreement. Purchaser's failure to so timely terminate this Agreement shall be automatically deemed to constitute Purchaser's acceptance of the results of the Tax Appeal and Purchaser shall have no further right to terminate this Agreement under this Section 7.G.

H.    Parcel D.

(i)    Building Preservation.  After Closing, Purchaser agrees to undertake and complete certain work, including preservation and stabilization work on the historic buildings located on Parcel D, infrastructure development on, in and around Parcel D, and tenant build out within the buildings located on Parcel D (collectively, the "**Parcel D Obligation**").  At Closing, Purchaser shall execute and deliver to Seller the "**Parcel D Preservation Agreement**" in the form attached hereto as **Exhibit P** pursuant to which Purchaser shall acknowledge and agree to the Parcel D Obligation, and which shall include the description of the work to be performed and the portion(s) of the Parcel D buildings to be completed within three (3), seven (7) and twelve (12) years after Closing.  The Parcel D Preservation Agreement shall provide that in the event Purchaser fails to complete such work in accordance with such milestones referenced therein, all of Purchaser's right, title and interest to the buildings that Purchaser has not completed shall revert to Seller.  At Closing, the parties shall execute a reversion agreement or other similar agreement providing Seller with such right of reversion (the "**Reversion Agreement**") in recordable form reasonably satisfactory to the parties.  In order to effectuate the Parcel D Preservation Agreement, the Parcel D Escrow Agreement (as defined below) and the Reversion Agreement, the parties

have agreed that Parcel D shall be subjected to a condominium regime for a "land condominium" by Condominium Declaration, Condominium Plats, Articles of Incorporation and Bylaws (the "**Condominium Documents**"), in form and content mutually acceptable to Seller and Purchaser, with Purchaser to be the Declarant.    The Condominium Documents shall be prepared and recorded at Purchaser's cost and expense.  The Condominium Documents shall be recorded after the recording of the Deed for the Property and prior to the Reversion Agreement.

(ii)    Parcel D Escrow Fund.  At Closing, Seller shall deposit One Million Three Hundred Fifty Thousand and No/100 Dollars ($1,350,000.00) of the proceeds from Closing in an escrow account that shall be used for the purpose of restoring, renovating and leasing the Parcel D Buildings, making infrastructure improvements for the benefit of Parcel D (and the Buildings located therein) and as otherwise provided below (the "**Parcel D Escrow Fund**").  The Parcel D Escrow Fund shall be held by Escrow Agent or such other escrow agent (the "**Parcel D Escrow Agent**") as may be mutually agreed upon by Seller and Purchaser and shall be placed and held in escrow by the Parcel D Escrow Agent in an interest-bearing account at a federally insured banking institution using Purchaser's Federal Taxpayer ID Number 46-2279159.  The Parcel D Escrow Fund shall be supplemented from time to time by payments under the Note as provided in Section 2.B.(iv) of this Agreement. At Closing, Seller, Purchaser and the Parcel D Escrow Agent shall execute and deliver an escrow and disbursement agreement that shall allocate the funds (except for the Public Project Escrow Component, as defined below) among the Parcel D Buildings and provide for the disbursement of funds for work performed on the Parcel D Buildings or with respect to infrastructure improvements within Parcel D in amounts matching amounts expended by Purchaser or its designees up to the amounts allocated for each building (the "**Parcel D Escrow Agreement**"), in the form attached hereto as **Exhibit Q**.  The Parcel D Escrow Agreement shall further provide that any and all funds then remaining in the Parcel D Escrow Fund shall be paid over and disbursed by Escrow Agent to Seller (1) upon reversion of all or any portion of Parcel D to Seller pursuant to the Reversion Agreement or (2) twelve (12) years after Closing.

Notwithstanding anything to the contrary provided in this Agreement, Purchaser hereby agrees that Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "**Public Project Escrow Component**") of the Parcel D Escrow Fund shall be made available to be paid and distributed to the Town, for use in connection with public projects the Town, in the Town's sole and absolute discretion, determines will, directly or indirectly, benefit and/or enhance Purchaser's project contemplated for the Property, within or with regard to the following: (a) the Warfield Park Parcel as shown on the Plat, (b) the Town's Millard Cooper Park, (c) the Town's Gatehouse Museum located next to Millard Cooper Park, (d) the "Girl's Shelter Property" situate immediately next to the Millard Cooper Park and the Gatehouse Museum, (e) certain property containing approximately 2.5112 acres directly adjoining Millard Cooper Park owned by Episcopal Ministries to the Aging, Inc. (or an affiliate thereof) which the Town has the option to ground lease for recreational uses (pursuant to Memorandum of Understanding executed in connection with the Route 32/Springfield Avenue Intersection Project), and/or (f) the streetscape (including road improvements, storm water management facilities, street trees and plantings and other enhancements) along Springfield Avenue and at the intersection of Springfield Avenue and Central Avenue.  The Town shall have the unilateral right to draw upon the Public Project Escrow Component by written notice to the Parcel D Escrow Agent, without invoice or further documentation; provided, however, that all such requests shall be made in good faith and in connection with costs anticipated to be incurred and/or actual costs incurred in connection with public projects as set forth above. The Parcel D Escrow Agreement shall provide for the disbursement of the Public Project Escrow Component to the Town and Purchaser shall match each disbursement of the Public Project Escrow Component by Purchaser or its designees expending matching amounts for work performed on the Parcel D Buildings or with respect to infrastructure improvements within Parcel D exceeding the amounts set forth in **Exhibit Q**. Any remaining sums from the Public Project Escrow Component that have not been drawn upon and disbursed to the

Town by the date seven (7) years after Closing shall be released from the Public Project Escrow Component and thereafter made available to be disbursed or reimbursed to Purchaser or its designee(s) for work performed on the Parcel D Buildings or with respect to infrastructure improvements within Parcel D exceeding the amounts set forth in **Exhibit Q**. Within thirty (30) days after Closing, Purchaser may submit written recommendations to Seller for consideration with respect to the use of the Public Project Escrow Component (for example, but not in limitation, for use for lighting, signage, landscaping, parking, walkways, access and park improvements), provided, however, that the final determination and usage of such funds shall be in the sole and absolute discretion of Seller.

(iii)    Survival.    The obligations of the respective parties contained in this Section 7.H shall survive Closing.

8.    **PAYMENT OR PRORATION OF TAXES AND OTHER COSTS**.

A.    Prorations and Adjustments at Closing. All ad valorem taxes, real estate taxes, general and special, and usual County imposed water and sewer annual front-foot benefit charges (if any), and all other fees payable on an annual or periodic basis shall be adjusted to the Closing Date and thereafter assumed and paid for by Purchaser. Special assessments against the Property for public improvements authorized, pending or completed and levied prior to the Closing Date, whether payable in one (1) lump sum or installments, shall at the Closing, be paid in full by Seller or, at Purchaser's election, credited against the Purchase Price. All real estate taxes for the Property for the fiscal year in which Closing occurs shall be apportioned at Closing based upon the tax year. If Closing shall occur before the tax rate or assessment is affixed, then the apportionment on the Closing Date of such real estate taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation and final adjustment shall be made between the parties after Closing based upon the actual rates and assessments for such periods promptly after such actual rates and assessments for such periods are fixed by the applicable authorities.

B.    Rent. All rentals collected by Seller up to the Closing Date, which are allocable to any lease term from and after Closing, shall be paid by Seller to Purchaser at Closing. That portion of any past due rentals payable to Seller at or prior to Closing which are allocable to the month in which Closing occurs shall be remitted to Seller by Purchaser as and if collected by Purchaser. Payments received by Purchaser after Closing shall be applied first to current rent due and then to past due rent starting with the most recent delinquency.

C.    Tenant Deposits.    At Purchaser's election, Purchaser shall receive a credit against the Purchase Price or Seller shall pay to Purchaser at Closing the total amount of all tenant security deposits then held by Seller under the Leases. Purchaser shall be responsible for repayment of tenant security deposits to tenants pursuant to the terms of the Leases or applicable law.

D.    Service Contracts and Utilities.    All prepayments by or payments due from Seller under any continuing service contracts affecting the Property, including water, sewer, electric, gas and utility bills, and maintenance agreements shall be adjusted and apportioned as of the Closing and thereafter assumed by Purchaser.

E.    Miscellaneous. All other charges and fees customarily prorated and adjusted in similar transactions shall be prorated at Closing and thereafter assumed by Purchaser. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills or statements are not obtainable (as, for example, utility bills), the parties shall prorate on the best available information, subject to adjustment upon receipt of the final bill or statement. Seller shall use its best efforts to have all

utility meters read on the Closing Date so as to accurately determine the proration of current utility bills. In the event the Improvements are heated by oil, Seller shall certify to Purchaser the amount of oil in the fuel tanks on the Property on the Closing Date and Purchaser shall purchase the oil from Seller at Closing at the per gallon price for heating oil then being charged by the suppliers thereof.

        F.     Closing, Transfer and Recordation Costs.  Purchaser shall pay all costs of the tax assessments levied upon the privilege of transferring real estate, including, but not limited to, any transfer taxes, documentary stamp taxes, recordation costs or taxes, intangible taxes, or other similar taxes, fees or assessments, expressly including the payment of all Agricultural Transfer Taxes assessed, if any, on or with respect to, all or any portion of the Property.  Except as otherwise provided herein or by separate agreement of the parties, each party shall be responsible for the payment of its own attorneys' fees incurred in connection with the transaction that is the subject of this Agreement.  Purchaser shall be responsible for paying the fees of the party conducting Closing, title insurance, preparation of Deed and all other costs and expenses incident to or associated with Closing (except for the reasonable costs of preparation and actual cost of recordation of releases of deeds of trust, mortgages and other monetary liens encumbering the Property, which shall be the responsibility of Seller).

        9.     **RISK OF LOSS; CONDEMNATION**.  Risk of loss or damage by fire or other casualty or condemnation or eminent domain to all or any part of the Property prior to Closing shall be the risk of Seller.  In the event of a material loss or damage prior to Closing (such material loss or damage being agreed by the parties to be loss or damages in excess of One Hundred Thousand and No/100 Dollars ($100,000.00)), Purchaser shall have the option of either continuing this Agreement upon the terms set forth herein or, by written notice to Seller, terminating this Agreement, whereupon Escrow Agent shall immediately return the Deposit to Purchaser and the parties shall thereupon be released from any further liability or obligation to each other (other than those that expressly survive termination of this Agreement).  If Purchaser elects to continue this Agreement upon any such occurrence or if less than a material loss or damage occurs, this Agreement shall not be affected; however, Seller shall assign to Purchaser all rights to any condemnation award and all rights under any insurance policy or policies applicable to such loss. Seller grants to Purchaser the right to bring any action on Seller's behalf to recover under any such policy or policies or condemnation award.  In the event that Seller should receive any payments for such damage or condemnation after the Effective Date of this Agreement and prior to Closing, if Purchaser elects to proceed to Closing, the Purchase Price shall be reduced by any amount so received by Seller for condemnation as for any damage occurring to the Property or other casualty prior to Closing; provided, however, that in the event such payments for damage or condemnation are paid to and retained by any holder of the Existing Mortgage Debt (rather than released and paid to the Seller), then Seller shall have the right to terminate this Agreement unless the Debt Payments are reduced by such same amounts and the holders of the Existing Mortgage Debt agree in writing to release their liens and the Seller from all liability upon payment of the reduced Debt Payments at Closing.

        10.    **OPERATIONS PRIOR TO CLOSING**.

        A.  Maintenance and Operations.  Until Closing, Seller shall (a) not enter into any agreements or contracts that will be an obligation affecting the Property subsequent to the Closing without Purchaser's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed)  (b) within ten (10) days after the receipt thereof, notify Purchaser if Seller receives notice or acquires knowledge of any violation of any law, ordinance, code or regulation pertaining to the Property, (c) within ten (10) days after the receipt thereof, furnish to Purchaser copies of any and all notices or communications that Seller receives from any governmental or quasi-governmental entities, any other body having jurisdiction with respect to the use and occupancy or physical condition of the Property and/or any other notice or communication relating to or concerning the Property, (d) not further mortgage or otherwise further encumber the Property, (e) not enter

into any new Leases or cancel, modify, extend or renew any current Leases, nor affirmatively waive any default under, nor accept surrender of, any Lease without in each case obtaining Purchaser's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), (f) not enter into any future, or modify any existing, easement, covenant, condition or restriction appertaining to the Property except as otherwise provided under this Agreement, (g) continue to operate the Property in its customary manner and maintain the Property in substantially the same physical condition as it exists as of the Effective Date, provided however that Seller shall have no obligation to make any capital improvements or repairs, and deliver the Property to Purchaser at Closing in substantially the same condition existing as of the Effective Date, subject to ordinary wear and tear and events of casualty, (h) maintain all casualty, liability and hazard insurance currently in force and insuring against claims for bodily injury, death and property damage occurring in, on or about the Property, and (i) comply in all material respects with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof, and pay all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due.

B. Existing Mortgage Debt. Until Closing, Seller will perform all of its obligations under the Deeds of Trusts and Mortgages securing the Existing Mortgage Debt, will make all periodic payments required thereunder and will not consent to any modification or amendment thereto without Purchaser's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

C. Seller's Contracts. Between the Effective Date and the Closing Date, Seller shall not, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed prior to the expiration of the Inspection Period and which consent may be withheld in Purchaser's sole discretion after the expiration of the Inspection Period: (a) execute any new Seller's Contract affecting the Property, or any part thereof unless such contract is terminable upon thirty (30) days prior written notice from Seller (or any assignee of Seller); or (b) materially amend any existing Seller's Contract listed on **Exhibit L** attached hereto if such new Seller's Contract or amendment will be binding on Purchaser following Closing. With respect to any new Seller's Contract or Seller's Contract amendment submitted by Seller to Purchaser as set forth in this Section 10.C, if Purchaser shall fail to either consent or to expressly withhold its consent by a written notice to Seller which specifically states the commercially reasonable basis for Purchaser's objection within five (5) business days after Purchaser's receipt of such request if given prior to the expiration of the Inspection Period, then Purchaser shall be deemed to have consented to such new Seller's Contract or Seller's Contract amendment. Seller shall terminate effective not later than the Closing Date, all Seller's Contracts except those that Purchaser requests that Seller not terminate, by written notice given by Purchaser to Seller not later than the expiration of the Inspection Period.

D. Other Acts. Until Closing, Seller shall not undertake or omit to undertake any other act which would have a material adverse effect on the Property or the operations thereof.

11. **RIGHT OF ENTRY; INDEMNITY; INSURANCE.**

A. Right of Entry; Restoration. Purchaser and its employees, agents, contractors and subcontractors may enter the Property at all times prior to Closing, and while thereon, make surveys and appraisals, take measurements, test borings, other tests of surface and subsurface conditions and soil tests, make structural and engineering studies, and inspect the Property, all at Purchaser's sole cost and expense. If Purchaser exercises its rights under the foregoing provisions of this Section, or enters upon the Property during the Inspection Period pursuant to Section 3.A of this Agreement, Purchaser shall keep the Property free and clear of any and all liens or claims resulting therefrom. Upon termination of this Agreement for any reason whatsoever, to the extent the Property has been damaged in any respect by reason of or as a

result of Purchaser's exercise of its rights under this Section, then Purchaser shall promptly restore the Property to substantially the same condition as existed as of the Effective Date. The provisions of this Section 11.A shall survive Closing or earlier termination of this Agreement.

        B.     Indemnity. Purchaser agrees to indemnify, defend and hold harmless Seller, and its elected officials, officers, directors, employees, partners and members from any claim, loss, injury, liability, damage or expense, including reasonable attorneys' fees and costs, arising out of (i) Purchaser's entry upon the Property pursuant to Section 11.A or 3.A of this Agreement, (ii) a breach by Purchaser of its obligation to restore the Property, if such restoration is required under the terms of this Agreement, and (iii) any lien, claim or levy, or governmental imposed fine and/or penalty, including without limitation mechanic's, materiahnan's and judgment liens, filed or pending against any portion of the Property, or title thereto, by a contractor or subcontractor authorized by Purchaser and having a claim against or through Purchaser. The provisions of this Section 11.B shall survive Closing or earlier termination of this Agreement.

        C.     Insurance. Prior to undertaking any inspection of the Property, Purchaser shall obtain, at Purchaser's sole cost and expense, a comprehensive general liability insurance policy with coverage of not less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and in the aggregate, with a contractual liability endorsement which ensures Purchaser's indemnity obligations hereunder and which names Seller as additional insured thereunder (a copy of which policies, or certificates evidencing such policies, shall be provided by Purchaser to Seller prior to undertaking any inspection under this Agreement). Such insurance coverage shall be maintained by Purchaser throughout the term of this Agreement. Failure to deposit such certificates shall not relieve Purchaser or its agents and contractors of their obligation to obtain and keep in force the insurance coverages required by this Agreement. The insurance required hereby may be maintained by means of a policy or polices of blanket insurance so long as the provisions of this Agreement are fully satisfied and the required amounts are specifically allocated to the Property without possibility of diminution because of occurrences or other properties. All policies of insurance required to be carried by Purchaser pursuant to this Section 11.C shall provide that the policies shall not be subject to cancellation, termination or change except after thirty (30) days prior written notice to Seller. Purchaser shall provide evidence of all renewals of the aforesaid insurance policies in a form satisfactory to Seller at least thirty (30) days prior to the effective date of such renewals.

    12.    **SELLER'S REPRESENTATIONS AND WARRANTIES**. The representations and warranties contained in this Section, and the other Sections of this Agreement, shall be deemed made as of the Effective Date of this Agreement and again as of the Closing Date. Seller makes the following representations and warranties to Purchaser:

        A.     Organization and Authority of Town. The Town is a duly organized and validly existing municipal corporation under the laws of the State of Maryland. All necessary consents and approvals have been obtained and the persons executing this Agreement on behalf of the Town are duly empowered to bind the Town to perform its obligations hereunder.

        B.     Organization and Authority of WDC. WDC is a duly organized and validly existing corporation under the laws of the State of Maryland. All necessary consents and approvals have been obtained and the persons executing this Agreement on behalf of WDC are duly empowered to bind WDC to perform its obligations hereunder.

        C.     Compliance With Existing Laws. To Seller's Knowledge, WDC possesses all licenses, certificates, permits and authorizations required to own, operate, use, occupy or maintain

Buildings G, H, I and W as shown on the Plat, for office use. All Seller's Permits which are transferable shall be transferred to Purchaser at Closing. To Seller's Knowledge, the Property is in compliance with all applicable building, zoning or other ordinances, resolutions, statutes or regulations of any government or governmental agencies with respect to the use, maintenance, condition or operation of the Property and Seller has not received any notices of violations of the same.

D.    Title.  Seller is, or as of the Closing Date will be, the sole legal and beneficial owner and has good and marketable title to the Property, free and clear of all liens, mortgages, pledges, encumbrances, security interests and charges of whatever kind and character except for the Permitted Exceptions.

E.    Leases.  As of the Effective Date of this Agreement the Property is subject to those tenancies and leases (sometimes collectively referred to as "**Leases**") listed on and attached hereto as **Exhibit J.  Exhibit J** contains a true and accurate list of all leases and tenancies affecting the Property and also contains true and complete copies of all such Leases, including all modifications thereto. No tenant has been given any concession, rebate, allowance, or free rent for any period after the Closing, except as otherwise indicated on **Exhibit K**.

F.    Status of Leases.  Except as otherwise indicated on **Exhibit K**, to Seller's Knowledge, all of the Leases are in good standing, valid and in full force and effect.  To Seller's Knowledge, no tenant has any claim or basis for any claim for free or reduced rent, or for reduction, deduction, or setoff against Seller of the rent under any Lease, except as otherwise indicated on **Exhibit K**. Except as specifically set forth in **Exhibit K**, to Seller's Knowledge: (i) no tenant has subleased or assigned any space leased by it and each tenant is in possession of all space leased to it; (ii) no tenant has given Seller notice, oral or written, of any intent to terminate its Lease prior to the end of its stated term; (iii) there is no default under any Lease by either Seller or the tenant and no state of facts which with notice and/or the passage of time would ripen into a default; (iv) no oral agreement has been entered into with any tenant relating to its occupancy of the Property; and (v) no brokerage or leasing commissions are or will become due with respect to any Lease or the renewal thereof and no understanding or agreement exists in regard to payment of any leasing commissions or fees for future Leases.

G.    Seller's Contracts.  Attached as **Exhibit L** are true and correct copies of each of Seller's Contracts together with a complete list of those which would survive Closing.  Purchaser shall assume all such Seller's Contracts unless Purchaser delivers written notice to Seller not later than thirty (30) days prior to the Closing Date specifying which, if any, of Seller's Contracts Purchaser elects not to assume.  To Seller's Knowledge, there is no default, or event that with notice or lapse of time or both would constitute a default, by any party to any Seller's Contract. Seller has received no notice that any party to any Seller's Contract intends to cancel or terminate such agreement.  Except as set forth in **Exhibit L**, all Seller's Contracts are in writing.

H.    Insurance.  Seller has in full force insurance policies covering the Improvements for loss or drainage by fire, extended coverage, vandalism, malicious mischief, all risk coverage, and loss of rents.

I.    Condemnation Proceedings.  Seller Knows of no condemnation or eminent domain proceedings pending or contemplated against the Property or any part thereof and Seller has received no notice, oral or written, of the desire of any public authority or other entity to take or use the Property or any part thereof.

J.    Pending Litigation.  Seller Knows of no litigation, claim, action or proceeding, pending or threatened, by any organization, person, individual or governmental agency which could (i) materially and adversely affect Purchaser or the use, occupancy or value of the Property, or any part thereof or (ii) interfere in a material respect with the transaction contemplated by this Agreement or otherwise affect Seller's ability to consummate the transaction contemplated hereby.  If Seller is served with process or receives notice that litigation is pending or threatened against it in a manner that would render the foregoing no longer accurate, Seller shall promptly send written notice to Purchaser.  As of the Effective Date, there are no existing actions, suits, proceedings or arbitrations initiated by Seller which could (a) materially and adversely affect Purchaser or the use, occupancy or value of the Property, or any part thereof or (b) interfere in a material respect with the transaction contemplated by this Agreement or otherwise affect Seller's ability to consummate the transaction contemplated hereby.  If Seller initiates any such actions, suits, proceedings or arbitrations that would render the foregoing no longer accurate, Seller shall promptly send written notice to Purchaser.

K.    No Defaults.  Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will: (i) conflict with, or result in a breach of, the terms, conditions, or provisions of, or constitute a default under, any agreement or instrument to which Seller is a party; (ii) violate any restriction to which Seller is subject; (iii) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance, rule, judgment, decree, or order; or (iv) give anyone the right to cancel any of Seller's Contracts or any Lease pertaining to the Property.

L.    Events Prior to Closing and Other Information.  Seller shall promptly notify Purchaser, in writing, of any event or condition known to Seller which occurs prior to Closing hereunder, which causes a change in the facts relating to, or the truth of, any of the above representations or warranties.  Within ten (10) days of receipt of such notice, Purchaser shall have the right to terminate this Agreement by written notice to Seller and receive a refund of the Deposit, whereupon this Agreement shall be null and void without any further liability or obligation to either party to the other except for those that are expressly stated to survive termination of this Agreement.

M.    Environmental Laws; Hazardous Materials.  Seller has delivered to Purchaser copies of all environmental audits, assessments, investigations, reports, notices, documents and other materials in connection with the Property, in Seller's possession or which may be reasonably obtained from Seller's advisors, engineers, consultants and other agents, prepared by or on behalf of Seller (collectively, the **"Environmental Reports"**).  Except as may be set forth in the Environmental Reports, as may have occurred during and/or in connection with the demolition of the "Lane Building" formerly located upon the Property, as may have occurred in connection with the restoration and rehabilitation of Buildings G, H, I and W as shown on the Plat, and/or as may have occurred in connection with use by Springfield Hospital, the State or any agency thereof of the Water Tower and/or of Parcel I and the improvements thereon: (a) Seller has not conducted or authorized the generation, transportation, storage, treatment or disposal at or from the Property or any portion thereof of any Hazardous Materials that are regulated by or restricted under any applicable Environmental Laws, and (b) to Seller's Knowledge, during Seller's period of ownership, there has not been any generation, transportation, storage, treatment or disposal at or from the Property or any portion thereof of any such Hazardous Materials in violation of any applicable Environmental Laws which has not been corrected.   For purposes of this Agreement, **"Hazardous Materials"** shall mean inflammable explosives, radioactive materials, radon, asbestos, polychlorinated biphenyls, urea formaldehyde, lead, lead-based paint, under and/or above ground tanks, hazardous materials, hazardous wastes, hazardous substances, oil or other petroleum products or related materials, any other substance, product, waste or other material of any nature whatsoever which is listed or regulated pursuant to any federal, state or local statute, law, ordinance, resolution, code, rule regulation, order or decree regulation, relating to, or imposing liability or standards of conduct concerning any

23

hazardous, toxic or dangerous waste, substance or material, as now in effect, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 6901, et seq.), the Resources Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (14 U.S.C. Section 1401, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.), the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.), and any other applicable federal, state or local laws or regulations covering Hazardous Materials or environmental conditions, any amendments to the aforementioned laws, and in the regulations adopted and publications promulgated pursuant to said laws (all of the foregoing, collectively, **"Environmental Laws"**).

N.    OFAC. Seller and, to Seller's Knowledge, each person or entity owning an interest in Seller is (a) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury (**"OFAC"**) and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the **"List"**), and (b) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (c) not an Embargoed Person (as hereinafter defined). To Seller's Knowledge, none of the funds or other assets of Seller constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Seller's Knowledge, no Embargoed Person has any interest of any nature whatsoever in Seller (whether directly or indirectly). The term **"Embargoed Person"** means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

O.    Approvals. No authorization, consent, order, approval or license from, filing with, or other act by any person, entity or governmental authority is or will be necessary to permit Seller's valid execution and delivery of, or its performance under, this Agreement.

P.    Bankruptcy. Seller (i) is not in receivership or dissolution, (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature, (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the Federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Seller with respect to which process has been served upon Seller, and (iv) to Seller's Knowledge, none of the foregoing is pending or threatened.

Q.    Employees. There are no on site employees or hired persons in connection with the management, operation or maintenance of the Property. Purchaser shall have no obligation, liability or responsibility with respect to charges, salaries, vacation pay, fringe benefits or like items subsequent to Closing, nor with respect to any management or employment agreements with respect to the Property.

R.    Existing Mortgage Debt. A list of all documents governing and securing the Existing Mortgage Debt (collectively, the **"Existing Mortgage Debt Documents"**) is included as **Exhibit M**, which is attached hereto. True and complete copies of the Existing Mortgage Debt Documents have been provided to Purchaser prior to the Effective Date. Except as noted on **Exhibit M**, Seller has not received any written notice from the holders of the Existing Mortgage Debt that an Event of Default or Default (as each term is defined in the Existing Mortgage Debt Documents) exists under the Existing Mortgage Debt Documents.

S.    No Options to Purchaser. Except as may be included within the Leases, Seller has not granted any person any option, right of first refusal or other rights to purchase the Property or any part thereof or interest therein, other than Purchaser and the holders of the Existing Mortgage Debt.

T.    Intentionally Deleted

U.    Tax Bills. True and complete copies of the most recent real property tax bills for the Property (which include bills for all real estate taxes from all municipal authorities assessing same) shall be delivered to Purchaser during the Inspection Period. There are no special assessments or betterment assessments (whether payable in installments or otherwise) applicable to the Property and, to Seller's Knowledge, no tenant is entitled to any refund of any tax or other payment by reason of tax reduction proceedings affecting current or prior years. All taxes and tax refunds charged or collected with respect to the Property shall be apportioned between the parties in accordance with their respective periods of ownership, provided that no apportionment or adjustment shall be required with respect to taxes for any portion of the Property subject to a Lease pursuant to which the tenant/lessee thereunder is obligated for payment of such tax. No tax reduction proceedings are pending or outstanding.

V.    Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

W.    LIMITATIONS ON REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY.

(i)    DISCLAIMER. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS OR WARRANTIES SET FORTH IN THIS SECTION 12 OF THIS AGREEMENT AND/OR AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT TO THE CONTRARY, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED IN THIS AGREEMENT AND THE WARRANTIES SET FORTH ABOVE), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, GEOLOGY OR ENVIRONMENTAL CONDITIONS OF THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR AND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS(AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.

(ii)     ADDITIONALLY, NO PERSON ACTING ON SELLER'S BEHALF IS AUTHORIZED TO MAKE, AND BY PURCHASER'S EXECUTION HEREOF, PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON SELLER'S BEHALF SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.

(iii)     PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT,  HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY AND, REGARDLESS OF WHETHER OR NOT PURCHASER HAS AVAILED ITSELF OF SUCH OPPORTUNITY, PURCHASER IS RELYING SOLELY ON PURCHASER'S OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SHALL ACCEPT THE PROPERTY AT CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY.

(iv)     PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION.

(v)     SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON.

(vi)     PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT TO THE CONTRARY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.

(vii)     FOR THE PURPOSES OF THIS AGREEMENT, **"SELLER'S KNOWLEDGE"** OR **"SELLER KNOWS"** SHALL MEAN THE ACTUAL KNOWLEDGE OF JAMES B. REES, PRESIDENT OF WDC AND OF NO OTHER OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF EITHER WDC OR THE TOWN.

13.     **PURCHASER'S REPRESENTATIONS AND WARRANTIES**. Each of Purchaser's representations and warranties contained in this Section, and the other Sections of this Agreement, shall be deemed made as of the Effective Date of this Agreement and again as of the Closing Date.  Purchaser makes the following representations and warranties to Seller:

A.    Purchaser has the lawful right and authority to enter into this Agreement and at Closing shall be ready, willing and able to perform its obligations hereunder.

B.    To Purchaser's Knowledge, the consummation of the transaction contemplated by this Agreement shall not result in any breach or constitute a default under any restriction or agreement to which Purchaser is a party and shall not result in the violation of any applicable law or regulation.

C.    To Purchaser's Knowledge, there is no litigation pending or threatened in any court, either state or federal, against Purchaser, or questioning the creation, organization or existence of Purchaser, which would prevent Purchaser from purchasing the subject Property.

D.    Purchaser and, to Purchaser's Knowledge, each person or entity owning an interest in Purchaser is (i) not currently identified on the List maintained by OFAC, and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an Embargoed Person. To Purchaser's Knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Purchaser's Knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

E.    Purchaser is not a "foreign person" within the meaning of Section 1445 of the Code.

FOR THE PURPOSES OF THIS AGREEMENT, **"PURCHASER'S KNOWLEDGE"** SHALL MEAN THE ACTUAL KNOWLEDGE OF ROGER CONLEY AND CHUCK SHULER, EACH A MEMBER OF PURCHASER AND OF NO OTHER OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR AGENT OF PURCHASER.

14.    **REMEDIES UPON DEFAULT**.

A.    Purchaser's Default.  In the event Purchaser defaults under the terms of this Agreement at or prior to Closing hereunder, for any reason except failure by Seller to perform hereunder, and such default is not cured by Purchaser within thirty (30) days after the date of receipt of written notice of such default, Seller shall be entitled to terminate this Agreement, notify Escrow Agent of such default and termination, in which event the Deposit shall be delivered by Escrow Agent to Seller as liquidated damages and not as a penalty in full satisfaction of Seller's claims against Purchaser hereunder, expressly waiving any and all other rights and remedies available to Seller.  Seller and Purchaser agree that:  (a) Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine; (b) it would be impracticable and extremely difficult to fix the actual damages suffered by Seller as a result of Purchaser's failure to complete the purchase of the Property pursuant to this Agreement; and (c) the Deposit is a fair estimate of those monetary damages which has been agreed to in an effort to cause the amount of said damages to be certain.

The foregoing notwithstanding, in the event of Purchaser's default under the indemnity and restoration provisions of Section 11.A and Section 11.B of this Agreement, Seller shall be entitled to exercise any and all rights and remedies that may be available to Seller either at law or in equity.

In the event Purchaser is in default under this Agreement with respect to, or otherwise fails to perform, any obligation to be performed by Purchaser after Closing (each a **"Purchaser's Post-Closing Default"**), and such Purchaser's Post-Closing Default is not cured by Purchaser within thirty (30) days after

the date of receipt of written notice of such Purchaser's Post-Closing Default, then Seller shall be entitled to exercise any and all rights and remedies that may be available to Seller either at law or in equity.

B.    Seller's Default.  In the event Seller is in default under this Agreement at or prior to Closing, for any reason except failure by Purchaser to perform hereunder, and such default is not cured by Seller within thirty (30) days after the date of receipt of written notice of such default, Purchaser, as its sole remedy, may elect either (a) to enforce the terms of this Agreement by action for specific performance, or (b) to terminate this Agreement by notice to Seller, whereupon the Deposit held by Escrow Agent shall be immediately returned to Purchaser.  In the event of a specific performance action by Purchaser in which specific performance is awarded by the court by final, non-appealable order, then the Purchase Price due at Closing (as adjusted pursuant to the provisions of this Agreement) shall be paid to Seller at the time of the Closing less a credit for all reasonable costs, fees and expenses incurred by Purchaser to pursue the specific performance action, including, without limitation, reasonable attorney's fees.

In the event Seller is in default under this Agreement with respect to, or otherwise fails to perform, any obligation to be performed by Seller after Closing (each a **"Seller's Post-Closing Default"**), and such Seller's Post-Closing Default is not cured by Seller within thirty (30) days after the date of receipt of written notice of such Seller's Post-Closing Default, then Purchaser shall be entitled to exercise any and all rights and remedies that may be available to Purchaser either at law or in equity.

C.    Attorney's Fees.  In the event either party hereto is required to employ an attorney in connection with court actions by one party against the other arising from the operation of this Agreement, the non-prevailing party shall pay the prevailing party all actual, reasonable fees and expenses, including but not limited to attorneys' fees, incurred in connection with such transaction.

D.    Survival of Indemnifications.  Nothing contained in this Section shall limit the indemnification obligations pursuant to the terms and provisions of Section 11.B of this Agreement.  The provisions of this Section shall survive termination of this Agreement.

15.    **COMPLETE AGREEMENT**.  This Agreement shall constitute the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless made in writing and signed by all of the parties hereto.  No purported or alleged waiver of any of the provisions of this Agreement shall be binding or effective unless in writing and signed by the party against whom it is sought to be enforced. A waiver, if any, shall only waive the specified condition and no other and shall not be deemed or construed to be a subsequent waiver.  The foregoing provisions shall expressly survive the termination of this Agreement.

16.    **NOTICES**.  Except as otherwise provided herein, notices, demands, requests, consents, approvals and other communications (collectively **"notice"**) required or permitted to be given hereunder or which are to be given with respect to this Agreement shall be in writing and addressed to the party to be so notified at the address set forth below, and shall be deemed duly given (a) when delivered if personally delivered, (b) one (1) business day after being sent by express mail, Federal Express, or any other similar form of overnight messenger, airborne/overnight delivery service, or (c) three (3) days after mailing, if mailed by certified or registered U. S. mail, postage prepaid, return receipt requested:

28

If to Seller:

  Warfield Development Corporation
  c/o The Town of Sykesville
  7547 Main Street
  Sykesville, MD  21784
  Attention:  James B. Rees, President

And to:

  Town of Sykesville
  7547 Main Street
  Sykesville, MD  21784
  Attention: Dawn Ashbacher,
        Town Manager

With a Copy to:

  Dennis J. Hoover, Esquire
  Rosen Hoover P.A.
  One Charles Center
  100 North Charles Street, Suite 1010
  Baltimore, Maryland 21201-3804

If to Escrow Agent:

  Home Title Company, Inc.
  One Charles Center
  100 North Charles Street, Suite 1020
  Baltimore, Maryland 21201-3804
  Attn : Laura I. Shanks, Vice President

If to Purchaser:

  Warfield Collaborative, LLC
  c/o Sudow Kohlhagen, LLP
  2001 Pennsylvania Avenue, N.W., 10th Floor
  Washington, DC  20006
  Attention: Roger Conley

With a Copy to:

  Sudow Kohlhagen, LLP
  2001 Pennsylvania Avenue, N.W., 10th Floor
  Washington, DC  20006
  Attention: William E. Sudow, Esq.

17.    **BINDING EFFECT**.  This Agreement shall be binding upon the parties, their successors and permitted assigns.

18.    **GOVERNING LAW**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, without regard to choice of law.

19.    **CONSTRUCTION OF AGREEMENT**.  All parties hereto acknowledge that they have had the benefit of independent counsel with regard to this Agreement and that this Agreement has been prepared as a result of the joint efforts of all parties and their respective counsel.  Accordingly, all parties agree that the provisions of this Agreement shall not be construed or interpreted for or against any party hereto based upon authorship.

20.    **BROKERAGE**.  Seller and Purchaser each represent and warrant to one another that it has not employed the services of any brokers, agents or other individuals or concerns which would be entitled to a commission or finder's fee on account of this Agreement or the transaction contemplated herein.  The provisions of this Section shall survive Closing or any earlier termination of this Agreement.

Seller and Purchaser agree to, and shall, indemnify and save one another harmless from any claims made through the indemnifying party for any loss, damage, claim, fees or commissions in connection with a breach of the representations and warranties made in this Section, including costs and reasonable attorneys' fees.

21.    **ESCROW AGENT**.  If a dispute arises between Seller and Purchaser as to whether, when or to whom the Deposit is to be disbursed by the Escrow Agent, the Escrow Agent may, in the exercise of its sole discretion, in lieu of disbursing the Deposit to a party hereto, deliver the Deposit to the Clerk of the Circuit Court for the County or any other court having jurisdiction over disputes between the parties hereto with respect to this Agreement, under such interpleader action or other legal or equitable proceeding as the Escrow Agent deems appropriate, pending a resolution of such dispute by such Court, in which event the Escrow Agent shall have no further obligation hereunder with respect to the Deposit or otherwise.  The Escrow Agent shall have no personal liability on account of its duties hereunder in the absence of fraud or willful misconduct on its part, and Seller and Purchaser shall jointly and severally defend, indemnify and hold harmless the Escrow Agent from and against the same.  Purchaser and Seller shall share equally the cost, if any, incurred by the Escrow Agent in performing its duties hereunder (except that if any such interpleader or other proceeding is initiated in any such court by the Escrow Agent or any party hereto to determine, inter alia, to whom the Escrow Agent is to deliver the Deposit, then all of the attorneys' fees and other costs incurred by the Escrow Agent in connection with such suit shall be paid (a) by Seller, if such court determines that Purchaser is entitled to the Deposit, or (b) by Purchaser, if such court determines that Seller is entitled to the Deposit).  The Escrow Agent shall be entitled to no fee for such performance.

22.    **HEADINGS; EXHIBITS**.  The headings of the Sections, Sub-Sections, paragraphs and sub-paragraphs herein are for convenience only and shall not affect the meanings or interpretations of the contents hereof.  All Exhibits and Schedules attached hereto are hereby incorporated by reference herein and made a substantive part of this Agreement.

23.    **TIME OF THE ESSENCE**.  Time shall be deemed of the essence with respect to all time periods for performance set forth herein.

24.    **PERFORMANCE ON SATURDAYS, SUNDAYS AND HOLIDAYS**.  Whenever the date fixed for the payment of funds, the giving of notice, or the performance of any other provision of this Agreement falls on a Saturday, Sunday, legal holiday or any day on which banking institutions in the city or town of payment are authorized by law to close, then such payment, notice or performance need not be made on such date, but may be made on the next succeeding regular business day with the same force and effect as if made on the date fixed (and, as to payments, interest shall accrue on such payment to the date payment is made).

25.    **ASSIGNMENT**.  Neither party may assign this Agreement without the prior written consent of the other party, which consent may be withheld in such party's sole discretion, provided, however, Purchaser shall have the right to assign this Agreement and all of its rights under this Agreement to any affiliate or subsidiary that is owned directly or indirectly and controlled by Roger Conley and/or Chuck Shuler, provided, further, that upon such assignment any such assignee shall, in writing, affirmatively assume all obligations of Purchaser hereunder and deliver such assignment and assumption to Seller no later than three (3) business days prior to the Closing Date.

26.    **PERPETUITIES**.  Notwithstanding anything to the contrary contained herein, in the event Closing has not occurred hereunder within five (5) years from the Effective Date, then this Agreement shall terminate without further action of the parties, whereupon the Deposit shall be returned to

Purchaser and the parties shall thereupon be released from any further liability or obligation to each other except for those that are expressly stated to survive termination of this Agreement. The provisions of this Section are for the sole purpose of satisfying the Rule Against Perpetuities and shall not be construed to delay or otherwise affect Closing hereunder.

27.    **EFFECTIVE DATE.**   The Effective Date of this Agreement shall be the later of the date of Purchaser's or Seller's execution of this Agreement, as indicated below their executions.

28.    **SEVERABILITY.**   If any provision of this Agreement shall be held violative of any applicable law or unenforceable for any reason, the invalidity or unenforceability of any such provision shall not invalidate or render unenforceable any other provision hereof, which shall remain in full force and effect.

29.    **RELATIONSHIP OF THE PARTIES.**      Notwithstanding any other provision of this Agreement, or any agreements, contracts or obligations which may derive herefrom, nothing herein shall be construed to make the parties hereto partners or joint venturers, or to render either party liable for any of the debts or obligations of the other party, it being the intent of this Agreement to merely create the relationship of Seller and Purchaser with regard to the Property.

30.    **WAIVER OF JURY TRIAL. THE PARTIES HEREBY EXPRESSLY COVENANT AND AGREE TO WAIVE THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY LITGATION OR JUDICIAL PROCEEDING RELATING TO, DIRECTLY OR INDIRECTLY, OR CONCERNING THIS AGREEMENT OR THE CONDUCT, OMMISSION, ACTION, OBLIGATION, DUTY, RIGHT, BENEFIT, PRIVILEGE OR LIABILITY OF A PARTY HEREUNDER TO THE FULL EXTENT PERMITTED BY LAW. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN AND IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE PARTIES. THE PARTIES HAVE HAD AN OPPORTUNITY TO SEEK LEGAL COUNSEL CONCERNING THIS WAIVER. THIS WAIVER IS INTENDED TO AND DOES ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE. THE PARTIES FURTHER CERTIFY AND REPRESENT TO EACH OTHER THAT NO PARTY, REPRESENTATIVE OR AGENT OF THE PARTIES (INCLUDING, BUT NOT LIMITED TO, THEIR RESPECTIVE COUNSEL), HAS REPRESENTED, EXPRESSLY OR OTHERWISE TO THE PARTIES (INCLUDING BUT NOT LIMITED TO THEIR RESPECTIVE COUNSEL) THAT THEY WILL NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL. THIS WAIVER SHALL APPLY TO THIS AGREEMENT AND ANY FURTHER AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS OF THIS AGREEMENT.**

31.    **FURTHER ASSURANCES.** After Closing, Seller shall execute and deliver to Purchaser any additional documents and instruments which Purchaser may reasonably determine are necessary to further assure to Purchaser the consummation of the purchase and sale contemplated herein, without additional expense to Seller.

32.    **EXCULPATION.** The obligations, representations, warranties, covenants, undertakings, and liabilities of the parties hereto are made for the purpose of binding the named parties only, and no elected official, officer, director, partner (general or limited), trustee, shareholder, beneficial owner, agent or employee of either Purchaser or Seller shall have any liability or obligation hereunder whatsoever.

33.    **RECORDATION.** Neither this Agreement nor any memorandum or other summary of this Agreement shall be recorded among the Land Records of the County under any circumstances except with the prior written consent of both Seller and Purchaser.

34.    **CONFIDENTIALITY, NON-DISCLOSURE AND RETURN OF DOCUMENTS.** Prior to acquiring the Property, Purchaser shall use and disclose information it obtains about the Property solely in connection with its purchase evaluation. Seller and Purchaser shall each maintain as confidential any and all materials obtained about the other, and, in the case of Purchaser, concerning the Property, and shall not disclose any such information to any third party except (i) to such parties' respective partners, employees, agents and permitted assignees, Property consultants and attorneys; (ii) as required by applicable law, including (with respect to the Town and WDC, the Maryland Public Information Act) or any court of competent jurisdiction; and (iii) for any information which is otherwise a matter of public record or available from any source not restricted by or subject to a confidentiality agreement. Following any termination of this Agreement for any cause whatsoever, Purchaser shall (i) return to Seller all documents, information, data and other instruments, as well as all copies thereof, delivered by or on behalf of Seller to Purchaser in connection with the Property, and (ii) deliver to Seller copies of any and all of Purchaser's Studies and Reports and any and all other third party reports generated for or at the direction of Purchaser; provided, however, Purchaser shall not be obligated to deliver any item described in (ii) if such item contains any confidential and proprietary information about or concerning Purchaser or Purchaser's operations, businesses and/or services, or any and all analyses, compilations, studies or other documents or information derived from confidential or proprietary information by Purchaser, its affiliates, agents or representatives.

35.    **SURVIVAL.** All Seller's representations, warranties, covenants, agreements and indemnifications set forth in or made pursuant to this Agreement shall remain operative and shall survive Closing for a period of one (1) year and shall not be merged in the Deed or any other closing document. The foregoing notwithstanding, no cause of action arising by reason of breach or default under such representations, warranties, covenants, agreements and indemnifications shall be brought or maintained against Seller for claims that do not exceed Twenty Five Thousand and No/100 Dollars ($25,000.00) in the aggregate.

36.    **INTENTIONALLY OMITTED.**

37.    **CHARACTER OF TOWN'S CONSENT AND APPROVALS.** Any consent or approval required of or given by the Town as Seller pursuant to the terms of this Agreement shall not constitute a consent or approval on behalf of the Town in its governmental capacity or waive any requirement to obtain any and all requisite consents and approvals from all applicable commissions, agencies and other public bodies of the Town.

38.    **COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which shall constitute an original but all of which together shall constitute one instrument, binding upon all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

39.    **HISTORIC TAX CREDITS.** Seller has been awarded Historic Tax Credits by the Maryland Historical Trust for Building W (the **"Historic Tax Credits"**), which are currently scheduled to expire on August 2, 2015. Purchaser shall have the option to include the Historic Tax Credits among the assets purchased under this Agreement by written notice to Seller prior to Closing and payment in cash at Closing of the additional amount of Twenty Six Thousand and No/100 Dollars ($26,000.00). Seller makes no representation or warranty that the Historic Tax Credits will not expire prior to Closing and in the event

Purchaser elects to exercise its option hereunder, Purchaser does so at its own risk. In the event Purchaser exercises such option, then at Closing Seller shall execute and deliver an assignment in commercially reasonable form sufficient to obtain the acknowledgement and consent of the Maryland Historical Trust to such assignment of the Historic Tax Credits to Purchaser.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement on the dates hereinafter indicated.

**SELLER:**

WITNESS or ATTEST:

TOWN OF SYKESVILLE

By: _____ (SEAL)
Name: Ian Shaw
Title: Mayor
Date: 4-17-14

WARFIELD DEVELOPMENT CORPORATION

By: _____ (SEAL)
Name: James B. Rees
Title: President
Date: 4/17/14

**PURCHASER:**

WITNESS or ATTEST:

WARFIELD COLLABORATIVE, LLC

By: _____ (SEAL)
Name: _____
Title: MEMBER
Date: 4/17/14

## JOINDER OF ESCROW AGENT

Escrow Agent joins in the execution of this Agreement to acknowledge and evidence its agreement to serve as Escrow Agent hereunder and to comply with the provisions of this Agreement as they apply to Escrow Agent.

ESCROW AGENT:

HOME TITLE COMPANY, INC.

By: _____ (SEAL)
Name: Laura L. Shanks
Title: Executive Vice President
Date: 4/29/14

33

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Description of Land |
| Exhibit B | Preliminary Concept Plan |
| Exhibit C | Required Provisions for Declaration of Covenants, Conditions & Restrictions |
| Exhibit D | Form of Title Affidavit |
| Exhibit E | Assignment of Leases |
| Exhibit F | Estoppel Certificate |
| Exhibit G | General Assignment |
| Exhibit H-1 | Town/SHA MOU |
| Exhibit H-2 | Town/WDC MOU |
| Exhibit I | Parcel I Utility Easement |
| Exhibit J | List of Leases |
| Exhibit K | Status of Leases |
| Exhibit L | Seller's Contracts |
| Exhibit M | Existing Mortgage Debt Documents |
| Exhibit N | Form of Promissory Note |
| Exhibit O | Form of Purchase Money Deed of Trust |
| Exhibit P | Parcel D Preservation Agreement |
| Exhibit Q | Parcel D Escrow Agreement |

# EXHIBIT A

## Description of Land

Initials 

# EXHIBIT A
## Description of Land

 **ALL OF THOSE PARCELS OF LAND** situate the Town of Sykesville, Carroll County, Maryland, being known and designated as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel H and Parcel G, as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records in Plat Book 51, Pages 187 through and including 202.

## EXHIBIT B

**Preliminary Concept Plan**

Initials 



ILLUSTRATIVE SITE PLAN

# Warfield

The Warfield Park Collaborative

BUTLER CUP ROAD

MD-RTE-32

Date: 06-27-13

**PRELIMINARY CONCEPT PLAN CONDITIONS:**

1. No more than 125 residential dwelling units shall be permitted at the Property;

2. No more than 100,000 sq. ft. of retail space shall be permitted at the Property; and

3. The Property shall be developed to include not less than 300,000 sq. ft. of commercial/professional office space (inclusive of existing Buildings on Parcel D).

EXHIBIT C

Required Provisions for Declaration of Covenants, Conditions & Restrictions

[Schedule 1 to be agreed upon during Inspection Period]

Initials 

<u>Exhibit C</u>

**Declaration of Covenants, Conditions and Restrictions
Required Provisions**

1.      For the purposes of this Exhibit, the following definitions shall apply:

"Common Area" means (a) Parcel D-1, Parcel G, all unpaved areas of the Dedicated Roadways, and (b) all parcels of land as may be hereinafter conveyed by deed  to the POA for use as common areas for the common use and benefit of the Owners.

"Dedicated Roadway" means each roadway right-of-way area (as delineated by its lines of conveyance or dedication), which, by a Subdivision Plat or otherwise, has been dedicated or conveyed, or offered for dedication or conveyance, to the Town of Sykesville ("Town"), Carroll County ("County"), the State of Maryland ("State") or another governmental body for public use as a roadway, regardless of whether any improved roadway actually exists within such right-of-way area at the time in question.

"Disposition Agreement" means that certain Disposition Agreement dated November, 2002, and recorded among the Land Records of Carroll County in Book 3176, Page 252, <u>et seq</u>., as amended by Amendment to Disposition Agreement dated November 5, 2005 and recorded among the Land Records in Liber 4704, Folio 197.

"Historic District Ordinance" means the Historic District Ordinance of the Town, appearing as Chapter 93, Sections 93-1, et seq. of the Town Code, as amended from time to time.

"Ground Lease" means a lease of all or a portion of any lot (or building thereon) for a term of twenty (20) years or more, inclusive of all rights of renewal.

"Historic Guidelines" means the architectural and development guidelines contained in the Historic Preservation Guidelines of the Warfield Commerce and Cultural Center (copyright 2002), Town of Sykesville as prepared by Richard Wagner AIA, Richard Gleason Associates, Inc., as may be amended, supplemented and/or modified from time to time hereafter.

"Lot" means Parcels A, B, C, D, E, F and H as shown on the Plat and all or any other portion of the Land which, at the time in question, constitutes a separate and entire subdivided lot for purposes of applicable law governing the subdivision of land; provided, that (a) if the land constituting a Lot, after such Lot is created in accordance with such law, is further subdivided, re-subdivided or combined with any or all of one or more other Lots in accordance with applicable law, then the Lot which had existed prior thereto shall not be deemed to be a "Lot" for purposes of the provisions hereof, but each new subdivided lot which, in accordance with applicable law, is created by such action shall thereafter be a "Lot" for purposes of the provisions hereof and (b) Parcel D-1 and Parcel G as shown on the Plat shall be deemed and considered Common Area and shall not be deemed and considered Lots as defined herein.

"MHT Easement" means that certain Deed of Easement dated October 18, 2004, recorded among the Land Records in Liber 4184 Folio 419, by and between the Town (as grantor) and the Maryland Historical Trust, for the purpose of promoting and ensuring the preservation and maintenance of the Warfield Commerce and Cultural Center and its historic, cultural, scenic and aesthetic character.

"New Construction Guidelines" means the architectural and development guidelines entitled Warfield Commercial Center:   New Construction Design Guidelines and Standards for Signs and Energy

Efficiency (copyright 2010), as prepared by Richard Wagner, AIA, David H. Gleason Associates, Inc., as may be amended, supplemented and/or modified from time to time hereafter.

"Owner" means (a) any Person or combination of Persons holding legal title in fee simple to a Lot under a Deed recorded among the Land Records and (b) any lessee under a Ground Lease; provided however that no mortgagee shall be deemed to be the Owner unless and until it acquires the mortgagor's equity of redemption therein by Deed recorded among the Land Records.

"Zoning Ordinance" means the Zoning Ordinance of the Town, appearing as Chapter 180, Sections 180-1, et. seq. of the Town Code, together with the Zoning Maps adopted pursuant thereto, all as amended from time to time.

2.      The Declaration of Covenants, Conditions and Restrictions shall impose covenants requiring compliance with the Historic Guidelines and the New Construction Guidelines, including a process for Architectural Committee review and approval.

3.      The POA shall obtain funds to pay its expenses incurred in exercising its powers and performing its duties under the provisions of Declaration of Conditions, Conditions and Restrictions, the Articles of Incorporation and the By-Laws, and to establish and maintain reserves to assist and permit the POA in paying such expenses in the future, by levying assessments (each of which is hereinafter referred to as an "Assessment") against each Lot from time to time.

4.      The Declaration of Covenants, Conditions and Restrictions shall provide that Owners shall be responsible for:

        (a)      Maintaining, repairing, replacing and insuring all buildings and other improvements on their Lots (residential and non-residential Lots);
        (b)      Providing janitorial services and security within buildings on their Lots (non-residential Lots);
        (c)      Cleaning, maintaining (including snow removal) and repairing of all paved surfaces, sidewalks and parking areas located within the boundaries of their Lots (residential and non-residential Lots);
        (d)      Maintaining all landscaped areas, repairing automatic sprinkler systems, water lines, sewer lines and replacing shrubs or other landscaping as necessary within the boundaries of a particular Lot (non-residential Lots);
        (e)      Providing or obtaining trash removal services (residential and non-residential Lots) (it being understood that the Town will not be providing municipal trash removal services to the Lots and Common Areas); and
        (f)      Operating, keeping and replacing when necessary such parking lot lighting facilities within their Lots (non-residential Lots).

5.      The Declaration of Covenants, Conditions and Restrictions shall further provide that the POA shall assume and be responsible for the full performance and fulfillment of all respective responsibilities of the Town under the Town/SHA MOU (as defined in Section 7.C of the Agreement) and of WDC under the Town/WDC MOU (as defined in Section 7.C of the Agreement), at the POA's sole cost and expense, including (but not limited to) (a) maintaining the Entrance Feature Monument Signs in good condition and repair, and (b) causing any lighting fixtures placed by the Town, Developer or the POA on or near such Entrance Feature Monument Signs for the principal purpose of lighting such signs to be lighted during all periods of darkness. All costs of maintenance, repair and replacement incurred by the POA pursuant to this Section shall constitute expenses included in the Assessments.

6.      The Declaration of Covenants, Conditions and Restrictions shall further provide (a) that the POA, at the POA's sole cost and expense, shall be responsible for maintenance, repair and/or replacement of the Storm Water Management Facility (as defined in Section 7.D of the Agreement), (b) that an easement and right, but not the obligation, shall be granted to the Town to enter upon Parcel G to gain access to the Storm Water Management Facility for the purpose of maintaining and keeping it in a state of good condition and repair (in which event, the Town shall have the right to seek reimbursement from the POA for all costs and expenses incurred by the Town in such maintenance and repair). All costs of maintenance, repair and replacement incurred by the POA pursuant to this Section shall constitute expenses included in the Assessments.

7.      The Declaration of Covenants, Conditions and Restrictions shall further provide that except for situations specifically provided for in the following subsections, no fence or other barrier which would unreasonably prevent or obstruct the passage of pedestrian or vehicular travel for the purposes herein permitted shall be erected or permitted along the common boundary line between any Lot; provided, however, that the foregoing provision shall not prohibit (a) the construction of fences between residential Lots or between residential Lots and non-residential Lots or (b) the installation on any Lot of convenience facilities (such as mailboxes, public telephones, benches or public transportation shelters), of landscaping, berms or planters, nor of limited turn-ins and other forms of traffic controls. The foregoing notwithstanding, it is recognized that the Warfield Commerce and Cultural Center is located within a geographical area with a heavy concentration of Uses devoted the defense and security of the United States of America, the Declaration of Covenants, Conditions and Restrictions may reserve to the Architectural Committee of the POA the right to waive the foregoing provisions with respect to the construction of fences or barriers with respect to any building or other structure, Lot or portion of a Lot upon application of the Owner thereof to the Architectural Committee based upon Use of such building or other structure, Lot or portion of a Lot by any local, state or federal governmental entity or agency or any other Person requiring such fences or barriers in order to satisfy security clearances and procedures necessary to conduct the business of such Owner or Tenant. In the event of such waiver, any fences or other barriers constructed shall be consistent with the Design Guidelines. The foregoing notwithstanding, all other approvals (including the approval of the Town of Sykesville's Historic District Commission) must be obtained for such fences or other barriers.

8.      The Declaration of Covenants, Conditions and Restrictions shall further provide that except if and to the extent that the Town, the County or any other governmental entity affirmatively and in writing undertakes the obligation to do so, the POA shall at its expense (a) maintain any and all grass or other landscaped areas located within any median, shoulder or other portion of any Dedicated Roadway, (b) operate, maintain, repair and replace any sprinkler system serving such areas and (c) provide, maintain, repair and replace as necessary, and cause to be lighted during all periods of darkness, electrical street lighting standards at the entrances to the Warfield Commerce and Cultural Center and along each Dedicated Roadway. All costs of maintenance, repair and replacement incurred by the POA pursuant to this Section shall constitute expenses included in the Assessments.

9.      The Declaration of Covenants, Conditions and Restrictions shall further provide that the POA, at the POA's sole cost and expense, shall be responsible for maintenance, repair and/or replacement private roads and parking areas within Common Areas. All costs of maintenance, repair and replacement incurred by the POA pursuant to this Section shall constitute expenses included in the Assessments

10.     The Declaration of Covenants, Conditions and Restrictions shall further provide that prior to the twenty-fifth (25th) anniversary of the date of recording of the Declaration of Covenants, Conditions and Restrictions, it shall not be amended or terminated with the prior written consent of the Town and WDC (if WDC is then and existing and functioning corporate body), which consent may be withheld in the sole and absolute discretion of the Town and/or WDC.

11.     The Declaration of Covenants, Conditions and Restrictions shall further prohibit (a) any use which violates the provisions of the MHT Easement, the Disposition Agreement, the Zoning Ordinance, the Historic District Ordinance, any land planning, adequate public facilities, environmental or other law, order or regulation of the State, Town or County, or any other applicable law and (b) any use which is included on the "Schedule of Prohibited Uses" attached hereto as **Schedule 1**.

12.     The Declaration of Covenants, Conditions and Restrictions shall further provide that Parcel D-1 shall be limited to use for parking, to include the right of the public to park on Parcel D-1 and for public access, ingress and egress to and from the Warfield Park Parcel as shown on the Plat, with all such parking areas to be maintained, repaired and replaced by at the cost and expense of the POA.  All costs of maintenance, repair and replacement incurred by the POA pursuant to this Section shall constitute expenses included in the Assessments.

13.     The Declaration of Covenants, Conditions and Restrictions shall further prohibit the transfer or ground lease of any Lot to a non-profit organization without the prior written approval of the Town and County, provided that such approval shall not be withheld if such non-profit organization enters into an Agreement for Payment in Lieu of Taxes ("PILOT Agreement") pursuant to which the Town and County shall receive the same sums under the PILOT Agreement and at such times as it would otherwise have received by payment of real property taxes and personal property taxes with respect to such Lot and such business.

**Schedule 1**
**Schedule of Prohibited Uses**


[to be agreed upon during Inspection Period]

# EXHIBIT D

## Form of Title Affidavit

### [to be agreed upon during Inspection Period]

Initials

# GAP INDEMNITY AND AFFIDAVIT

STATE OF _____     )
                                       ) SS
CITY/COUNTY OF _____    )

WHEREAS, HOME TITLE COMPANY, INC., an agent of Chicago Title Insurance Company, Inc., (hereinafter referred to as "the Company") has been requested to issue its Title Insurance Commitment No. **132114F** having an effective date of 5/1/2014 (hereinafter referred to as "the Commitment") in respect to the land therein described;

AND WHEREAS, the Company intends to raise the following exception (hereinafter referred to as "the Exception") to the title on the Commitment:

Defects, liens, encumbrances, adverse claims or other matters, if any created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

AND WHEREAS, the Company has been requested to issue the Commitment without the Exception.

NOW THEREFORE, it is agreed that in consideration of the Company issuing the Commitment without the Exception, and issuing its policy(ies) without exception to such matters as are described in the Exception, the undersigned hereby agrees to promptly defend, and within thirty (30) days of recordation to remove, bond or otherwise dispose of any encumbrance, lien or other act of the undersigned which may arise or be filed, as the case may be, against or having an effect upon the subject premises and of which the Purchaser had no knowledge during the period of time between the effective date of the commitment as noted above and the date of recording of the deed from the Town of Sykesville to the Proposed Insured, provided that the date of recording is by no later than twenty-one (21) days from the date hereof, and further agrees to cooperate fully with the Company in promptly resolving such matters and, subject to any governmental immunity as may exist at law, to indemnify and hold the Company harmless against all loss or damage, including but not limited to, all expenses, costs, and attorney's fees which may arise out of the failure to so remove, bond, or otherwise dispose of any said liens, encumbrances or acts of the undersigned.

NOTWITHSTANDING the aforementioned, it is agreed that the liability of the undersigned hereunder shall cease twenty – one (21) days from the date hereof, provided the Company has received documents in recordable form acceptable to the recording office, and provided that it finds no defects, liens, encumbrances, adverse claims or other matters in addition to those appearing in the Commitment and those consented to by the Proposed Insured, and provided that the undersigned is not in default in the performance of any of the terms, covenants and conditions hereof.

Dated this ___ day of _____, 20__.

                                       TOWN OF SYKESVILLE

_____                By:_____

Executed, subscribed and sworn to, before me, the undersigned, a Notary Public in and for the State aforesaid, on this _____day of _____, 20__.

                                       _____
                                       Notary Public

                                                            (SEAL)

My Commission Expires: _____

# EXHIBIT E

**Assignment of Leases**

**[to be agreed upon during Inspection Period]**

Initials 

## EXHIBIT E
## ASSIGNMENT OF LEASES

**THIS ASSIGNMENT OF LEASES** (this "Assignment") is made as of the ____ day of _____, 2014, by and between **WARFIELD DEVELOPMENT CORPORATION**, a Maryland non-profit corporation (hereinafter referred to as "Assignor") and **WARFIELD COLLABORATIVE, LLC**, a Maryland limited liability company (hereinafter referred to as "Assignee").

**WHEREAS**, The Town of Sykesville is the owner of a parcel of land located in the Fifth Election District of Carroll County, Maryland described in a deed dated July 11, 2001 and recorded among the Land Records of Carroll County, Maryland in Liber 2610 Folio 696 and confirmed by a deed dated June 25, 2003 and recorded among the Land Records of Carroll County, Maryland in Liber 3562 Folio 465; and

**WHEREAS**, Assignor is the Lessee pursuant to the terms of that certain Master Ground Lease by and between the Town of Sykesville and Assignor dated January 27, 2005 and recorded among the Land Records of Carroll County, Maryland in Liber 4299 Folio 182 (the "Master Ground Lease"), of all of that land in the Town of Sykesville, Carroll County, Maryland, as more particularly described in the Master Ground Lease (as amended from time to time), together with the improvements thereon and the appurtenances thereto (the "Development Land").

**WHEREAS**, Assignor, with the joinder and consent of the Town of Sykesville, has subdivided the Development Land into eleven (11) parcels designated as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel G, Parcel H, Parcel I, and the Warfield Park Parcel (collectively the "Parcels"; each individually a "Parcel") and certain dedicated roadways, all as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records in Plat Book 51, Pages 187 through and including 202; and

**WHEREAS**, by Agreement of Sale and Purchase dated April 17, 2014 (the "Agreement of Sale"), Assignee contracted to purchase all right, title and interest in and to the Parcels situate in the Town of Sykesville, Carroll County, Maryland as described on **Assignment of Leases Exhibit A** attached hereto, and all structures, improvements and fixtures located thereon (the "Property"), and by deed of even date herewith The Town of Sykesville and Assignor has conveyed or will convey the Property to Assignee; and

**WHEREAS**, Assignor is the landlord under certain leases of portions of the Property as identified in **Assignment of Leases Exhibit B** (hereinafter referred to as the "Indicated Leases"); and

**WHEREAS**, Assignor holds certain security deposits and other monies pursuant to some of the Indicated Leases, as enumerated in **Assignment of Leases Exhibit C** (hereinafter referred to as the "Indicated Security Deposits"); and

1

**WHEREAS**, Assignor desires to assign, transfer, sell, and convey unto assignee, and to confirm the assignment, transfer, sale, and conveyance, unto Assignee of all of Assignor's right, title, and interest in, to, and under the Leases and Security Deposits, as hereinafter defined.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agrees as follows:

1.    **Definitions**.    For the purposes of this Assignment the following words shall have the indicated meanings:

"Leases" shall mean the Indicated Leases and all leases, subleases, licenses, concessions, agreements, contracts, and permits, written or oral, which entitle any person or entity to occupy or use space in the Property, and all amendments, modifications, supplements, extensions, and renewals thereof.

"Security Deposits" shall mean the Indicated Security Deposits and all security deposits, payments of rent in advance, escrow deposits, or similar payments under any of the Leases.

2.    **Assignment of Leases and Security Deposits**.    Assignor does hereby assign, transfer, sell, and convey unto Assignee and does hereby confirm the assignment, transfer, sale, and conveyance unto assignee all of Assignor's right, title, and interest in, to, and under the Leasess, and (b) the Security Deposits.

3.    **Totality of Leases and Security Deposits**.    Assignor warrants and represents that the Indicated Leases are all of the current Leases in respect of the Property, and the Indicated Security Deposits are all of the Security Deposits in respect of the Indicated Leases.

4.    **Assumption of Leases and Security Deposits**.    By execution hereof, Assignee does hereby assume and agree to perform all duties, obligations, and responsibilities of Assignor as landlord under the Leases and with respect to the Security Deposits arising or accruing from and after the date hereof.

5.    **Mutual Indemnification Agreement**.

A.    Assignor does hereby agree to defend, indemnity, and hold Assignee harmless from and against any and all causes, claims, demands, losses, liabilities, costs, damages, expenses, and fees (including, but not limited to, reasonable attorney's fees) incurred or suffered by Assignee as a result of Assignor's failure to perform, at any time prior to the date hereof, any or all of Assignor's obligations as landlord under the Leases, or pertaining to the Security Deposits.

B.    Assignee does hereby agree to defend, indemnity, and hold Assignor harmless from and against any and all causes, claims, demands, losses, liabilities, costs, damages, expenses, and fees (including, but not limited to, reasonable attorney's fees) incurred or suffered by Assignor as a result of Assignee's failure to perform, from and after the date hereof, any or all of

2

Assignee's obligations as landlord under the Leases, or pertaining to the Security Deposits.

6.    **Successors**.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their personal representatives, successors, and assigns.

7.    **Miscellaneous**.

A.    This Assignment shall be interpreted and construed in accordance with the laws of the State of Maryland.

B.    The invalidity of any of the provisions of this Assignment shall not affect any of the other provisions, all of which shall remain in full force and effect.

C.    As used in this Assignment the singular shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders.

D.    This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

E.    The captions of this Assignment are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope or intent of this Assignment or any part hereof.

F.    This Assignment may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Assignment and all of which, when taken together, shall be deemed to constitute one and the same document.

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment under seal as of the day and year first hereinabove written.

**WITNESS:**                                    **ASSIGNOR**
                                                **WARFIELD DEVELOPMENT**
                                                **CORPORATION**

_____                By: _____(SEAL)
                                                     James B. Rees, President


**WITNESS:**                                    **ASSIGNEE**
                                                **WARFIELD COLLABORATIVE, LLC**

_____                By: _____(SEAL)
                                                Name: _____
                                                Title: _____

3

## ASSIGNMENT OF LEASES
## EXHIBIT A

### Description of Land

**ALL OF THOSE PARCELS OF LAND** situate the Town of Sykesville, Carroll County, Maryland, being known and designated as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel H and Parcel G, as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records in Plat Book 51, Pages 187 through and including 202.

4

## ASSIGNMENT OF LEASES
## EXHIBIT B

### List of Leases

1.      Lease Dated January 27, 2005 by and between Warfield Development Corporation and KB Warfield, LLC for the premises known as Parcel D, Building "I", 6937 Warfield Avenue Sykesville, MD 21784 as more particularly described in the therein.  See also Side Letter dated 5/17/2007 re conversion to quarterly rental payments.

2.      Lease Dated as of _____, 2005 by and between Warfield Development Corporation and Carroll Dance Center, Inc. (the "Original Lease") as amended by (1) Amendment to Lease dated April 1, 2008 and (2) Second Amendment to Lease dated June 23, 2008, for the premises known as Building "H," 6933 Warfield Avenue, Sykesville, Maryland 21784, as more particularly described in the Original Lease.  See also Letter dated November 24, 2010, exercising option for second 5 year term.

3.      Lease Dated June 17, 2011 by and between Warfield Development Corporation and Rising Phoenix Development, LLC for the Premises known as Parcel D, Building G, as amended by First Amendment to Lease dated December 14, 2011, Second Amendment to Lease dated as of March 15, 2012, Third Amendment to Lease dated as of June 15, 2012, Fourth Amendment to Lease dated April 25, 2013, which lease was assigned to G Building LLC pursuant to that certain Assignment and Assumption Agreement by and between Rising Phoenix Development, LLC and G Building LLC dated April 25, 2013.

4.      Lease dated July 31, 2013 by and between Warfield Development Corporation and Warfield Collaborative, LLC for the premises known as Parcel D, Building "W" as more particularly described in the therein.

5

## ASSIGNMENT OF LEASES
## <u>EXHIBIT C</u>

### List of Security Deposits

1.    KB Warfield, LLC - None

2.    Carroll Dance Center, Inc. - $1,600.00

3.    G Building LLC - $20,000.00

4.    Warfield Collaborative, LLC - $20,000.00

**EXHIBIT F**

**Estoppel Certificate**

[to be agreed upon during Inspection Period]

Initials 

**EXHIBIT F**

TENANT ESTOPPEL CERTIFICATE

TO:    Warfield Collaborative, LLC
    c/o Sudow Kohlhagen, LLP
    2001 Pennsylvania Avenue, N.W., 10th Floor
    Washington, DC 20006

The undersigned, _____ ("**Tenant**"), having the power and authority to do so, acknowledging that you have the right to rely on the provisions hereof and realizing that you are, in fact, relying on such provisions in purchasing certain property known as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel G and Parcel H, all as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records of Carroll County in Plat Book 51, Pages 187 through and including 202, hereby states, certifies, and affirms the following to you:

1.    Tenant is the tenant under that certain Lease dated _____ (the "**Lease**"), between Warfield Development Corporation, a Maryland non-profit corporation ("**Landlord**") and Tenant, whereby Tenant leased the premises known as _____ _____ (the "Premises") from Landlord. A true and correct copy of the Lease is attached hereto as **Schedule 1**.

2.    The Lease is in full force and effect, has not been modified, changed, altered, extended, or amended in any respect whatsoever except as specifically set forth in **Schedule 2** attached hereto, and constitutes the complete agreement between Landlord and Tenant with respect to the leasing of the Premises. The term "Lease," as used herein, shall include any modifications indicated on **Schedule 2** attached hereto. A true and correct copy of all amendments and modifications to the Lease is attached hereto as **Schedule 2**.

3.    Tenant and Landlord, to the best of the Tenant's knowledge, have performed all of their obligations under the Lease, and all improvements required by the Lease to be completed by Landlord have been completed.

4.    The Tenant has been in possession of the Premises since _____ \_\_, _____. The term of the Lease commenced on _____ \_\_, _____, and shall expire on _____ \_\_\_\_, _____. The Lease provides for the following options or rights of first refusal with respect to extensions of the term of the Lease, purchase of the Property or otherwise:_____ _____

5.    Except as specifically set forth on **Schedule 3** attached hereto, Tenant asserts no claim (a) of offset, defense, or counterclaim to the payment of rent or other charges payable under the Lease, or (b) against Landlord for any obligation of Landlord under the Lease.

6.      Tenant is paying all rent and other charges in accordance with the provisions of the Lease in the present monthly amount of $_____and Tenant is not in default in making any of such payments. All base rent has been paid through and including _____ ___, 20__.    There has been no prepayment of rent under the Lease other than as expressly required thereunder.

7.      Tenant is not aware of any fact or circumstance that, by itself or with the giving of notice or the passage of time or both, would constitute a default by Landlord or Tenant under the Lease.

8.      Tenant has not been granted any options, reduced or free rent or other concessions or rights except as expressly set forth in the Lease.

9.      Tenant has paid to the Landlord, and the Landlord is holding on behalf of the Tenant, a security deposit in the amount of $_____.

10.      The Property has been completed and delivered to Tenant in accordance with the terms of the Lease and have been accepted unconditionally by Tenant.

11.      Tenant has received no notice and has no actual knowledge of any prior assignment, hypothecation or pledge of the rights of Landlord under the Lease or the rents or other amounts payable thereunder.

12.      The Lease has not been assigned (in whole or in part) and the Property has not been sublet (in whole or in part), except as follows:

_____
_____.

13.      No voluntary or involuntary action in bankruptcy is pending against Tenant in any state or federal court.

14.      This certificate may be relied upon by the addressee hereof, its successors and assigns, and any prospective lender or mortgagee.

IN WITNESS WHEREOF, the undersigned has caused this Certificate to be duly executed as of the _____ day of _____, 20___.

TENANT:

_____

By:_____
Name:_____
Title: _____

**TENANT ESTOPPEL**
**SCHEDULE 1**

**Copy of Lease**

**TENANT ESTOPPEL**
<u>**SCHEDULE 2**</u>

**Amendments and Modifications to Lease and copies**

# TENANT ESTOPPEL
## SCHEDULE 3

**Tenant Claims**

EXHIBIT G

**General Assignment**

**[to be agreed upon during Inspection Period]**

Initials 

# EXHIBIT G

## GENERAL ASSIGNMENT

THIS GENERAL ASSIGNMENT (this "Assignment"), made this ___ day of _____, 20__, by and between **THE TOWN OF SYKESVILLE**, a municipal corporation organized and existing under the laws of the State of Maryland corporation (the "**Town**") and **WARFIELD DEVELOPMENT CORPORATION**, a Maryland non-profit corporation ("**WDC**") (the Town and WDC being hereinafter collectively referred to as "Assignor"), and **WARFIELD COLLABORATIVE, LLC**, a Maryland limited liability company ("Assignee").

### Recitals

Pursuant to an Agreement of Sale and Purchase dated April 17th, 2014 (the "Contract"), by and between Assignor and Assignee, Assignor agreed to sell, assign and transfer to Assignee and Assignee agreed to purchase the Property as described on **General Assignment Exhibit A** (the "Property") and to accept an assignment and transfer from Assignor of, among other things, certain assets more particularly described herein.

NOW, THEREFORE, FOR AND IN CONSIDERATION of the premises, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party hereto, the parties hereto hereby agree as follows:

**Section 1.**    **ASSIGNMENT.**

Assignor hereby assigns to Assignee, and Assignee hereby accepts and assumes from Assignor, all of Assignor's right, title, interest and obligations, if any, in, to, under and in connection with the following assets related to, used in, and pertaining to the ownership, operation and maintenance of the Property (collectively, the "Assets"):

a)    Seller's Transferrable Warranties (as such term is defined in Section 1.D of the Contract);

b)    Those Seller's Contracts (as such term is defined in Section 1.E of the Contract) which Purchaser has agreed to assume, as listed on **General Assignment Exhibit B** attached hereto and hereby incorporated by reference;

c)    Seller's Studies and Data (as such term is defined in Section 1.F of the Contract);

d)    Seller's Permits (as such term is defined in Section 1.G of the Contract);

e)    All other general intangibles owned by Seller and used in connection with its ownership and operation of the Property, including but not limited to all licenses, leases,

1

rents, royalties, profits, revenues, incomes and other benefits of and from the Property as set forth in Section 1 of the Contract;

Section 2.    **CONTRACTS NOT ASSUMED BY ASSIGNEE.**

Notwithstanding anything to the contrary contained in Section 1 above, Assignee does not accept nor assume any debts, liabilities or obligations of Assignor under any Seller's Contracts which are not listed on the attached **General Assignment Exhibit B**.

Section 3.    **MUTUAL INDEMNIFICATION.**

a)    Assignor does hereby agree to defend, indemnify, and hold Assignee harmless from and against any and all causes, claims, demands, losses, liabilities, costs, damages, expenses, and fees (including, but not limited to, reasonable attorney's fees) incurred or suffered by Assignee as a result of Assignor's failure to perform, at any time prior to the date hereof, any or all of Assignor's obligations pertaining to the Assets.

b)    Assignee does hereby agree to defend, indemnify, and hold Assignor harmless from and against any and all causes, claims, demands, losses, liabilities, costs, damages, expenses, and fees (including, but not limited to, reasonable attorney's fees) incurred or suffered by Assignor as a result of Assignee's failure to perform, from and after the date hereof, any or all of Assignee's obligations pertaining to the Assets.

Section 4.    **DISCLAIMER.**

This Assignment is made without representation, warranty or recourse by Assignor of any kind or nature; provided only that Assignor represents that it has not previously transferred, assigned or encumbered its rights in or to the Assets, if any, other than in connection with previously existing financing secured by liens on the Property which have been or will be released of record as part of the sale and transfer of the Property.

Section 5.    **GENERAL.**

5.1. **Amendment**.  This Assignment may be amended by and only by an instrument executed and delivered by each party hereto.

5.2. **Waiver**.  No party hereto shall be deemed to have waived the exercise of any right which it holds hereunder unless such waiver is made expressly and in writing (and, without limiting the generality of the foregoing, no delay or omission by any party hereto in exercising any such right shall be deemed a waiver of its future exercise).  No such waiver made in any instance involving the exercise of any such right shall be deemed a waiver as to any other such instance, or any other such right.

5.3. **Applicable Law; Nature of Assignment**.  This Assignment shall be given effect and construed by application of the law of Maryland without regard to principles of

2

conflicts of laws. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns hereunder.

        **5.4. Severability; Partnership Status.** No determination by any court, governmental body or otherwise that any provision of this Assignment or any amendment hereof is invalid or unenforceable in any instance shall affect the validity or enforceability of (a) any other provision thereof, or (b) such provision in any circumstance not controlled by such determination. Each such provision shall be valid and enforceable to the fullest extent allowed by, and shall be construed wherever possible as being consistent with, applicable law. Nothing in the provisions of this Assignment shall be deemed in any way to create between the parties hereto any relationship of partnership, joint venture or association, and the parties hereto hereby disclaim the existence of any such relationship.

        IN WITNESS WHEREOF, each party hereto has executed this Assignment under seal as of the day and year first above written.

**WITNESS or ATTEST:**

**ASSIGNOR:**
**TOWN OF SYKESVILLE**

By: _____ (SEAL)
Name: Ian Shaw
Title: Mayor
Date: _____

**WARFIELD DEVELOPMENT CORPORATION**

By: _____ (SEAL)
Name: James B. Rees
Title: President
Date: _____

**ASSIGNEE:**
**WARFIELD COLLABORATIVE, LLC**

By: _____ (SEAL)
Name: _____
Title: _____
Date: _____

0007.077N\general assignment 05.30.14

## GENERAL ASSIGNMENT
## EXHIBIT A

### Description of Land

**ALL OF THOSE PARCELS OF LAND** situate the Town of Sykesville, Carroll County, Maryland, being known and designated as Parcel A, Parcel B, Parcel C, Parcel D, Parcel D-1, Parcel E, Parcel F, Parcel H and Parcel G, as shown on the subdivision plat entitled "Warfield Commerce and Cultural Center, Town of Sykesville, 5th Election District, Carroll County, Maryland", dated March 17, 2009 by The Wilson T. Ballard Company, recorded among the Land Records in Plat Book 51, Pages 187 through and including 202.

4

## GENERAL ASSIGNMENT
## EXHIBIT B

### Seller's Contracts to be assumed by Purchaser

1. Right of Entry Agreement dated March 11, 2013, by and between the Town, WDC and Maryland Department of Natural Resources.

2. Mowing Agreement with Absolute Landscape & Turf Services, Inc. dated 2/14/2014 and accepted 3/5/2014.

**EXHIBIT H-1**

**TOWN /SHA MOU**

Initials 

EXHIBIT H-1

RECEIVED

SEP 2 7 2010

TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

## MEMORANDUM OF UNDERSTANDING
## FOR MAINTENANCE RESPONSIBILITIES ALONG

RECEIVED

JUN 25 2010

TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

MD Route 32
By and Between
The Town of Sykesville
And
Maryland State Highway Administration

**THIS MEMORANDUM OF UNDERSTANDING (MOU),** executed in duplicate, made and entered into this 23rd day of June of, 2010, by and between the Town of Sykesville, Maryland, hereinafter called **"Town,"** a political subdivision of the State of Maryland and Maryland State Highway Administration Department of Transportation, acting for and on behalf of the State of Maryland, hereinafter called **"SHA".**

**WHEREAS,** the community, desires to install two brick "Warfield Commerce & Cultural Center" 5' 8" in height and 48'in length along the east side of MD 32; north side of Springfield Avenue 22' from the face of curb and south side of Springfield Avenue 30' from the face of curb. SHA and the Town agree that the Signs will be a benefit to all parties of the MOU and will promote the safety, health and general welfare of the citizens of the Town and the State.

**GENERAL**

A.    The parties hereto agree to cooperate with each other to accomplish the terms and conditions of this MOU.

B.    This MOU shall inure to and be binding upon the parties hereto, their respective agents, successors and assigns.

C.    This MOU and the rights and liabilities of the parties hereto shall be determined in accordance with Maryland law.

D.    If the Town fails to provide the required maintenance activities referenced herein, SHA shall notify in writing the Town that it is in default and that the signs may be removed. The Town shall have thirty (30) days to respond to this notification. If no response is received at the end of the 30-day period, SHA shall further inform the Town that the signs shall be removed and the cost incurred shall be the responsibility of the Town.

E.    The Town is responsible for 100% of removal and or relocation costs. Moreover, any modification or replacement of the signs must be approved by SHA.

F.    If SHA needs right of way for future road improvements the Town shall be responsible to remove the signs prior to our notice to proceed date.

IN WITNESS WHEREOF, the parties hereto have cause for this Agreement to be executed, in duplicate, by their proper and duly authorized officers, on the day and year first above written.

1

RECEIVED

SEP 2 7 2010

TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

The Town of Sykesville

RECEIVED

JUN 25 2010

TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

By: _____
Matthew H. Candland
Town Manager

BEFORE ME, THE UNDERSIGNED Notary Public of the State of Maryland, in and for the aforesaid County, personally appeared on this _3rd_ day of _September_ , 2010, _Matthew H. Candland_ , who acknowledged the execution of the aforementioned Agreement to be the true, lawful and voluntary act of The Town of Sykesville.

AS WITNESS MY HAND AND NOTARIAL SEAL, this _3rd_ day of _September_ , 2010.

_Dinah B. Riley_
Notary Public

My Commission expires: _October 5, 2012_

---

### STATE HIGHWAY ADMINISTRATION

By: _____
David J. Coyne, District Engineer

BEFORE ME, THE UNDERSIGNED Notary Public of the State of Maryland, in and for the aforesaid County, personally appeared on this _24th_ day of _September_, 2010, _David Coyne_ , District Engineer for the State Highway Administration to the Department of Transportation of the State of Maryland, who acknowledged the execution of the aforementioned Agreement to be the true, lawful and voluntary act of the State Highway Administration.

AS WITNESS MY HAND AND NOTARIAL SEAL, this _24th_ day of _September_, 2010.

_Patricia M. Wilkinson_
Notary Public

My Commission expires;
_12\30\13_

2

## Sign Maintenance Checklist

*Introduction*

The Maryland State Highway Administration (SHA) has developed a Project Maintenance Checklist for the Signs that provide local jurisdictions with post-construction maintenance required in the vicinity of the Signs. The types of maintenance activities to executed by the Town on a routine basis, include but are not limited to:

> Mowing in the area adjacent to the signs.
> Weeding and mulching planting beds.
> Watering grass, trees and plantings as needed.
> Removal of stakes, wires and/or supports for plant material.
> Pruning trees and shrubs as required.
> Replacing plant materials as required.
> Clean up and trash removal in area adjacent to the signs.
> Repair and maintenance of sign and any incidental items as required.

The Town may be required to perform any number of the above listed maintenance activities as deemed necessary throughout the year, in addition to the general routine maintenance, at the discretion of the SHA.

*Purpose*

This document, along with a signed Memorandum of Understanding (MOU), is designed to provide the maintenance responsibilities and guidelines for SHA and the Town for an individual construction project. This document will insure that the improvements are maintained after construction and acceptance as envisioned by the design.

It is expected that this document will be attached to the signed MOU and will be filed with the Town and in the applicable SHA office. Long term, it is expected that this document will be amended as items or issues arise on projects.



RECEIVED
SEP 27 2010
TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

RECEIVED
JUN 25 2010
TOWN OF SYKESVILLE
OFFICE OF TOWN MANAGER

3

EXHIBIT H-2

**TOWN/WDC MOU**

Initials 

EXHIBIT H-2

## MEMORANDUM OF UNDERSTANDING
## FOR MAINTENANCE RESPONSIBILITIES ALONG

MD Route 32
By and Between
The Town of Sykesville
And
Warfield Development Corporation

**THIS MEMORANDUM OF UNDERSTANDING** (the "Agreement"), executed in duplicate, made and entered into this _3ed_ of ~~August~~ September 2010, by and between **THE TOWN OF SYKESVILLE**, Maryland (the "Town"), a political subdivision of the State of Maryland, 7547 Main Street, Sykesville, Maryland 21784, Attn: Town Manager and **WARFIELD DEVELOPMENT CORPORATION**, a Maryland non-profit corporation, 7547 Main Street, Sykesville, Maryland 21784, Attn: WDC Board Chairman ("WDC").

### RECITALS

**WHEREAS**, by Master Ground Lease ("Ground Lease") dated January 27, 2006 and the recorded among the Land Records of Carroll County in Book 4299, Page 0182, WDC leases from the Town all that property described therein known as the "Warfield Commerce & Cultural Center"; and

**WHEREAS**, WDC desires to install within the right of way of Maryland Route 32 two brick "Warfield Commerce & Cultural Center" brick entrance feature signs (the "Signs"), 5' 8" in height and 48' in length along the east side of MD 32; north side of Springfield Avenue 22' from the face of the curb, and south side of Springfield Avenue 30' from the face of the curb; and

**WHEREAS,** to assist and accommodate WDC, the Town entered into a Memorandum of Understanding dated effective June 23, 2010, with the State Highway Administration of the State of Maryland ("SHA") (the "MOU"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference, pursuant to which the Town was granted permission to erect the Signs subject to the terms and conditions set forth in the MOU; and

**WHEREAS**, WDC has agreed to undertake and fulfill all the duties and obligations of the Town under the MOU; and

**NOW, THEREFORE, WITNESSETH,** for good and valuable consideration, receipt of which is hereby acknowledged, the parties agree to the following:

1.    The Recitals are hereby incorporated by reference as a substantive part of this Agreement.

2.    WDC shall perform all duties and acts and fulfill all responsibilities and obligations of the Town owed or undertaken by the Town under the MOU at WDC's sole cost and expense, including, but not limited to: (1) the construction and installation of the Signs in accordance with approved plans, (2) maintenance of the signs in accordance with the Sign

1

Maintenance Checklist appended and attached to the MOU, and (3) removal of the signs if required pursuant to the MOU.

3.    WDC agrees to indemnify and hold harmless the Town from any and all claims, demands, losses, causes of action, damage, lawsuits, judgments, including attorneys' fees and costs, arising out of or relating to the fulfillment of the MOU between the SHA and the Town.

4.    In the event WDC fails to perform its duties in accordance with the terms of this Agreement and remains uncured thirty (30) days after written notice of such default from the Town to WDC, then the Town shall have the remedy the default and WDC shall be responsible for all costs and expenses incurred by the Town in connection therewith.

5.    Notwithstanding the above, if the Town receives notice of default under the MOU from SHA, the Town will endeavor to promptly provide a copy of such notice to WDC and WDC shall remedy such default within the lesser of (i) ten (10) days from receipt of such notice or (2) the remaining time to remedy and cure the default under the notice received from SHA notice and the MOU.

6.    All notices required herein shall be in writing and hand-delivered or mailed to the parties at the addresses set forth above.  A party may, by proper notice to the other, change the address at which future notices shall be delivered.

7.    This Agreement shall inure to and be binding upon the parties hereto, their respective agents, successors and assigns.

8.    This Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with Maryland law.

**IN WITNESS WHEREOF**, the parties hereto have cause for this Agreement to be executed, in duplicate by their proper and duly authorized officers, on the day and year first above written.

WITNESS/ATTEST

*Derick B. Riley*

WITNESS/ATTEST

TOWN:
**THE TOWN OF SYKESVILLE**
The Town of Sykesville,
a political subdivision of the State of Maryland

By: _____
    Matthew H. Candland, Town Manager

WDC:
**WARFIELD DEVELOPMENT CORPORATION**
a Maryland non-profit corporation

By: _____
Name: James B. Rees
Title: President

0007.077A/MOU btw Sykesville and Warfield 081110.doc

2

# EXHIBIT I

## PARCEL I UTILITY EASEMENT

Initials



WARFIELD COMMERCE AND
CULTURAL CENTER
PLAT BOOK D.B.S. 51
PAGES 187-202
SHEETS 12 & 16 OF 16

TOWN OF SYKESVILLE
LIBER 2610, FOLIO 696
LIBER 3562, FOLIO 465

PINEY RUN

EXISTING 15' WIDE RIGHT OF WAY
FOR SANITARY SEWER LINE

WARFIELD
PARK
PARCEL

EXISTING 100 YEAR
FLOOD PLAIN EASEMENT

EXISTING 20' WIDE RIGHT OF WAY
FOR CARROLL COUNTY SEWER LINE

S 64°17'42" E
114.03'

N 07°45'22" W
9.49'

N 82°14'39" E
105.61'

S 39°18'02" E
62.51'

S 83°54'13" W
57.71'

ELECTRIC
SUBSTATION
PARCEL I

N 82°14'39" E
60.51'

MASTER GROUND LEASE LINE
LIBER 4299, FOLIO 182

294.11'

N 07°45'19" W

S 83°54'13" W

WARFIELD AVENUE
RIGHT OF WAY LINE

MATCH MARK SEE SHEET 2 OF 2

RIGHT OF WAY LINE

RIGHT OF WAY

E. MAIN STREET

668.80'

S 18°15' W

RIGHT OF WAY LINE

SURVEYOR'S CERTIFICATION:

I HEREBY CERTIFY THAT THE PROPERTY LINES SHOWN
HEREON ARE CORRECT TO THE BEST OF MY KNOWLEDGE,
INFORMATION AND BELIEF BASED ON THE RECORD
DESCRIPTIONS THEREOF, AND THE FIELD SURVEY
PERFORMED BY THE WILSON T. BALLARD COMPANY
UNDER MY DIRECT SUPERVISION. THIS PLAT AND
THE SURVEY UPON WHICH IT IS BASED ARE IN
COMPLIANCE WITH THE MARYLAND MINIMUM
STANDARDS OF PRACTICE FOR LAND SURVEYORS IN
EFFECT AS OF AUGUST 1, 2005. THIS PLAT WAS PREPARED
WITHOUT THE BENEFIT OF A CURRENT TITLE EXAMINATION
REPORT.

ROBERT L. GREEN II
MARYLAND PROFESSIONAL LAND SURVEYOR
REGISTRATION NO. 21174

SHEET 1 OF 2

WARFIELD COMMERCE AND CULTURAL CENTER

TOWN OF SYKESVILLE

5TH ELECTION DISTRICT     CARROLL COUNTY, MARYLAND

PARCEL I AND VARIABLE WIDTH RIGHT OF WAY
FOR TELEPHONE AND ELECTRIC LINES

SCALE:
1"=60'

DATE:
JAN. 13, 2011

JOB NO.:
0800-068.76

THE WILSON T. BALLARD COMPANY
17 GWYNNS MILL COURT
OWINGS MILL, MD 21117
TEL. 410-363-0150
FAX. 410-363-7811

STATE OF MARYLAND
Robert L. Green II
PROFESSIONAL LAND SURVEYOR
NO. 21174

ROBERT L. GREEN II
MD. REGISTRATION NO. 21174

FILE NO. RSUBWARF.DGN

NAD 83/91



VARIABLE WIDTH RIGHT OF WAY
FOR TELEPHONE AND ELECTRIC
LINES

| | | |
|---|---|---|
| 1 | S78°22'38"E | 21.13' |
| 2 | S30°28'10"W | 42.32' |
| 3 | S10°10'07"W | 200.70' |
| 4 | S27°32'43"W | 48.71' |
| 5 | S81°11'12"E | 51.83' |
| 6 | R=890.00' | L=20.04' |
| | CHD S05°05'01"W | 20.04' |
| 7 | N81°11'12"W | 44.74' |
| 8 | S53°48'48"W | 7.07' |
| 9 | N81°11'12"W | 31.27' |
| 10 | N08°48'48"E | 25.00' |
| 11 | S81°11'12"E | 6.76' |
| 12 | N27°32'43"E | 52.43' |
| 13 | N10°10'07"E | 201.22' |
| 14 | N30°28'10"E | 39.08' |

7620 SQ. FT. OR 0.1749 AC.

PARCEL D

WARFIELD COMMERCE AND
CULTURAL CENTER
PLAT BOOK D.B.S. 51
PAGES 187-202
SHEET 11 OF 16

SHEET 2 OF 2

# WARFIELD COMMERCE AND CULTURAL CENTER

TOWN OF SYKESVILLE

5TH ELECTION DISTRICT    CARROLL COUNTY, MARYLAND

PARCEL I AND VARIABLE WIDTH RIGHT OF WAY
FOR TELEPHONE AND ELECTRIC LINES

SCALE:
1"=60'

DATE:
JAN. 13, 2011

JOB NO.:
0800-068.76

THE WILSON T. BALLARD COMPANY
17 GWYNNS MILL COURT
OWINGS MILL, MD 21117
TEL. 410-363-0150
FAX. 410-363-7811

STATE OF MARYLAND
ROBERT L. GREEN II
PROFESSIONAL LAND SURVEYOR
NO. 21174

ROBERT L. GREEN II
MD. REGISTRATION NO. 21174

FILE NO. RSISYWARF.DGN

**EXHIBIT J**

**LIST OF LEASES**

[to be provided during Inspection Period]

Initials 

# EXHIBIT J

## LIST OF LEASES

As of the Effective Date of the Agreement, the Property is currently encumbered by the following leases, subleases, licenses, concessions, agreements, contracts, and permits, written or oral, which entitle any person or entity to occupy or use space on the Property, and all amendments, modifications, supplements, extensions, and renewals thereof:

     1.     Lease dated January 27, 2005 by and between Warfield Development Corporation and KB Warfield, LLC for the premises known as Parcel D, Building "I", 6937 Warfield Avenue Sykesville, MD 21784 as more particularly described therein.  See also Side Letter dated 5/17/2007 regarding conversion to quarterly rental payments.

     2.     Lease dated as of _____, 2005 by and between Warfield Development Corporation and Carroll Dance Center, Inc. (the "Original CDC Lease"), (a) as amended by Amendment to Lease dated April 1, 2008, and (b) as amended by Second Amendment to Lease dated June 23, 2008, for the premises known as Building "H," 6933 Warfield Avenue, Sykesville, Maryland 21784, as more particularly described in the Original CDC Lease.  See also Letter dated November 24, 2010, exercising option for second 5 year term.

     3.     Lease dated June 17, 2011 by and between Warfield Development Corporation and Rising Phoenix Development, LLC (the "Original RPD Lease"), (a) as amended by First Amendment to Lease dated December 14, 2011, (b) as amended by Second Amendment to Lease dated as of March 15, 2012, (c) as amended by Third Amendment to Lease dated as of June 15, 2012, (d) as amended by Fourth Amendment to Lease dated April 25, 2013, (e) as assigned to G Building LLC pursuant to that certain Assignment and Assumption Agreement by and between Rising Phoenix Development, LLC and G Building LLC dated April 25, 2013, (f) as amended by Fifth Amendment to Lease dated June 30, 2013, and (g) as amended by Sixth Amendment to Lease dated September 30, 2013, for the Premises known as Parcel D, Building "G", as more particularly described in the Original RPD Lease.

     4.     Lease dated July 31, 2013 by and between Warfield Development Corporation and Warfield Collaborative, LLC for the premises known as Parcel D, Building "W", as more particularly described therein.

Initials

Date: *June 26, 2018*

## EXHIBIT K

**STATUS OF LEASES**

[to be provided during Inspection Period]

Initials 

## EXHIBIT K

**Status of Leases**
(Exceptions to Seller's representations and warranties made in Section 12.F as to Status of Leases)

1.     KB Warfield, LLC – No Exceptions

2.     Carroll Dance Center, Inc. – No Exceptions

3.     Rising Phoenix Development, LLC – No Exceptions, but see "Rent Commencement Date".  No other concessions, rebates, allowances or free rent.

4.     Warfield Collaborative, LLC – No Exceptions, but see "Rent Commencement Date".  No other concessions, rebates, allowances or free rent.

0007.077NExhibits to Agreement-Final\Exhibit K Status Of Leases 05.30.14

**EXHIBIT L**

**SELLER'S CONTRACTS**

[to be provided during Inspection Period]

Initials 

Piney Run Restoration

### RIGHT OF ENTRY

THIS RIGHT OF ENTRY AGREEMENT (the "Right of Entry"), made this __ll<sup>th</sup>__ day of __MARCH__ , 20**13** by and between the Town of Sykesville, a municipal corporation of the State of Maryland (the "Town"), and Warfield Development Corporation, a body corporate of the State of Maryland ("WDC") (the Town and WDC being hereinafter collectively referred to as the "Grantor") and the Maryland Department of Natural Resources (the "Grantee");

WITNESSETH, WHEREAS, Town is the owner of a certain parcel of real property situate and lying in Carroll County, Maryland, as more fully described in a deed dated June 25, 2003, from the State of Maryland to the use and benefit of the Department of Health and Mental Hygiene to Grantor and recorded among the Land Records of the aforesaid County at Liber 03562, folio 0465 (the "Land"); and

WHEREAS, WDC is the Lessee pursuant to the terms of that certain Master Ground Lease by and between the Town and WDC dated January 27, 2005 and recorded among the Land Records in Liber 4299, folio 182 (the "Master Ground Lease"), of all of that land in the Town of Sykesville, Carroll County, Maryland, as more particularly described in the Master Ground Lease (as amended from time to time), including that portion described below as the "Area"); and

WHEREAS, Grantee desires to enter a portion of the Land (the "Area") in those areas more particularly shown outlined on Exhibit A, attached hereto and made a part hereof for the purpose of restoring Piney Run and planting trees; and

WHEREAS, Grantor is willing to grant to Grantee a right of entry onto the Area, subject to the terms and conditions contained herein and subject to the operation and effect of any and all instruments and matters of record or in fact;

NOW, THEREFORE, in consideration of the mutual entry into this Right of Entry by the parties hereto, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties agree as follows.

Section I.        Grant of Right of Entry.

1.1.    Grantor hereby grants to Grantee a non-exclusive right to enter the Land in the Area outlined on Exhibit A, for and only for the purpose of land survey, construction of a stream restoration project along Piney Run within the Area and planting trees on and within the Area. This Right of Entry shall include the right to enter the Area by Grantee's contractors and agents

1

solely for the aforementioned purpose under the supervision and control of Grantee and in accordance with the terms and conditions of this Right of Entry.

      1.2.    Grantor reserves the right to continue to use the Land, including the Area, without limitation.

      1.3.    Grantee shall have the right of ingress or egress to the Area through the Land over existing roadways or driveways.

      1.4.    The granting of this Right of Entry does not convey to Grantee any interest in or to any mineral rights.

1.5.    This Right of Entry is subject to the operation and effect of any and all instruments or matters of record or in fact.

Section II.    Term.

2.1.    Grantee's Right of Entry shall be for a term of 1,810 days, beginning on the date this Right of Entry is fully executed by both parties ("Commencement Date") and terminating 1,810 days from the Commencement Date ("Termination Date"), at which time Grantee and any of its contractors, agents, servants, employees, licensees and/or invitees, shall vacate the Land and Area.

2.2.    Grantee shall notify the Town Manager of the Town (Dawn Ashbacher; telephone number (410)795-6390), at least three (3) days prior to entry onto the Area, and immediately if any unusual conditions are encountered.  Grantee shall provide the following information to the Town Manager during the aforesaid notification:

        a.     Access Routes to and from the work area.

        b.     Type, size, and number of vehicles and crews to be used to conduct the work.

        c.     A copy of all plans, drawings, permits, etc.

Section III.    Use of Premises.

3.1.    Compliance with Laws.    Grantee shall be responsible for obtaining and delivering copies of all permits, licenses, inspections and approvals required for its use and operation on the Land and the Area.  Grantee's use of the Land and the Area shall be in compliance with the requirements of all applicable Federal, State and local laws, ordinances, rules and regulations.

3.2.    Grantee agrees that Grantor and/or Town Manager reserves the right to order the immediate cessation of work in the event Grantee fails to abide by any condition herein contained or any conditions or requirements contained in permitting procedures, unless corrective action is initiated by Grantee within twenty-four (24) hours following telephonic notification to Grantee by Grantor, and Grantee diligently pursues such corrective action thereafter until completion.

3.3.    Repair.    Upon completion of work on the Land and Area, Grantee agrees to repair any damage and to restore any disturbed areas to existing grade and in a condition equal to or better than the original condition.

3.4.    Grantee agrees that there shall be no use or spraying of pesticides and/or herbicides on the Land or the Area without prior permission from the Grantor.

3.5.    Grantee agrees that any and all trimming of trees, cutting of timber and/or clearing of the Land and the Area will be reviewed and inspected by the Town Manager, before any work is initiated, to insure that all such cutting, etc., is within the Area.

3.6.    Grantee agrees that there shall be no burning, burial or disposal of any waste or excess materials, of any kind, on the Land or Area.

3.7.    Grantee shall not place, hold, store, discharge, deposit, release, or dispose of any Hazardous Material, as herein defined, under, at, on or in the Area or Land.  "Hazardous Material" means and includes any hazardous substance or any pollutant or contaminant defined as such in, or for the purpose of, the Comprehensive Environmental Response, Compensation and Liability Act 1980, 42 U.S.C. 9601 et seq., as amended, any so-called "Superfund" or

3

"Superlien" law, the Toxic Substance Control Act, 15 U.S.C. 1601 et seq., or any other Federal, State, or local statue, law, ordinance, code, rule, regulation, order, or decree relating to imposing standards of conduct regarding, or imposing liability for hazardous substances, materials, or waste.

Section IV.    Indemnification.

4.1.    Indemnification of Grantor.    Grantee shall be responsible for, and shall defend, indemnify and hold harmless the Grantor, and their respective, members, officers, agents, and employees against and from, any and all liability or claim of liability for personal injury, death or property damage (including reasonable attorneys' fees) arising out of the use, occupancy, conduct, operation or management of the Area during the Term by Grantee or its agents, contractors, servants, employees, subtenants, licensees, or invitees including but not limited to: (a) any breach or default by Grantee in performing any of their obligations under the provisions of this Right of Entry or applicable law, or (b) any negligent or intentionally tortious act or omission. Grantee agrees that indemnification as described in this section shall further mean and include indemnification of any injury or harm occurring as a result of Grantee's use and occupancy of the Area pursuant to this Right of Entry, even if the injury does not become apparent or does not manifest until after expiration of this Right of Entry.

4.2.    Insurance. Grantee shall require any contractor or subcontractor which they or their contractor(s) retain to obtain in conjunction with the work permitted under this right of entry maintains (a) Commercial General Liability (CGL) insurance against loss or liability arising from bodily injury, death, and/or property damage or destruction, occurring within Area or Land arising out of the use thereof by the contractor, its subcontractors, employees, agents or invitees under one or more policies, with a limit of not less that $1,000,000 each occurrence and $1,000,000 aggregate coverage, and (b) workers compensation insurance as may be required by applicable law. All such insurance shall name each of the Town and WDC as additional insureds on the policies, and proof of the required insurance shall be made by submitting to the Grantor certificates of insurance prior to commencing any work permitted hereunder.

Section V.    General.

5.1.    Effectiveness. This Right of Entry shall become effective on and only on its execution and delivery by each party hereto.

5.2.    Amendment.    This Right of Entry may be amended by and only by an instrument executed and delivered by each party hereto.

5.3.    Applicable law.    This Right of Entry shall be given effect and construed by application of the law of Maryland.

5.4.    Exhibits.    Each writing or plat referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto is hereby made a part hereof.

5.5.    Assignment.    Grantee shall not be permitted to assign or in any manner transfer its rights and obligations under this Right of Entry without obtaining the prior written consent of Grantor, which may be granted or withheld in Grantor's sole discretion.

5.6. Termination for Convenience.    This Right of Entry may be terminated by Grantor in accordance with this clause in whole, or from time to time in part, whenever Grantor determines that such termination shall be in the best interest of the State of Maryland .

[SIGNATURES APPEAR ON FOLLOWING PAGE]

4

IN WITNESS WHEREOF, Grantor and Grantee have hereunto set their hands and seals in the day and year above written.

WITNESS:

Date: _March 14, 2013_

GRANTOR:
Town of Sykesville

BY: _____(SEAL)
       Michael Miller, Mayor

Warfield Development Corporation

BY:_____(SEAL)
       James B. Rees, President

Date:_____

WITNESS:

GRANTEE:
Maryland Department of Natural Resources

Date:_____

BY:_____(SEAL)
       Matthew Fleming
       Director
       Chesapeake and Coastal Services

Approved as to legal form and
sufficiency this _____ day of
_____, 20___.

_____
Assistant Attorney General

Approved as to legal form and
sufficiency this _____ day of
_____, 20___.

_____
Town Attorney for the Town of Sykesville

5

IN WITNESS WHEREOF, Grantor and Grantee have hereunto set their hands and seals in the day and year above written.

WITNESS:

GRANTOR:
Town of Sykesville

BY: _____ (SEAL)
Michael Miller, Mayor

Date: _____

Warfield Development Corporation

BY: _____ (SEAL)
James B. Rees, President

Date: 3/20/13

WITNESS:

GRANTEE:
Maryland Department of Natural Resources

BY:_____(SEAL)
            Matthew Fleming
            Director
            Chesapeake and Coastal Services

Date:_____

Approved as to legal form and
sufficiency this _____ day of
_____, 20__.

_____
Assistant Attorney General

Approved as to legal form and
sufficiency this _____ day of
_____, 20__.

_____
Town Attorney for the Town of Sykesville

5



**LANDSCAPE & TURF SERVICES, INC.**

## 2014 MOWING AGREEMENT

### TERMS & CONDITIONS

Absolute Landscape & Turf Services, Inc. will not be liable for any weather related delays or total inability to provide service and will provide no credits for delays or failed performance related to same. Client agrees to pay **$95.00 for termination** of the contract prior to its natural termination. Absolute Landscape & Turf Services Inc., is not responsible for any damages to unforeseen object on property. Any perceived damages by Absolute Landscape & Turf Services, Inc., must be sent in writing within 15 days of incident or deemed waived. Absolute Landscape & Turf Services, Inc. reserves the right to add a 5% gas surcharge, applied monthly, should fuel prices rise significantly above current prices.

Absolute Landscape & Turf Services, Inc., agrees to provide invoices of balances owed by Client. Payments for the invoiced work shall be received within fifteen days of the invoiced date. If payment is not received within fifteen days of the invoice date, all Absolute Landscape and Turf Services, Inc. services may be cancelled. Receivables that are fifteen days past due will accrue interest at a rate of one and one-half percent (1.5%) per month or 18% per annum or the highest rate permitted by applicable law. If Absolute Landscape and Turf Services, Inc. would need to retain an attorney to collect any receivables, the client will be liable for attorney fees, court costs, and any other expenses incurred by the Contractor in collecting amounts past due. A $25.00 charge will apply for any returned checks.

### ACCEPTANCE

The above specified work; terms and cost are satisfactory and herby accepted, payment to be made as outlined above.

Printed Name: _JAMES B. REES_

Authorized Signature: _____

Date of acceptance: _3/5/14_

**Respectfully submitted by:**

Ken Keck
Maintenance Division Manager
Phone: (410)-984-5603
Ken@AbsoluteScapes.com

Absolute Landscape & Turf Services, Inc.
1430 Buckhorn Road
Sykesville, MD 21784
Phone: (410) 795.9300
Fax: (410) 795.5551
MDA#28959
MHIC#101248



## 2014 MOWING AGREEMENT

### TERMS & CONDITIONS

Absolute Landscape & Turf Services, Inc. will not be liable for any weather related delays or total inability to provide service and will provide no credits for delays or failed performance related to same. Client agrees to pay $95.00 for termination of the contract prior to its natural termination. Absolute Landscape & Turf Services Inc., is not responsible for any damages to unforeseen object on property. Any perceived damages by Absolute Landscape & Turf Services, Inc., must be sent in writing within 15 days of incident or deemed waived.   Absolute Landscape & Turf Services, Inc. reserves the right to add a 5% gas surcharge, applied monthly, should fuel prices rise significantly above current prices.

Absolute Landscape & Turf Services, Inc., agrees to provide invoices of balances owed by Client. Payments for the invoiced work shall be received within fifteen days of the invoiced date.  If payment is not received within fifteen days of the invoice date, all Absolute Landscape and Turf Services, Inc. services may be cancelled. Receivables that are fifteen days past due will accrue interest at a rate of one and one-half percent (1.5%) per month or 18% per annum or the highest rate permitted by applicable law.  If Absolute Landscape and Turf Services, Inc. would need to retain an attorney to collect any receivables, the client will be liable for attorney fees, court costs, and any other expenses incurred by the Contractor in collecting amounts past due. A $25.00 charge will apply for any returned checks.

### ACCEPTANCE

**The above specified work; terms and cost are satisfactory and herby accepted, payment to be made as outlined above.**

Printed Name: JAMES B. REES

Authorized Signature: _(signature)_

Date of acceptance: 3/5/14

**Respectfully submitted by:**

Ken Keck
Maintenance Division Manager
Phone: (410)-984-5603
Ken@AbsoluteScapes.com

Absolute Landscape & Turf Services, Inc.
1430 Buckhorn Road
Sykesville, MD 21784
Phone: (410) 795.9300
Fax: (410) 795.5551
MDA#28959
MHIC#101248

EXHIBIT M

EXISTING MORTAGE DEBT DOCUMENTS

[to be provided during Inspection Period]

Initials 

## EXHIBIT M

## EXISTING MORTGAGE DEBT DOCUMENTS

As of the Effective Date of the Agreement, the Property is currently encumbered by liens of deeds of trust and loan obligations in favor of the following parties, and all amendments, modifications, supplements, extensions, and renewals thereof:

(1)    The County Commissioners of Carroll County, Maryland in the original principal amount of One Million Ninety Seven Thousand Six Hundred Eighty Dollars ($1,097,680), together with accrued interest, as evidence by that certain Promissory Note dated February 16, 2005, and secured by that certain Deed of Trust and Assignment of Leases and Rents dated February 16, 2005 and recorded in the Land Records of Carroll County at Liber 4328, Folio 0001.

(2)    The County Commissioners of Carroll County, Maryland in the original principal amount of One Hundred Fifty Thousand Dollars ($150,000), together with accrued interest, as evidenced by that certain Promissory Note dated December 14, 2011 (Unsecured).

(3)    The Town of Sykesville in the original principal amount of One Hundred Forty Four Thousand Nine Hundred Dollars ($144,900), together with accrued interest, as evidenced by that certain Promissory Note dated February 1, 2005 and secured by that certain Leasehold Deed of Trust and Assignment of Leases and Rents (unrecorded) dated February 1, 2005.

(4)    The Town of Sykesville in the original principal amount of Ninety Thousand Dollars ($90,000), together with accrued interest, as evidenced by (i) that certain Promissory Note dated November 6, 2013 (Unsecured).

(5)    The Industrial Development Authority of Carroll County, using funds provided by the State of Maryland's Department of Business and Economic Development, in the original principal amount of Four Million Dollars ($4,000,000), together with accrued interest, as evidenced by (i) that certain Promissory Note dated February 1, 2005, and (ii) that certain Loan Agreement dated February 1, 2005, and secured by (x) that certain Indemnity Deed of Trust and Assignment of Leases and Rents dated February 1, 2005 and recorded in the Land Records of Carroll County at Liber 4323, Folio 420 and (y) that certain Leasehold Deed of Trust and Assignment of Leases and Rents at Liber 4323, folio 448.

Initials

Date: June 26, 2018

## EXHIBIT N

**Form of Promissory Note**

**[to be agreed upon during Inspection Period]**

Initials 

EXHIBIT O

Form of Purchase Money Deed of Trust

[to be agreed upon during Inspection Period]

Initials 

EXHIBIT P

Parcel D Preservation Agreement

[to be agreed upon during the Inspection Period; provided, however, that the Preservation Schedule, attached hereto as "Exhibit P - Attachment A", shall be incorporated by reference in and made a part of the Parcel D Preservation Agreement]

Initials 

**Warfield Project**
**Parcel D Preservation Escrow Fund**
**Schedule and Allocations**

I.    **Basic Information**

A.    **Contributions**

| Seller Commitment | $2,100,000 -- Matching Amount<br>$  250,000 -- Public Project<br>                    Escrow Component<br>$2,350,000 -- Total Commitment |
|---|---|
| Purchaser Commitment | $2,100,000 -- Matching Amount<br>$  250,000 -- Flexible Stabilization Funds[1]<br>$2,350,000 -- Total Commitment |
| Minimum Funds committed for Parcel D Buildings A, B, C, D, E, F, G, L, W and Auditorium | $4,200,000 -- Matching Amount<br>$  250,000 -- Flexible Stabilization Funds<br>$4,450,000 -- Amount committed<br>                    to Parcel D Buildings |

B.    **Building Area**

| Total Building Area Subject to Parcel D Escrow Fund (the "Building Area") | 155,328 sq. ft. |
|---|---|

C.    **Total Allocations (Seller Escrow + Purchaser Commitment)**

| Stabilization and Preservation | $3,106,560 |
|---|---|
| Cold Dark Shell | $1,093,440 |
| Flexible Stabilization Funds (see also Footnote 1) | $  250,000 |
| **Total** | **$4,450,000** |

II.    **Authorized Expenditure Categories**

A.    *Stabilization and Preservation* -- Preserving and minimizing further deterioration of the building from the elements, including costs related to (a) work performed on the roof, gutters, envelope, drainage and foundation, (b) clean-up and vegetation, (c) engineering and architectural reports[2] related to building stabilization, preservation, and adaptive re-use , e.g. structural, feasibility, storm water management, and (d) security.

---

[1]    Purchaser shall be entitled to spend the Flexible Stabilization Funds ($250,000) for any eligible cost set forth within the Authorized Expenditure Categories in Section II.A (Stabilization and Preservation) at any time.

[2]    Release of Project D Escrow Funds for payment under Section II.A.(c) shall not exceed $350,000 without approval by Seller. .

1

B.  *Cold Dark Shell* – Preparing the base buildings for tenant build-out and occupancy, asbestos and lead paint addressed to EPA standards, delivering utilities, parking lot paving and improvements, interior demolition of non-historic elements and window repair.

## III.  Allocations

| Expenditure Category | Target Completion of Expenditures | | |
|---|---|---|---|
| | **Years 1-4** | **Years 5-7** | **Years 8-12** |
| A.  Stabilization & Preservation | A minimum of 75% of the Building Area shall be completed and Purchaser shall be reimbursed up to $10/sq. ft. (for example, reimbursement of $1,164,960 from Escrow to Purchaser as buildings are completed: reimbursed amounts to be matched by $10/sq. ft. from Purchaser commitment)[3] | 100% of the Building Area shall be completed and Purchaser shall be reimbursed up to $10/sq. ft. (total reimbursement from Escrow to Purchaser of $1,553,280 at 100%) | N/A |
| B.  Cold Dark Shell | A minimum of 53,000 sq. ft. of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $186,560 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) | A minimum of 98,516 sq. ft. of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $160,216 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) | 100% of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $199,944 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) |

---

[3]    Purchaser shall use commercially reasonable efforts to have Stabilization and Preservation components for (i) Building G and Building W completed within 2 years of Closing and Buildings and (ii) Building E and Building F completed within 4 years of Closing.

Note: During Years 1 – 12, if portions of Parcel D are improved by Purchaser investments for preservation, preparation and improvements, and buildings or portions of Parcel D revert to Seller and that building or portion of the site which reverted to Seller is subsequently sold or leased to other parties within 3 years of the reversion date, then Purchaser shall be reimbursed by Seller for the direct bona fide out of pocket third party cost of improvements (including engineering and architectural reports) on those buildings or portions of the site incurred by Purchaser prior to the date of reversion as substantiated by invoice (the "Purchaser Direct Costs"); provided, however, that the Purchaser Direct Costs shall be paid solely from the net proceeds of such sale or lease and only after recoupment in full by Seller of those direct bona fide out of pocket third party cost of improvements on those buildings or portions of the site incurred by Seller after the date of the reversion as substantiated by invoice.. In case of reversion of a building, then access to or copies of any engineering and architectural reports, evaluations and designs regarding that building that were supported in part by reimbursement from the Preservation Escrow Fund, shall be provided to the Seller within 30 days of reversion.

3

EXHIBIT <u>Q</u>

Parcel D Escrow Agreement

[to be agreed upon during the Inspection Period; provided, however, that the Preservation
Schedule, attached hereto as "Exhibit <u>Q</u> - Attachment A", shall be incorporated
by reference in and made a part of the Parcel D Escrow Agreement]

Initials 

**Warfield Project**
**Parcel D Preservation Escrow Fund**
**Schedule and Allocations**

I.    **Basic Information**

A.    **Contributions**

| Seller Commitment | $2,100,000 – Matching Amount<br>$   250,000 – Public Project<br>                        Escrow Component<br>$2,350,000 – Total Commitment |
|---|---|
| Purchaser Commitment | $2,100,000 – Matching Amount<br>$   250,000 – Flexible Stabilization<br>Funds[1]<br>$2,350,000 – Total Commitment |
| Minimum Funds committed for Parcel D Buildings A, B, C, D, E, F, G, L, W and Auditorium | $4,200,000 – Matching Amount<br>$   250,000 – Flexible Stabilization<br>Funds<br>$4,450,000 – Amount committed<br>                        to Parcel D Buildings |

B.    **Building Area**

| Total Building Area Subject to Parcel D Escrow Fund (the "Building Area") | 155,328 sq. ft. |
|---|---|

C.    **Total Allocations (Seller Escrow + Purchaser Commitment)**

| Stabilization and Preservation | $3,106,560 |
|---|---|
| Cold Dark Shell | $1,093,440 |
| Flexible Stabilization Funds (see also Footnote 1) | $  250,000 |
| **Total** | **$4,450,000** |

II.    **Authorized Expenditure Categories**

A.    *Stabilization and Preservation* – Preserving and minimizing further deterioration of the building from the elements, including costs related to (a) work performed on the roof, gutters, envelope, drainage and foundation, (b) clean-up and vegetation,  (c) engineering and architectural reports[2] related to building stabilization, preservation, and adaptive re-use , e.g. structural, feasibility, storm water management, and (d) security.

---

[1]    Purchaser shall be entitled to spend the Flexible Stabilization Funds  ($250,000) for any eligible cost set forth within the Authorized Expenditure Categories in Section II.A (Stabilization and Preservation) at any time.
[2]    Release of Project D Escrow Funds for payment under Section II.A.(c) shall not exceed $350,000 without approval by Seller. .

1

B.    *Cold Dark Shell* – Preparing the base buildings for tenant build-out and occupancy, asbestos and lead paint addressed to EPA standards, delivering utilities, parking lot paving and improvements, interior demolition of non-historic elements and window repair.

## III.    Allocations

| Expenditure Category | Target Completion of Expenditures | | |
|---|---|---|---|
| | **Years 1-4** | **Years 5-7** | **Years 8-12** |
| A.  Stabilization & Preservation | A minimum of 75% of the Building Area shall be completed and Purchaser shall be reimbursed up to $10/sq. ft. (for example, reimbursement of $1,164,960 from Escrow to Purchaser as buildings are completed: reimbursed amounts to be matched by $10/sq. ft. from Purchaser commitment)[3] | 100% of the Building Area shall be completed and Purchaser shall be reimbursed up to $10/sq. ft. (total reimbursement from Escrow to Purchaser of $1,553,280 at 100%) | N/A |
| B.  Cold Dark Shell | A minimum of 53,000 sq. ft. of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $186,560 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) | A minimum of 98,516 sq. ft. of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $160,216 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) | 100% of the Building Area shall be completed and Purchaser shall be reimbursed for expenditures of up to $3.52/sq. ft. of building area (reimbursement from Escrow to Purchaser of $199,944 as buildings are completed; reimbursed amounts to be matched by $3.52/sq. ft. from Purchaser commitment) |

---

[3]    Purchaser shall use commercially reasonable efforts to have Stabilization and Preservation components for (i) Building G and Building W completed within 2 years of Closing and Buildings and (ii) Building E and Building F completed within 4 years of Closing.

Note: During Years 1 – 12, if portions of Parcel D are improved by Purchaser investments for preservation, preparation and improvements, and buildings or portions of Parcel D revert to Seller and that building or portion of the site which reverted to Seller is subsequently sold or leased to other parties within 3 years of the reversion date, then Purchaser shall be reimbursed by Seller for the direct bona fide out of pocket third party cost of improvements (including engineering and architectural reports) on those buildings or portions of the site incurred by Purchaser prior to the date of reversion as substantiated by invoice (the "Purchaser Direct Costs"); provided, however, that the Purchaser Direct Costs shall be paid solely from the net proceeds of such sale or lease and only after recoupment in full by Seller of those direct bona fide out of pocket third party cost of improvements on those buildings or portions of the site incurred by Seller after the date of the reversion as substantiated by invoice.. In case of reversion of a building, then access to or copies of any engineering and architectural reports, evaluations and designs regarding that building that were supported in part by reimbursement from the Preservation Escrow Fund, shall be provided to the Seller within 30 days of reversion.